# EXHIBIT A

First issued by
The Baltic and International Maritime Council (BIMCO), Copenhagen in 1974
as "Barecon 'A'" and "Barecon 'B'". Revised and amalgamated 1989. Revised 2001

Printed by BIMCO's *idea*

Copyright, published by
The Baltic and International Maritime Council (BIMCO), Copenhagen. Issued November 2001

| | |
|---|---|
| 1. Shipbroker<br>**N/A** | **BIMCO STANDARD BAREBOAT CHARTER**<br>**CODE NAME: "BARECON 2001"**     **PART I** |
| | 2. Place and date<br>    **1 November**    **2017** |

| 3. Owners/Place of business (Cl. 1)<br>**Oriental Fleet International Company Limited**<br>**32/F, Tower 2, Kowloon Commerce Centre,**<br>**51 Kwai Cheong Road, Kwai Chung,**<br>**New Territories, Hong Kong** | 4. Bareboat Charterers/Place of business (Cl. 1)<br>**Folegandros Shipping Corporation**<br>**80 Broad Street, Monrovia, Liberia** |
|---|---|

| 5. Vessel's name, call sign and flag (Cl. 1 and 3)<br>**FOLEGANDROS, Hull No. H1426, Greek flag or any other approved flag** |
|---|

| 6. Type of Vessel<br>**LR2 Product Tanker** | 7. GT/NT<br>**To be confirmed** |
|---|---|

| 8. When/Where built<br>**2018, Shanghai Waigaoqiao Shipbuilding Co., Ltd.** | 9. Total DWT (abt.) in metric tons on summer freeboard<br>**To be confirmed** |
|---|---|

| 10. Classification Society (Cl. 3)<br>**Lloyds Register** | 11. Date of last special survey by the Vessel's classification society<br>**N/A** |
|---|---|

| 12. Further particulars of Vessel (also indicate minimum number of months' validity of class certificates agreed acc. to Cl. 3)<br>**Hull No.: H1426** |
|---|

| 13. Port or Place of delivery (Cl. 3)<br>**Worldwide (at any port or at high seas)** | 14. Time for delivery (Cl. 4)<br>**See Clause 34** | 15. Cancelling date (Cl. 5)<br>**See Clause 33** |
|---|---|---|

| 16. Port or Place of redelivery (Cl. 15)<br>**At a safe, ice free port when the Vessel would be afloat at all times** | 17. No. of months' validity of trading and class certificates upon redelivery (Cl. 15)<br><br>**Six (6) months** |
|---|---|

| 18. Running days' notice if other than stated in Cl. 4<br>**N/A** | 19. Frequency of dry-docking (Cl. 10(g))<br>**In accordance with Classification Society or flag state requirements** |
|---|---|

| 20. Trading limits (Cl. 6)<br>**Worldwide within Institute Warranty Limits, please also see clauses 46.1(n), 46.1(o) and 46.1(p)** |
|---|

| 21. Charter period (Cl. 2)<br>**See Clause 32** | 22. Charter hire (Cl. 11)<br>**See Clause 36** |
|---|---|

| 23. New class and other safety requirements (state percentage of Vessel's insurance value acc. to Box 29)(Cl. 10(a)(ii))<br>**N/A** |
|---|

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

| 24. Rate of interest payable acc. to Cl. 11 (f) and, if applicable, acc. to PART IV | 25. Currency and method of payment (Cl. 11) |
|---|---|
| **(a) in relation to the Pre-delivery Interest Charterhire, the rate of 6.00% per annum** <br> **(B) in relation to the Variable Charterhire, the rate of LIBOR for a 3 month period plus 4.60% per annum** <br> **See also Clause 36.11** | **USD/bank transfer** |

| 26. Place of payment; also state beneficiary and bank account (Cl. 11) | 27. Bank guarantee/bond (sum and place) (Cl. 24) (optional) |
|---|---|
| **Such account as the Owners may notify the Charterers from time to time** | **See Clause 24** |

| 28. Mortgage(s), if any (state whether 12(a) or (b) applies; if 12(b) applies state date of Financial Instrument and name of Mortgagee(s)/Place of business) (Cl. 12) | 29. Insurance (hull and machinery and war risks) (state value acc. to Cl. 13(f) or, if applicable, acc. to Cl. 14(k)) (also state if Cl. 14 applies) |
|---|---|
| **See Clause 12(b)** | **See Clause 38 – CLAUSE 14 DOES NOT APPLY** |

| 30. Additional insurance cover, if any, for Owners' account limited to (Cl. 13(b) or, if applicable, Cl. 14(g)) | 31. Additional insurance cover, if any, for Charterers' account limited to (Cl. 13(b) or, if applicable, Cl. 14(g)) |
|---|---|
| **See Clause 38** | **N/A** |

| 32. Latent defects (only to be filled in if period other than stated in Cl. 3) | 33. Brokerage commission and to whom   payable (Cl. 27) |
|---|---|
| **N/A** | **N/A** |

| 34. Grace period (state number of clear ~~banking days~~**Business Days**) (Cl. 28) | 35. Dispute Resolution (state 30(a), 30(b) or 30(c); if 30(c) agreed Place of Arbitration must be stated (Cl. 30) |
|---|---|
| **N/A** | **See Clause 30(a)** |

| 36. War cancellation (indicate countries agreed) (Cl. 26(f)) |
|---|
| **N/A** |

| 37. Newbuilding Vessel (indicate with "yes" or "no"   whether PART III applies) (optional) | 38. Name and place of Builders (only to be filled in if PART III applies) |
|---|---|
| **No, Part III does not apply** | **N/A** |

| 39. Vessel's Yard Building No. (only to be filled in if PART III applies) | 40. Date of Building Contract (only to be filled in if PART III applies) |
|---|---|
| **N/A** | **N/A** |

| 41. Liquidated damages and costs shall accrue to (state party acc. to Cl. 1) |
|---|
| a)    **N/A** |
| b)    **N/A** |
| c)    **N/A** |

| 42. Hire/Purchase agreement (indicate with "yes" or "no" whether PART IV applies) (optional) | 43. Bareboat Charter Registry (indicate with "yes" or "no" whether PART V applies) (optional) |
|---|---|
| **No, Part IV does not apply** | **No, Part V does not apply** |

| 44.Flag and Country of the Bareboat Charter Registry (only to be filled in if PART V applies) | 45. Country of the Underlying Registry (only to be filled in if PART V applies) |
|---|---|
| **N/A** | **N/A** |

| 46. Number of additional clauses covering special provisions, if agreed |
|---|
| **Clause 32 to Clause 56** |

PREAMBLE - It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include PART I and PART II. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II to the extent of such conflict but no further. It is further mutually agreed that PART III and/or PART IV and/or PART V shall only apply and only form part of this Charter if expressly agreed and stated in Boxes 37, 42 and 43. If PART III and/or PART IV and/or PART V apply, it is further agreed that in the event of a conflict of conditions, the provisions of PART I and PART II shall prevail over those of PART III and/or PART IV and/or PART V to the extent of such conflict but no further.

This document is a computer generated BARECON 2001 form printed by authority of BIMCO.   Any insertion or deletion to the form must be clearly visible.   In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply.   BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| For and on behalf of<br>Oriental Fleet International Company Limited<br><br><br>Name: *Jiang Zhong*   *Li Bing*<br>Title: *Director* | For and on behalf of<br>Folegandros Shipping Corporation<br><br>_____<br>Name:<br>Title: |

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| For and on behalf of | For and on behalf of |
| Oriental Fleet International Company Limited | Folegandros Shipping Corporation |
| | |
| _____ | |
| Name: | Name: |
| Title: | Title: I.J. KARASTAMATI |
| | *Vice President, Secretary and Director* |

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**1. Definitions** — 1

In this Charter, the following terms shall have the — 2
meanings hereby assigned to them: — 3
*"The Owners"* shall mean the party identified in Box 3; — 4
*"The Charterers"* shall mean the party identified in Box 4; — 5
*"The Vessel"* shall mean the vessel named in Box 5 and — 6
with particulars as stated in Boxes 6 to 12. — 7
*"Financial Instrument"* ~~means the mortgage, deed of~~ — 8
~~covenant or other such financial security instrument as~~ — 9
~~annexed to this Charter and stated in Box 28~~ **has the** — 10
**meaning ascribed to such term in Clause 56.** — 10

**2. Charter Period** — 11

In consideration of the hire detailed in Box 22, — 12
the Owners have agreed to let and the Charterers have — 13
agreed to hire the Vessel for the period stated in Box 21 — 14
~~("The Charter Period").~~ **See also Clause 32.** — 15

**3. Delivery** — 16

*(not applicable when Part III applies, as indicated in Box 37)* — 17
~~**(a)** The Owners shall before and at the time of delivery~~ — 18
~~exercise due diligence to make the Vessel seaworthy~~ — 19
~~And in every respect ready in hull, machinery and~~ — 20
~~equipment for service under this Charter.~~ — 21
The Vessel shall be delivered by the Owners and taken — 22
over by the Charterers at the port or place indicated in — 23
Box 13 ~~in such ready safe berth as the Charterers may~~ — 24
~~direct.~~ — 25
**(b)** The Vessel shall be properly documented on — 26
delivery in accordance with the laws of the flag State — 27
indicated in Box 5 and the requirements of the — 28
classification society stated in Box 10. ~~The Vessel upon~~ — 29
~~delivery shall have her survey cycles up to date and~~ — 30
~~trading and class certificates valid for at least the number~~ — 31
~~of months agreed in Box 12.~~ — 32
**(c)** The delivery of the Vessel by the Owners and the — 33
taking over of the Vessel by the Charterers shall — 34
constitute a full performance by the Owners of all the — 35
Owners' obligations under this Clause 3, and thereafter — 36
the Charterers shall not be entitled to make or assert — 37
any claim against the Owners on account of any — 38
conditions, representations or warranties expressed or — 39
implied with respect to the Vessel ~~but the Owners shall~~ — 40
~~be liable for the cost of but not the time for repairs or~~ — 41
~~renewals occasioned by latent defects in the Vessel,~~ — 42
~~her machinery or appurtenances, existing at the time of~~ — 43
~~delivery under this Charter, provided such defects have~~ — 44
~~manifested themselves within twelve (12) months after~~ — 45
~~delivery unless otherwise provided in Box 32.~~ — 46

**4. Time for Delivery (see Clauses 32 and 34)** — 47

*~~(not applicable when Part III applies, as indicated in Box 37)~~* — 48
~~The Vessel shall not be delivered before the date~~ — 49
~~indicated in Box 14 without the Charterers' consent and~~ — 50
~~the Owners shall exercise due diligence to deliver the~~ — 51
~~Vessel not later than the date indicated in Box 15.~~ — 52
~~Unless otherwise agreed in Box 18, the Owners shall~~ — 53
~~give the Charterers not less than thirty (30) running days'~~ — 54
~~preliminary and not less than fourteen (14) running days'~~ — 55
~~definite notice of the date on which the Vessel is~~ — 56
~~expected to be ready for delivery.~~ — 57
~~The Owners shall keep the Charterers closely advised~~ — 58
~~of possible changes in the Vessel's position.~~ — 59

**5. Cancelling (See Clause 33)** — 60

*~~(not applicable when Part III applies, as indicated in Box 37)~~* — 61
~~**(a)** Should the Vessel not be delivered latest by the~~ — 62
~~cancelling date indicated in Box 15, the Charterers shall~~ — 63
~~have the option of cancelling this Charter by giving the~~ — 64
~~Owners notice of cancellation within thirty-six (36)~~ — 65
~~running hours after the cancelling date stated in Box~~ — 66
~~15, failing which this Charter shall remain in full force~~ — 67
~~and effect.~~ — 68
~~**(b)** If it appears that the Vessel will be delayed beyond~~ — 69
~~the cancelling date, the Owners may, as soon as they~~ — 70
~~are in a position to state with reasonable certainty the~~ — 71
~~day on which the Vessel should be ready, give notice~~ — 72

~~thereof to the Charterers asking whether they will~~ — 73
~~exercise their option of cancelling, and the option must~~ — 74
~~then be declared within one hundred and sixty-eight~~ — 75
~~(168) running hours of the receipt by the Charterers of~~ — 76
~~such notice or within thirty-six (36) running hours after~~ — 77
~~the cancelling date, whichever is the earlier. If the~~ — 78
~~Charterers do not then exercise their option of cancelling,~~ — 79
~~the seventh day after the readiness date stated in the~~ — 80
~~Owners' notice shall be substituted for the cancelling~~ — 81
~~date indicated in Box 15 for the purpose of this Clause 5.~~ — 82
~~**(c)** Cancellation under this Clause 5 shall be without~~ — 83
~~prejudice to any claim the Charterers may otherwise~~ — 84
~~have on the Owners under this Charter.~~ — 85

**6. Trading Restrictions (See also Clauses 46.1(o),** — 86
**46.1(n) and 46.1(p))** —

The Vessel shall be employed in lawful trades for the — 87
carriage of suitable lawful merchandise **operating** within — 88
the trading —
limits indicated in Box 20. — 89
The Charterers undertake not to employ the Vessel or — 90
suffer the Vessel to be employed otherwise than in — 91
conformity with the terms of the contracts of insurance — 92
(including any warranties expressed or implied therein) — 93
without first obtaining the consent of the insurers to such — 94
employment and complying with such requirements as — 95
to extra premium or otherwise as the insurers may — 96
prescribe. — 97
The Charterers also undertake not to employ the Vessel — 98
or suffer her employment in any trade or business which — 99
is forbidden by the law of any country to which the Vessel — 100
may sail or is otherwise illicit or in carrying illicit or — 101
prohibited goods or in any manner whatsoever which — 102
may render her liable to condemnation, destruction, — 103
seizure or confiscation. — 104
Notwithstanding any other provisions contained in this — 105
Charter it is agreed that nuclear fuels or radioactive — 106
products or waste are specifically excluded from the — 107
cargo permitted to be loaded or carried under this — 108
Charter. This exclusion does not apply to radio-isotopes — 109
used or intended to be used for any industrial, — 110
commercial, agricultural, medical or scientific purposes — 111
provided the Owners' prior approval has been obtained — 112
to loading thereof. — 113

**7. Surveys on ~~Delivery and~~ Redelivery** — 114

*(not applicable when Part III applies, as indicated in Box 37)* — 115
The Owners and Charterers shall each appoint — 116
surveyors for the purpose of determining and agreeing — 117
in writing the condition of the Vessel at the time of — 118
~~delivery and~~ redelivery hereunder **unless the Vessel is** — 119
**sold to the Charterers**. ~~The Owners shall~~ — 
~~bear all expenses of the On-hire Survey including loss~~ — 120
~~of time, if any, and T~~the Charterers shall bear all — 121
expenses —
of the Off-hire Survey ~~including loss of time, if any,~~ at — 122
the daily equivalent to the rate of hire or pro rata thereof. — 123

**8. Inspection** — 124

The Owners shall have the right ~~at any time,~~ **once every** — 125
**calendar year provided no Potential Termination** —
**Event or Termination Event has occurred or at any** —
**time following the occurrence of a Potential** —
**Termination Event or Termination Event and for as** —
**long as it is continuing,** after giving, **in each case,** —
**reasonable** notice **(which shall be reasonable if no** —
**Termination Event has occurred and is continuing)** to — 126
the Charterers to inspect or survey —
the Vessel or instruct a duly authorised surveyor to carry — 127
out such survey on their behalf:- — 128
**(a)** to ascertain the condition of the Vessel and satisfy — 129
themselves that the Vessel is being properly repaired — 130
and maintained. **If (i) such inspection or survey is** — 131
**conducted during the period commencing on the** —
**Commencement Date and ending on the fifth** —
**anniversary thereof and (ii) the Owners have** —

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

determined in their sole discretion that the Vessel is being properly repaired and maintained, ~~Tt~~he costs and fees for such inspection

or survey shall be paid by the Owners. **If (i) such inspection or survey is conducted during the period commencing on the Commencement Date and ending on the fifth anniversary thereof and (ii) the Owners have determined in their sole discretion that the Vessel is not being properly repaired and maintained, the costs and fees for such inspection or survey shall be paid by the Charterers. If (i) such inspection or survey is conducted anytime falling after the fifth anniversary of the Commencement Date, the costs and fees for such inspection or survey shall be paid by the Charterers**~~unless the Vessel~~ 132

~~is found to require repairs or maintenance in order to~~ 133
~~achieve the condition so provided;~~ 134
**(b)** in dry-dock if the Charterers have not dry-docked 135
Her in accordance with Clause 10(g). The costs and fees 136
for such inspection or survey shall be paid by the 137
Charterers; and 138
**(c)** for any other commercial reason they consider 139
necessary **acting reasonably** (provided **that, if no** 140
**Potential Termination Event or Termination Event has occurred or is continuing,** it does not unduly interfere with

the commercial operation of the Vessel). The **reasonable** 141
costs and
fees for such inspection and survey shall be paid by the 142
~~Owners~~**Charterers.** 143
All time lost in respect of inspection, survey or repairs 144
shall be for the Charterers' account and form part of the 145
Charter Period. 146
The Charterers shall also permit the Owners to inspect 147
the Vessel's log books whenever requested and shall 148
whenever required by the Owners furnish them with full 149
information regarding any casualties or other accidents 150
or damage to the Vessel. 151

**9. Inventories, Oil and Stores** 152
A complete inventory of the Vessel's entire equipment, 153
outfit including **all bunkers, unused lubricating oils and greases in storage tanks, unopened drums,** spare 154
parts, appliances and of all
consumable stores on board the Vessel shall be made 155
by the Charterers in conjunction with the Owners on 156
delivery and again on redelivery of the Vessel. The 157
Charterers ~~and the Owners, respectively,~~ shall at the 158
time of delivery ~~and redelivery~~ take over ~~and pay for~~ all 159
bunkers, lubricating oil, unbroached provisions, paints, 160
ropes and other consumable stores (excluding spare 161
parts) in the said Vessel **if they have paid the price for such bunkers, lubricating oil, unbroached provisions, paints, ropes and other consumable stores to the Builder on or about the delivery of the Vessel from the Builder under the Shipbuilding Contract**~~at the then current market prices~~ 162
~~at the ports of delivery and redelivery, respectively.~~ The 163
Charterers shall ensure that all spare parts listed in the 164
inventory and used during the Charter Period are 165
replaced at their expense prior to redelivery of the 166
Vessel. 167

**10. Maintenance and Operation** 168
**(a)(i)**Maintenance and Repairs - During the Charter 169
Period the Vessel shall be in the full possession 170
and at the absolute disposal for all purposes of the 171
Charterers and under their complete control in 172
every respect. The Charterers shall maintain the 173
Vessel, her machinery, boilers, appurtenances and 174
spare parts in a good state of repair, in efficient 175
operating condition and in accordance with good 176
commercial maintenance practice and, ~~except as~~ 177
~~provided for in~~ Clause 14(l), if applicable, at their 178
own expense they shall at all times keep the 179

Vessel's Class fully up to date with the Classification 180
Society indicated in Box 10 and maintain all other 181
necessary certificates in force at all times. 182
**(ii)** New Class and Other Safety Requirements - In the 183
event of any improvement, structural changes or 184
new equipment becoming necessary for the 185
continued operation of the Vessel by reason of new 186
class requirements or by compulsory legislation 187
~~costing (excluding the Charterers' loss of time)~~ 188
~~more than the percentage stated in Box 23, or if~~ 189
~~Box 23 is left blank, 5 per cent. of the Vessel's~~ 190
~~insurance value as stated in Box 29, then the~~ 191
~~extent, if any, to which the rate of hire shall be varied~~ 192
~~and the ratio in which the cost of compliance shall~~ 193
~~be shared between the parties concerned in order~~ 194
~~to achieve a reasonable distribution thereof as~~ 195
~~between the Owners and the Charterers having~~ 196
~~regard, inter alia, to the length of the period~~ 197
~~remaining under this Charter shall, in the absence~~ 198
~~of agreement, be referred to the dispute resolution~~ 199
~~method agreed in Clause 30,~~ **the costs of compliance shall be for the Charterers' account.** 200
**(iii)** Financial Security - The Charterers shall maintain 201
financial security or responsibility in respect of third 202
party liabilities as required by any government, 203
including federal, state or municipal or other division 204
or authority thereof, to enable the Vessel, without 205
penalty or charge, lawfully to enter, remain at, or 206
leave any port, place, territorial or contiguous 207
waters of any country, state or municipality in 208
performance of this Charter without any delay. This 209
obligation shall apply whether or not such 210
requirements have been lawfully imposed by such 211
government or division or authority thereof. 212
The Charterers shall make and maintain all arrange- 213
ments by bond or otherwise as may be necessary to 214
satisfy such requirements at the Charterers' sole 215
expense and the Charterers shall indemnify the Owners 216
against all consequences whatsoever (including loss of 217
time) for any failure or inability to do so. 218
**(b)** Operation of the Vessel - The Charterers shall at 219
their own expense and by their own procurement man, 220
victual, navigate, operate, supply, fuel and, whenever 221
required, repair the Vessel during the Charter Period 222
and they shall pay all charges and expenses of every 223
kind and nature whatsoever incidental to their use and 224
operation of the Vessel under this Charter, including 225
annual flag State fees and any foreign general 226
municipality and/or state taxes. The Master, officers 227
and crew of the Vessel shall be the servants of the Charterers 228
for all purposes whatsoever, even if for any reason 229
appointed by the Owners. 230
Charterers shall comply with the regulations regarding 231
officers and crew in force in the country of the Vessel's 232
flag or any other applicable law. 233
**(c)** The Charterers shall keep the Owners and the 234
mortgagee(s) advised of the intended employment, 235
planned dry-docking and major repairs of the Vessel, 236
as reasonably required. 237
**(d)** Flag and Name of Vessel – During the Charter 238
Period, the Charterers shall have the liberty to paint the 239
Vessel in their own colours, install and display their 240
funnel insignia and fly their own house flag. The 241
Charterers shall also have the liberty, with the Owners' 242
consent, **and which, subject to Clause 41.4, shall be deemed to be granted in the case of Marshall Islands or Liberian flag or any other flag selected by the Charterers and approved by the Owners** ~~which shall not be unreasonably withheld,~~ to 243
change the flag and name of the Vessel during 244
the Charter Period. Painting and re-painting, instalment 245
and re-instalment, registration and re-registration, if 246
required by the Owners, shall be at the Charterers' 247
expense and time. 248
**(e)** Changes to the Vessel – Subject to Clause 10(a)(ii), 249

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

the Charterers shall make no structural changes in the Vessel or changes in the machinery, boilers, appurtenances or spare parts thereof without in each instance first securing the Owners' approval thereof **(such approval not to be unreasonably withheld or delayed)**. If the Owners so agree, the Charterers shall, if the Owners so require, restore the Vessel to its former condition ~~before the termination of this Charter~~.

**(f)** Use of the Vessel's Outfit, Equipment and Appliances - The Charterers shall have the use of all outfit, equipment, and appliances on board the Vessel at the time of delivery, provided the same or their substantial equivalent shall be returned to the Owners on redelivery in the same good order and condition as when received, ordinary wear and tear excepted. The Charterers shall from time to time during the Charter Period replace such items of equipment as shall be so damaged or worn as to be unfit for use. The Charterers are to procure that all repairs to or replacement of any damaged, worn or lost parts or equipment be effected in such manner (both as regards workmanship and quality of materials) as not to diminish the value of the Vessel. **Title of any equipment so replaced shall remain with the Owners.** The Charterers have the right to fit additional equipment at their expense and risk **(provided that no permanent structural damage is caused to the Vessel by reason of such installation) and**~~but~~ the Charterers shall, **at their expense,** remove such equipment and **make good any damage caused by the fitting or removal of such additional equipment before the Vessel is redelivered to the Owners**~~at the end of the period~~ if requested by the Owners. Any equipment including radio equipment on hire on the Vessel at time of delivery shall be kept and maintained by the Charterers and the Charterers assume the obligations and liabilities of the Owners under any lease contracts in connection therewith and shall reimburse the Owners for all expenses incurred in connection therewith, also for any new equipment required in order to comply with radio regulations.

**(g)** Periodical Dry-Docking - The Charterers shall dry-dock the Vessel and clean and paint her underwater parts whenever the same may be necessary, but not less than once during the period stated in Box 19 or, if Box 19 has been left blank, every sixty (60) calendar months after delivery or such other period as may be required by the Classification Society or flag State.

**11.** **Hire** **(See Clause 36)**
~~(a) The Charterers shall pay hire due to the Owners punctually in accordance with the terms of this Charter in respect of which time shall be of the essence.~~
~~(b) The Charterers shall pay to the Owners for the hire of the Vessel a lump sum in the amount indicated in Box 22 which shall be payable not later than every thirty (30) running days in advance, the first lump sum being payable on the date and hour of the Vessel's delivery to the Charterers. Hire shall be paid continuously throughout the Charter Period.~~
~~(c) Payment of hire shall be made in cash without discount in the currency and in the manner indicated in Box 25 and at the place mentioned in Box 26.~~
~~(d) Final payment of hire, if for a period of less than thirty (30) running days, shall be calculated proportionally according to the number of days and hours remaining before redelivery and advance payment to be effected accordingly.~~
~~(e) Should the Vessel be lost or missing, hire shall cease from the date and time when she was lost or last heard of. The date upon which the Vessel is to be treated as lost or missing shall be ten (10) days after the Vessel was last reported or when the Vessel is posted as~~

~~missing by Lloyd's, whichever occurs first. Any hire paid in advance to be adjusted accordingly.~~
~~(f) Any delay in payment of hire shall entitle the Owners to interest at the rate per annum as agreed in Box 24. If Box 24 has not been filled in, the three months Interbank offered rate in London (LIBOR or its successor) for the currency stated in Box 25, as quoted by the British Bankers' Association (BBA) on the date when the hire fell due, increased by 2 per cent., shall apply.~~
~~(g) Payment of interest due under sub-clause 11(f) shall be made within seven (7) running days of the date of the Owners' invoice specifying the amount payable or, in the absence of an invoice, at the time of the next hire payment date.~~

**12.** **Mortgage**
~~(only to apply if Box 28 has been appropriately filled in)~~
~~*) (a) The Owners warrant that they have not effected any mortgage(s) of the Vessel and that they shall not effect any mortgage(s) without the prior consent of the Charterers, which shall not be unreasonably withheld.~~
*) **(b)** The Vessel chartered under this Charter **may be, at the Owners' option to be exercised in their full discretion,** ~~is~~ financed by ~~a~~ mortgage**(s)** according to the Financial Instrument**s**. The Charterers undertake to comply, and provide such information and documents to enable the Owners to comply, with all such instructions or directions in regard to the employment, insurances, operation, repairs and maintenance of the Vessel as laid down in the Financial Instrument**s** or as may be directed from time to time during the currency of the Charter by the mortgagee(s) in conformity with ~~the~~ **each** Financial Instrument **(if any)**. The Charterers **agree to acknowledge** ~~confirm that, for this purpose, they have acquainted themselves with~~ all relevant terms, conditions and provisions of ~~the~~ **each** Financial Instrument **(if any) and agree to** ~~acknowledge this~~ in writing in any form that may be required by the mortgagee(s) **provided that no provision of the Financial Instruments may be construed to create additional obligations on the Charterers by the mortgagee(s) beyond those stipulated in this Charter. However, if the mortgagee(s) raise a demand for any amendment to this Charter, the Owners and the Charterers shall enter into discussions in good faith to agree any such requested amendments.**~~The Owners warrant that they have not effected any mortgage(s) other than stated in Box 28 and that they shall not agree to any amendment of the mortgage(s) referred to in Box 28 or effect any other mortgage(s) without the prior consent of the Charterers, which shall not be unreasonably withheld.~~
~~*) (Optional, Clauses 12(a) and 12(b) are alternatives; indicate alternative agreed in Box 28).~~

**13.** **Insurance and Repairs** **(See also Clause 38)**
**(a)** **Subject to Clause 38,** ~~D~~during the Charter Period the Vessel shall be kept insured by the Charterers at their expense against hull and machinery, war and Protection and Indemnity risks (and any risks against which it is compulsory to insure for the operation of the Vessel, including **but not limited to** maintaining financial security in accordance with sub-clause 10(a)(iii)) in such form as the Owners shall in writing approve~~, which approval shall not be un-reasonably withheld~~. Such insurances shall be arranged by the Charterers to protect the interests of both the Owners and the Charterers and the mortgagee(s) (if any)~~.~~**,** ~~and The Charterers shall be at liberty to protect under such insurances the interests of any managers they may appoint.~~ Insurance policies shall cover the Owners and

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

the Charterers according to their respective interests. 372
Subject to the provisions of ~~the Financial Instrument, if~~ **the agreed loss payable clauses,** 373
~~any,~~ and the approval of the Owners and the insurers, 374
the Charterers shall effect all insured repairs and shall 375
undertake settlement and reimbursement from the 376
insurers of all costs in connection with such repairs as 377
well as insured charges, expenses and liabilities to the 378
extent of coverage under the insurances herein provided 379
for. 380
The Charterers also to remain responsible for and to 381
effect repairs and settlement of costs and expenses 382
incurred thereby in respect of all other repairs not 383
covered by the insurances and/or not exceeding any 384
possible franchise(s) or deductibles provided for in the 385
insurances. 386
All time used for repairs under the provisions of sub- 387
clause 13(a) and for repairs of latent defects according 388
to Clause 3(c) above, including any deviation, shall be 389
for the Charterers' account. 390
**(b)** ~~If the conditions of the above insurances permit~~ 391
~~additional insurance to be placed by the parties, such~~ 392
~~cover shall be limited to the amount for each party set~~ 393
~~out in Box 30 and Box 31, respectively. The~~ Owners or 394
~~the~~ Charterers ~~as the case may be~~ shall immediately 395
furnish the ~~other party~~**Owners** with particulars of any 396
additional
insurance effected, including copies of any cover notes 397
or policies and the written consent of the insurers of 398
any such required insurance in any case where the 399
consent of such insurers is necessary. 400
**(c)** The Charterers shall upon the request of the 401
Owners, provide information and promptly execute such 402
documents as may be required to enable the Owners to 403
comply with the insurance provisions of ~~the~~ **each** 404
Financial
Instrument **(if any)**. 405
**(d)** Subject to the provisions of the Financial Instru- 406
ments **and Clause 38 and Clause 40,** if any, should the 407
Vessel become ~~an actual,~~
~~constructive, compromised or agreed a~~ t**T**otal **lL**oss under 408
the insurances required under ~~sub-clause 13(a),~~ all 409
insurance payments for such loss shall be paid to the 410
Owners **(or if applicable, its financiers) in accordance** 411
**with the agreed loss payable clauses** ~~who shall~~
~~distribute the moneys between the~~
~~Owners and the Charterers according to their respective~~ 412
~~interests.~~ The Charterers undertake to notify the Owners 413
and the mortgagee(s), ~~if any,~~ of any occurrences in 414
consequence of which the Vessel is likely to become a 415
**T**total **L**loss ~~as defined in this Clause.~~ 416
**(e)** The Owners shall upon the request of the 417
Charterers, promptly execute such documents as may 418
be required to enable the Charterers to abandon the 419
Vessel to insurers and claim a constructive total loss 420
**provided that any constructive total loss shall be**
**reasonable and approved by the Owners (in their sole**
**discretion) and the Charterers shall provide to the**
**Owners all the relevant documents and information**
**relating to such constructive total loss during a**
**reasonable period.**
**(f)** For the purpose of insurance coverage against hull 421
and machinery and war risks under the provisions of 422
sub-clause 13(a), the value of the Vessel is the sum 423
indicated in ~~Box 29~~**Clause 38**. 424

**14. Insurance, Repairs and Classification – intentionally** 425
**omitted**
*(Optional, only to apply if expressly agreed and stated* 426
*in ~~Box 29,~~ in which event ~~Clause 13~~ shall be considered* 427
*deleted).* 428
~~(a) During the Charter Period the Vessel shall be kept~~ 429
~~insured by the Owners at their expense against hull and~~ 430
~~machinery and war risks under the form of policy or~~ 431
~~policies attached hereto. The Owners and/or insurers~~ 432

~~shall not have any right of recovery or subrogation~~ 433
~~against the Charterers on account of loss of or any~~ 434
~~damage to the Vessel or her machinery or appurt-~~ 435
~~enances covered by such insurance, or on account of~~ 436
~~payments made to discharge claims against or liabilities~~ 437
~~of the Vessel or the Owners covered by such insurance.~~ 438
~~Insurance policies shall cover the Owners and the~~ 439
~~Charterers according to their respective interests.~~ 440
~~(b) During the Charter Period the Vessel shall be kept~~ 441
~~insured by the Charterers at their expense against~~ 442
~~Protection and Indemnity risks (and any risks against~~ 443
~~which it is compulsory to insure for the operation of the~~ 444
~~Vessel, including maintaining financial security in~~ 445
~~accordance with sub-clause 10(a)(iii)) in such form as~~ 446
~~the Owners shall in writing approve which approval shall~~ 447
~~not be unreasonably withheld.~~ 448
~~(c) In the event that any act or negligence of the~~ 449
~~Charterers shall vitiate any of the insurance herein~~ 450
~~provided, the Charterers shall pay to the Owners all~~ 451
~~losses and indemnify the Owners against all claims and~~ 452
~~demands which would otherwise have been covered by~~ 453
~~such insurance.~~ 454
~~(d) The Charterers shall, subject to the approval of the~~ 455
~~Owners or Owners' Underwriters, effect all insured~~ 456
~~repairs, and the Charterers shall undertake settlement~~ 457
~~of all miscellaneous expenses in connection with such~~ 458
~~repairs as well as all insured charges, expenses and~~ 459
~~liabilities, to the extent of coverage under the insurances~~ 460
~~provided for under the provisions of sub-clause 14(a).~~ 461
~~The Charterers to be secured reimbursement through~~ 462
~~the Owners' Underwriters for such expenditures upon~~ 463
~~presentation of accounts.~~ 464
~~(e) The Charterers to remain responsible for and to~~ 465
~~effect repairs and settlement of costs and expenses~~ 466
~~incurred thereby in respect of all other repairs not~~ 467
~~covered by the insurances and/or not exceeding any~~ 468
~~possible franchise(s) or deductibles provided for in the~~ 469
~~insurances.~~ 470
~~(f) All time used for repairs under the provisions of~~ 471
~~sub-clauses 14(d) and 14(e) and for repairs of latent~~ 472
~~defects according to Clause 3 above, including any~~ 473
~~deviation, shall be for the Charterers' account and shall~~ 474
~~form part of the Charter Period.~~ 475
~~The Owners not to be responsible for any expenses~~ 476
~~as are incident to the use and operation of the Vessel~~ 477
~~for such time as may be required to make such repairs.~~ 478
~~(g) If the conditions of the above insurances permit~~ 479
~~additional insurance to be placed by the parties such~~ 480
~~cover shall be limited to the amount for each party set~~ 481
~~out in Box 30 and Box 31, respectively. The Owners or~~ 482
~~the Charterers as the case may be shall immediately~~ 483
~~furnish the other party with particulars of any additional~~ 484
~~insurance effected, including copies of any cover notes~~ 485
~~or policies and the written consent of the insurers of~~ 486
~~any such required insurance in any case where the~~ 487
~~consent of such insurers is necessary.~~ 488
~~(h) Should the Vessel become an actual, constructive,~~ 489
~~compromised or agreed total loss under the insurances~~ 490
~~required under sub-clause 14(a), all insurance payments~~ 491
~~for such loss shall be paid to the Owners, who shall~~ 492
~~distribute the moneys between themselves and the~~ 493
~~Charterers according to their respective interests.~~ 494
~~(i) If the Vessel becomes an actual, constructive,~~ 495
~~compromised or agreed total loss under the insurances~~ 496
~~arranged by the Owners in accordance with sub-clause~~ 497
~~14(a), this Charter shall terminate as of the date of such~~ 498
~~loss.~~ 499
~~(j) The Charterers shall upon the request of the~~ 500
~~Owners, promptly execute such documents as may be~~ 501
~~required to enable the Owners to abandon the Vessel~~ 502
~~to the insurers and claim a constructive total loss.~~ 503
~~(k) For the purpose of insurance coverage against hull~~ 504
~~and machinery and war risks under the provisions of~~ 505
~~sub-clause 14(a), the value of the Vessel is the sum~~ 506
~~indicated in Box 29.~~ 507

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

~~(l) Notwithstanding anything contained in sub-clause 10(a), it is agreed that under the provisions of Clause 14, if applicable, the Owners shall keep the Vessel's Class fully up to date with the Classification Society indicated in Box 10 and maintain all other necessary certificates in force at all times.~~ 508–513

**15. Redelivery See also Clauses 40.6 and 40.7** 514
At the expiration of the Charter Period the Vessel shall be redelivered by the Charterers to the Owners at a safe and ice-free port or place ~~as indicated in Box 16, in such ready safe berth~~ as the Owners may direct. ~~The Charterers shall give the Owners not less than thirty (30) running days' preliminary notice of expected date, range of ports of redelivery or port or place of redelivery and not less than fourteen (14) running days' definite notice of expected date and port or place of redelivery. Any changes thereafter in the Vessel's position shall be notified immediately to the Owners.~~ 515–525
The Charterers warrant that they will not permit the Vessel to commence ~~a voyage (including any preceding ballast voyage)~~ **any work or operation** which cannot reasonably be expected 526–528
to be completed in time to allow redelivery of the Vessel within the Charter Period, **subject always to the trading restrictions under Clause 6 and Clauses 46.1(n), 46.1(o) and 46.1(p).** Notwithstanding the above, should the Charterers fail to redeliver the Vessel within ~~T~~the Charter Period, the Charterers shall pay the daily equivalent to the rate of hire stated in Box 22 plus 10 per cent. or to the market rate, whichever is the higher, for the number of days by which the Charter Period is exceeded. All other terms, conditions and provisions of this Charter shall continue to apply. 529–537
Subject to the provisions of Clause 10, the Vessel shall, **without prejudice to the requirements set out in Clause 40.7,** 538
be redelivered to the Owners in the same or as good structure, state, condition and class as that in which she was delivered, fair wear and tear not affecting class excepted. 539–542
The Vessel upon redelivery shall have her survey cycles up to date and trading and class certificates valid for at least the number of months agreed in Box 17. 543–545

**16. Non-Lien** 546
The Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the Owners in the Vessel. The Charterers further agree to fasten to the Vessel in a conspicuous place and to keep so fastened during the Charter Period a notice reading as follows: 547–553
"This Vessel is the property of (name of Owners). It is under charter to (name of Charterers) and by the terms of the Charter Party neither the Charterers nor the Master have any right, power or authority to create, incur or permit to be imposed on the Vessel any lien whatsoever." 554–559

**17. Indemnity (See Clauses 37.3, 40.5, 41.2, 41.3, 41.4 and 51)** 560
~~(a) The Charterers shall indemnify the Owners against any loss, damage or expense incurred by the Owners arising out of or in relation to the operation of the Vessel by the Charterers, and any lien of whatsoever nature arising out of an event occurring during the Charter Period. If the Vessel be arrested or otherwise detained by reason of claims or liens arising out of her operation hereunder by the Charterers, the Charterers shall at their own expense take all reasonable steps to secure that within a reasonable time the Vessel is released, including the provision of bail. Without prejudice to the generality of the foregoing, the Charterers agree to indemnify the Owners against all consequences or liabilities arising from the Master,~~ 561–574

~~officers or agents signing Bills of Lading or other documents.~~ 575–576
~~(b) If the Vessel be arrested or otherwise detained by reason of a claim or claims against the Owners, the Owners shall at their own expense take all reasonable steps to secure that within a reasonable time the Vessel is released, including the provision of bail. In such circumstances the Owners shall indemnify the Charterers against any loss, damage or expense incurred by the Charterers (including hire paid under this Charter) as a direct consequence of such arrest or detention.~~ 577–586

**18. Lien** 587
The Owners to have a lien upon all cargoes, sub-hires and sub-freights belonging or due to the Charterers or any sub-charterers and any Bill of Lading freight for all claims under this Charter, ~~and the Charterers to have a lien on the Vessel for all moneys paid in advance and not earned.~~ 588–593

**19. Salvage** 594
All salvage and towage performed by the Vessel shall be for the Charterers' benefit and the cost of repairing damage occasioned thereby shall be borne by the Charterers. 595–598

**20. Wreck Removal** 599
In the event of the Vessel becoming a wreck or obstruction to navigation the Charterers shall indemnify the Owners against any sums whatsoever which the Owners shall become liable to pay and shall pay in consequence of the Vessel becoming a wreck or obstruction to navigation. 600–605

**21. General Average** 606
The Owners shall not contribute to General Average. 607

**22. Assignment, Sub-Charter and Sale** 608
**(a)** The Charterers shall not assign this Charter nor **(subject to Clause 46.1(m))** sub-charter the Vessel on a bareboat basis except with 609–610
the prior consent in writing of the Owners, which shall not be unreasonably withheld, and subject to such terms and conditions as the Owners shall approve. 611–613
~~(b) The Owners shall not sell the Vessel during the currency of this Charter except with the prior written consent of the Charterers, which shall not be unreason-ably withheld, and subject to the buyer accepting an assignment of this Charter.~~ 614–618
**(b) The Owners shall not sell the Vessel during the currency of this Charter except (i) with the prior written consent of the Charterers (such consent not to be unreasonably withheld or delayed), unless it is sold to an affiliate of the Owners in which case no consent is required, and subject to the buyer accepting an assignment of this Charter, (ii) on the occurrence of a Termination Event which is continuing and the Owners having provided the Termination Event Notice pursuant to Clause 44.2 or (iii) in accordance with Clauses 47 to 49.**

**23. Contracts of Carriage** 619
**\*)** **(a)** The Charterers are to procure that all documents issued during the Charter Period evidencing the terms and conditions agreed in respect of carriage of goods shall contain a paramount clause incorporating any legislation relating to carrier's liability for cargo compulsorily applicable in the trade; if no such legislation exists, the documents shall incorporate the Hague-Visby Rules. The documents shall also contain the New Jason Clause and the Both-to-Blame Collision Clause. 620–628
~~\*) (b) The Charterers are to procure that all passenger tickets issued during the Charter Period for the carriage of passengers and their luggage under this Charter shall~~ 629–631

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

contain a paramount clause incorporating any legislation 632

The Charterers undertake to furnish, **on or about the** 642
**date of this Charter,** before delivery of 643
the Vessel, a first class bank **a corporate** guarantee **from** 643
**the Guarantor** or bond in the
sum and at the place as indicated in Box 27 as guarantee 644
**and the other Security Documents (except for the** 645
**Account Security which can be signed before delivery**
**of the Vessel),** for full performance of their obligations
under this
Charter. 646

**25. Requisition/Acquisition** 647
**(a) Subject to the provisions of the Financial** 648
**Instruments (if any),** Iin the event of the Requisition for
Hire of the Vessel
by any governmental or other competent authority 649
(hereinafter referred to as "Requisition for Hire") 650
irrespective of the date during the Charter Period when 651
"Requisition for Hire" may occur and irrespective of the 652
length thereof and whether or not it be for an indefinite 653
or a limited period of time, and irrespective of whether it 654
may or will remain in force for the remainder of the 655
Charter Period, this Charter shall not be deemed thereby 656
or thereupon to be frustrated or otherwise terminated 657
and the Charterers shall continue to pay the stipulated 658
hire in the manner provided by this Charter until the time 659
when the Charter would have terminated pursuant to 660
any of the provisions hereof always provided however 661
that **if all hire has been paid by the Charterers** 662
**hereunder then** in the event of "Requisition for Hire" any
Requisition
Hire or compensation **is** received or receivable by the 663
Owners, **the same** shall be payable to the Charterers 664
during the
remainder of the Charter Period or the period of the 665
"Requisition for Hire" whichever be the shorter. 666
**(b) Subject to the other provisions of this Charter** 667
**and the Financial Instruments (if any),** Iin the event of
the Owners being deprived of their
ownership in the Vessel by any Compulsory Acquisition 668
of the Vessel or requisition for title by any governmental 669
or other competent authority (hereinafter referred to as 670
"Compulsory Acquisition"), then, irrespective of the date 671
during the Charter Period when "Compulsory Acqui- 672
sition" may occur, this Charter shall be deemed 673
terminated as of the date of such "Compulsory 674
Acquisition". In such event Charter Hire to be considered 675
as earned and to be paid up to the date and time of 676
such "Compulsory Acquisition". 677

**26. War** 678
**(a) Subject to the provisions of the Financial** 679
**Instruments (if any),** Ffor the purpose of this Clause, the
words "War
Risks" shall include any war (whether actual or 680
threatened), act of war, civil war, hostilities, revolution, 681
rebellion, civil commotion, warlike operations, the laying 682
of mines (whether actual or reported), acts of piracy, 683
acts of terrorists, acts of hostility or malicious damage, 684
blockades (whether imposed against all vessels or 685
imposed selectively against vessels of certain flags or 686
ownership, or against certain cargoes or crews or 687
otherwise howsoever), by any person, body, terrorist or 688
political group, or the Government of any state 689
whatsoever, which may be dangerous or are likely to be 690
or to become dangerous to the Vessel, her cargo, crew 691
or other persons on board the Vessel. 692
**(b)** The Vessel, unless the written consent of the 693
Owners be first obtained **Charterers have arranged for** 694
**requisition insurance in respect of the Vessel**, shall
not continue to or go
through any port, place, area or zone (whether of land 695
or sea), or any waterway or canal, where it reasonably 696
appears that the Vessel, her cargo, crew or other 697
persons on board the Vessel, in the reasonable 698

relating to carrier's liability for passengers and their 633
luggage compulsorily applicable in the trade; if no such 634
legislation exists, the passenger tickets shall incorporate 635
the Athens Convention Relating to the Carriage of 636
Passengers and their Luggage by Sea, 1974, and any 637
protocol thereto. 638
*) *Delete as applicable.* 639

**24.** Bank **Corporate** Guarantee 640
*(Optional, only to apply if Box 27 filled in)* 641

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being
made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss,
damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

judgement of the Owners, may be, or are likely to be, 699
exposed to War Risks. Should the Vessel be within any 700
such place as aforesaid, which only becomes danger- 701
ous, or is likely to be or to become dangerous, after her 702
entry into it, the Owners shall have the right to require 703
the Vessel to leave such area. 704
**(c)** The Vessel shall not load contraband cargo, or to 705
pass through any blockade, whether such blockade be 706
imposed on all vessels, or is imposed selectively in any 707
way whatsoever against vessels of certain flags or 708
ownership, or against certain cargoes or crews or 709
otherwise howsoever, or to proceed to an area where 710
she shall be subject, or is likely to be subject to 711
a belligerent's right of search and/or confiscation. 712
**(d)** If the insurers of the war risks insurance, when 713
Clause 14 is applicable, should require payment of 714
premiums and/or calls because, pursuant to the 715
Charterers' orders, the Vessel is within, or is due to enter 716
and remain within, any area or areas which are specified 717
by such insurers as being subject to additional premiums 718
because of War Risks, then such premiums and/or calls 719
shall be reimbursed by the Charterers to the Owners at 720
the same time as the next payment of hire is due. 721
**(e)** The Charterers shall have the liberty: 722
**(i)** to comply with all orders, directions, recommend- 723
ations or advice as to departure, arrival, routes, 724
sailing in convoy, ports of call, stoppages, 725
destinations, discharge of cargo, delivery, or in any 726
other way whatsoever, which are given by the 727
Government of the Nation under whose flag the 728
Vessel sails, or any other Government, body or 729
group whatsoever acting with the power to compel 730
compliance with their orders or directions; 731
**(ii)** to comply with the orders, directions or recom- 732
mendations of any war risks underwriters who have 733
the authority to give the same under the terms of 734
the war risks insurance; 735
**(iii)** to comply with the terms of any resolution of the 736
Security Council of the United Nations, any 737
directives of the European Community, the effective 738
orders of any other Supranational body which has 739
the right to issue and give the same, and with 740
national laws aimed at enforcing the same to which 741
the Owners are subject, and to obey the orders 742
and directions of those who are charged with their 743
enforcement. 744
**(f)** In the event of outbreak of war (whether there be a 745
declaration of war or not) (i) between any two or more 746
of the following countries: the United States of America; 747
Russia; the United Kingdom; France; and the People's 748
Republic of China, (ii) between any two or more of the 749
countries stated in Box 36, both the Owners and the 750
Charterers shall have the right to cancel this Charter, 751
whereupon the Charterers shall redeliver the Vessel to 752
the Owners in accordance with Clause 15, if the Vessel 753
has cargo on board after discharge thereof at 754
destination, or if debarred within this Clause from 755
reaching or entering it at a near, open and safe port as 756
directed by the Owners, or if the Vessel has no cargo 757
on board, at the port at which the Vessel then is or if at 758
sea at a near, open and safe port as directed by the 759
Owners. In all cases hire shall continue to be paid in 760
accordance with Clause 11 and except as aforesaid all 761
other provisions of this Charter shall apply until 762
redelivery. 763

**27. Commission – intentionally omitted** 764
The Owners to pay a commission at the rate indicated 765
in Box 33 to the Brokers named in Box 33 on any hire 766
paid under the Charter. If no rate is indicated in Box 33, 767
the commission to be paid by the Owners shall cover 768
the actual expenses of the Brokers and a reasonable 769
fee for their work. 770
If the full hire is not paid owing to breach of the Charter 771
by either of the parties the party liable therefor shall 772

indemnify the Brokers against their loss of commission. 773
Should the parties agree to cancel the Charter, the 774
Owners shall indemnify the Brokers against any loss of 775
commission but in such case the commission shall not 776
exceed the brokerage on one year's hire. 777

**28. Termination (See Clauses 40 and 44)** 778
**(a)** Charterers' Default 779
The Owners shall be entitled to withdraw the Vessel from 780
the service of the Charterers and terminate the Charter 781
with immediate effect by written notice to the Charterers if: 782
**(i)** the Charterers fail to pay hire in accordance with 783
Clause 11. However, where there is a failure to 784
make punctual payment of hire due to oversight, 785
negligence, errors or omissions on the part of the 786
Charterers or their bankers, the Owners shall give 787
the Charterers written notice of the number of clear 788
banking days stated in Box 34 (as recognised at 789
the agreed place of payment) in which to rectify 790
the failure, and when so rectified within such 791
number of days following the Owners' notice, the 792
payment shall stand as regular and punctual. 793
Failure by the Charterers to pay hire within the 794
number of days stated in Box 34 of their receiving 795
the Owners' notice as provided herein, shall entitle 796
the Owners to withdraw the Vessel from the service 797
of the Charterers and terminate the Charter without 798
further notice; 799
**(ii)** the Charterers fail to comply with the requirements of: 800
**(1)** Clause 6 (Trading Restrictions) 801
**(2)** Clause 13(a) (Insurance and Repairs) 802
provided that the Owners shall have the option, by 803
written notice to the Charterers, to give the 804
Charterers a specified number of days grace within 805
which to rectify the failure without prejudice to the 806
Owners' right to withdraw and terminate under this 807
Clause if the Charterers fail to comply with such 808
notice; 809
**(iii)** the Charterers fail to rectify any failure to comply 810
with the requirements of sub-clause 10(a)(i) 811
(Maintenance and Repairs) as soon as practically 812
possible after the Owners have requested them in 813
writing so to do and in any event so that the Vessel's 814
insurance cover is not prejudiced. 815
**(b)** Owners' Default 816
If the Owners shall by any act or omission be in breach 817
of their obligations under this Charter to the extent that 818
the Charterers are deprived of the use of the Vessel 819
and such breach continues for a period of fourteen (14) 820
running days after written notice thereof has been given 821
by the Charterers to the Owners, the Charterers shall 822
be entitled to terminate this Charter with immediate effect 823
by written notice to the Owners. 824
**(c)** Loss of Vessel 825
This Charter shall be deemed to be terminated if the 826
Vessel becomes a total loss or is declared as a 827
constructive or compromised or arranged total loss. For 828
the purpose of this sub-clause, the Vessel shall not be 829
deemed to be lost unless she has either become an 830
actual total loss or agreement has been reached with 831
her underwriters in respect of her constructive, 832
compromised or arranged total loss or if such agreement 833
with her underwriters is not reached it is adjudged by a 834
competent tribunal that a constructive loss of the Vessel 835
has occurred. 836
**(d)** Either party shall be entitled to terminate this 837
Charter with immediate effect by written notice to the 838
other party in the event of an order being made or 839
resolution passed for the winding up, dissolution, 840
liquidation or bankruptcy of the other party (otherwise 841
than for the purpose of reconstruction or amalgamation) 842
or if a receiver is appointed, or if it suspends payment, 843
ceases to carry on business or makes any special 844
arrangement or composition with its creditors. 845
**(e)** The termination of this Charter shall be without 846

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being
made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss,
damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

prejudice to all rights accrued due between the parties 847
prior to the date of termination and to any claim that 848
either party might have. 849

**29. Repossession** 850
In the event of the termination of this Charter in 851
accordance with the applicable provisions of ~~Clause 28~~**Clauses 40 and 44**, 852
the Owners shall have the right to repossess the Vessel 853
from the Charterers at her current or next port of call, or 854
at a port or place convenient to them without hindrance 855
or interference by the Charterers, courts or local 856
authorities. Pending physical repossession of the Vessel 857
in accordance with this Clause 29 **and Clause 40**, the 858
Charterers shall
hold the Vessel as gratuitous bailee only to the Owners 859
**and the Charterers shall procure that the master and**
**crew follow the orders and directions of the Owners**.
The Owners shall arrange for an authorised represent- 860
ative to board the Vessel as soon as reasonably 861
practicable following the termination of the Charter. The 862
Vessel shall be deemed to be repossessed by the 863
Owners from the Charterers upon the boarding of the 864
Vessel by the Owners' representative. All arrangements 865
and expenses relating to the settling of wages, 866
disembarkation and repatriation of the Charterers' 867
Master, officers and crew shall be the sole responsibility 868
of the Charterers. 869

**30. Dispute Resolution** 870
**\*) (a)** This Contract shall be governed by and construed 871
in accordance with English law. 872

**Any dispute, controversy, difference or claim arising**
**out of or relating to this Contract, including the**
**existence, validity, interpretation, performance,**
**breach or termination thereof or any dispute**
**regarding non-contractual obligations arising out of**
**or relating to it shall be referred to and finally**
**resolved by arbitration administered by the Hong**
**Kong International Arbitration Centre ("HKIAC")**
**under the HKIAC Administered Arbitration Rules in**
**force when the Notice of Arbitration is submitted.**

**The law of this arbitration clause shall be English law.**

**The seat of arbitration shall be Hong Kong.**

**The number of arbitrators shall be three. The**
**arbitration proceedings shall be conducted in**
**English.**

and any dispute arising
~~out of or in connection with this Contract shall be referred~~ 873
~~to arbitration in London in accordance with the Arbitration~~ 874
~~Act 1996 or any statutory modification or re-enactment~~ 875
~~thereof save to the extent necessary to give effect to~~ 876
~~the provisions of this Clause.~~ 877
~~The arbitration shall be conducted in accordance with~~ 878
~~the London Maritime Arbitrators Association (LMAA)~~ 879
~~Terms current at the time when the arbitration proceed-~~ 880
~~ings are commenced.~~ 881
~~The reference shall be to three arbitrators. A party~~ 882
~~wishing to refer a dispute to arbitration shall appoint its~~ 883
~~arbitrator and send notice of such appointment in writing~~ 884
~~to the other party requiring the other party to appoint its~~ 885
~~own arbitrator within 14 calendar days of that notice and~~ 886
~~stating that it will appoint its arbitrator as sole arbitrator~~ 887
~~unless the other party appoints its own arbitrator and~~ 888
~~gives notice that it has done so within the 14 days~~ 889
~~specified. If the other party does not appoint its own~~ 890
~~arbitrator and give notice that it has done so within the~~ 891
~~14 days specified, the party referring a dispute to~~ 892
~~arbitration may, without the requirement of any further~~ 893
~~prior notice to the other party, appoint its arbitrator as~~ 894
~~sole arbitrator and shall advise the other party~~ 895

~~accordingly. The award of a sole arbitrator shall be~~ 896
~~binding on both parties as if he had been appointed by~~ 897
~~agreement.~~ 898
~~Nothing herein shall prevent the parties agreeing in~~ 899
~~writing to vary these provisions to provide for the~~ 900
~~appointment of a sole arbitrator.~~ 901
~~In cases where neither the claim nor any counterclaim~~ 902
~~exceeds the sum of US$50,000 (or such other sum as~~ 903
~~the parties may agree) the arbitration shall be conducted~~ 904
~~in accordance with the LMAA Small Claims Procedure~~ 905
~~current at the time when the arbitration proceedings are~~ 906
~~commenced.~~ 907
**\*) (b)** ~~This Contract shall be governed by and construed~~ 908
~~in accordance with Title 9 of the United States Code~~ 909
~~and the Maritime Law of the United States and any~~ 910
~~dispute arising out of or in connection with this Contract~~ 911
~~shall be referred to three persons at New York, one to~~ 912
~~be appointed by each of the parties hereto, and the third~~ 913
~~by the two so chosen; their decision or that of any two~~ 914
~~of them shall be final, and for the purposes of enforcing~~ 915
~~any award, judgement may be entered on an award by~~ 916
~~any court of competent jurisdiction. The proceedings~~ 917
~~shall be conducted in accordance with the rules of the~~ 918
~~Society of Maritime Arbitrators, Inc.~~ 919
~~In cases where neither the claim nor any counterclaim~~ 920
~~exceeds the sum of US$50,000 (or such other sum as~~ 921
~~the parties may agree) the arbitration shall be conducted~~ 922
~~in accordance with the Shortened Arbitration Procedure~~ 923
~~of the Society of Maritime Arbitrators, Inc. current at~~ 924
~~the time when the arbitration proceedings are commenced.~~ 925
**\*) (c)** ~~This Contract shall be governed by and construed~~ 926
~~in accordance with the laws of the place mutually agreed~~ 927
~~by the parties and any dispute arising out of or in~~ 928
~~connection with this Contract shall be referred to~~ 929
~~arbitration at a mutually agreed place, subject to the~~ 930
~~procedures applicable there.~~ 931
~~(d) Notwithstanding (a), (b) or (c) above, the parties~~ 932
~~may agree at any time to refer to mediation any~~ 933
~~difference and/or dispute arising out of or in connection~~ 934
~~with this Contract.~~ 935
~~In the case of a dispute in respect of which arbitration~~ 936
~~has commenced under (a), (b) or (c) above, the~~ 937
~~following shall apply:-~~ 938
~~(i) Either party may at any time and from time to time~~ 939
~~elect to refer the dispute or part of the dispute to~~ 940
~~mediation by service on the other party of a written~~ 941
~~notice (the "Mediation Notice") calling on the other~~ 942
~~party to agree to mediation.~~ 943
~~(ii) The other party shall thereupon within 14 calendar~~ 944
~~days of receipt of the Mediation Notice confirm that~~ 945
~~they agree to mediation, in which case the parties~~ 946
~~shall thereafter agree a mediator within a further~~ 947
~~14 calendar days, failing which on the application~~ 948
~~of either party a mediator will be appointed promptly~~ 949
~~by the Arbitration Tribunal ("the Tribunal") or such~~ 950
~~person as the Tribunal may designate for that~~ 951
~~purpose. The mediation shall be conducted in such~~ 952
~~place and in accordance with such procedure and~~ 953
~~on such terms as the parties may agree or, in the~~ 954
~~event of disagreement, as may be set by the~~ 955
~~mediator.~~ 956
~~(iii) If the other party does not agree to mediate, that~~ 957
~~fact may be brought to the attention of the Tribunal~~ 958
~~and may be taken into account by the Tribunal when~~ 959
~~allocating the costs of the arbitration as between~~ 960
~~the parties.~~ 961
~~(iv) The mediation shall not affect the right of either~~ 962
~~party to seek such relief or take such steps as it~~ 963
~~considers necessary to protect its interest.~~ 964
~~(v) Either party may advise the Tribunal that they have~~ 965
~~agreed to mediation. The arbitration procedure shall~~ 966
~~continue during the conduct of the mediation but~~ 967
~~the Tribunal may take the mediation timetable into~~ 968
~~account when setting the timetable for steps in the~~ 969
~~arbitration.~~ 970

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

| | |
|---|---|
| **(vi)** Unless otherwise agreed or specified in the | 971 |
| mediation terms, each party shall bear its own costs | 972 |
| incurred in the mediation and the parties shall share | 973 |
| equally the mediator's costs and expenses. | 974 |
| **(vii)** The mediation process shall be without prejudice | 975 |
| and confidential and no information or documents | 976 |
| disclosed during it shall be revealed to the Tribunal | 977 |
| except to the extent that they are disclosable under | 978 |
| the law and procedure governing the arbitration. | 979 |
| *(Note: The parties should be aware that the mediation* | 980 |
| *process may not necessarily interrupt time limits.)* | 981 |
| **(e)** If Box 35 in Part I is not appropriately filled in, sub-clause | 982 |
| 30(a) of this Clause shall apply. Sub-clause 30(d) shall | 983 |
| apply in all cases. | 984 |
| *\*)* *Sub-clauses 30(a), 30(b) and 30(c) are alternatives;* | 985 |
| *indicate alternative agreed in Box 35.* | 986 |
| | |
| **31. Notices (See Clause 43)** | 987 |
| **(a)** Any notice to be given by either party to the other | 988 |
| party shall be in writing and may be sent by fax, telex, | 989 |
| registered or recorded mail or by personal service. | 990 |
| **(b)** The address of the Parties for service of such | 991 |
| communication shall be as stated in Boxes 3 and 4 | 992 |
| respectively. | 993 |

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART III**
**PROVISIONS TO APPLY FOR NEWBUILDING VESSELS ONLY**
*(Optional, only to apply if expressly agreed and stated in Box 37)*

| OPTIONAL |
| PART |

**1.    Specifications and Building Contract**
(a)    The Vessel shall be constructed in accordance with
the Building Contract (hereafter called "the Building
Contract") as annexed to this Charter, made between the
Builders and the Owners and in accordance with the
specifications and plans annexed thereto, such Building
Contract, specifications and plans having been counter-
signed as approved by the Charterers.
(b)    No change shall be made in the Building Contract or
in the specifications or plans of the Vessel as approved by
the Charterers as aforesaid, without the Charterers'
consent.
(c)    The Charterers shall have the right to send their
representative to the Builders' Yard to inspect the Vessel
during the course of her construction to satisfy themselves
that construction is in accordance with such approved
specifications and plans as referred to under sub-clause
(a) of this Clause.
(d)    The Vessel shall be built in accordance with the
Building Contract and shall be of the description set out
therein. Subject to the provisions of sub-clause 2(c)(ii)
hereunder,  the Charterers shall be bound to accept the
Vessel from the Owners, completed and constructed in
accordance with the Building Contract, on the date of
delivery by the Builders.  The Charterers undertake that
having accepted the Vessel they will not thereafter raise
any claims against the Owners in respect of the Vessel's
performance or specification or defects, if any.
Nevertheless, in respect of any repairs, replacements or
defects which appear within the first 12 months from
delivery by the Builders, the Owners shall  endeavour to
compel the Builders to repair, replace or remedy any defects
or to recover from the Builders any expenditure incurred in
carrying out such repairs, replacements or remedies.
However, the Owners' liability to the Charterers shall be
limited  to the extent the Owners have a valid claim against
the Builders under the guarantee clause of the Building
Contract (a copy whereof has been supplied to the
Charterers). The Charterers shall be bound to accept such
sums as the Owners are reasonably able to recover under
this Clause and shall make no further claim on the Owners
for the difference between the amount(s) so recovered and
the actual expenditure on repairs, replacement or
remedying defects or for any loss of time incurred.
Any liquidated damages for physical defects or deficiencies
shall accrue to the account of the party stated in Box 41(a)
or if not filled in shall be shared equally between the parties.
The costs of pursuing a claim or claims against the Builders
under this Clause (including any liability to the Builders)
shall be borne by the party stated in Box 41(b) or if not
filled in shall be shared equally between the parties.

**2.    Time and Place of Delivery**
(a)    Subject to the Vessel having completed her
acceptance trials including trials of cargo equipment in
accordance with the Building Contract and specifications
to the satisfaction of the Charterers, the Owners shall give
and the Charterers shall take delivery of the Vessel afloat
when ready for delivery and properly documented at the
Builders' Yard or some other safe and readily accessible
dock, wharf or place as may be agreed between the parties
hereto and the Builders. Under the Building Contract the
Builders have estimated that the Vessel will be ready for
delivery to the Owners as therein provided but the delivery
date for the purpose of this Charter shall be the date when
the Vessel is in fact ready for delivery by the Builders after
completion of trials whether that be before or after as
indicated in the Building Contract. The Charterers shall not
be entitled to refuse acceptance of delivery of the Vessel

and upon and after such acceptance, subject to Clause
1(d), the Charterers shall not be entitled to make any claim
against the Owners in respect of any conditions,
representations or warranties, whether express or implied,
as to the seaworthiness of the Vessel or in respect of delay
in delivery.
(b)    If for any reason other than a default by the Owners
under the Building Contract, the Builders become entitled
under that Contract to deliver the Vessel to the Owners,
the Owners shall upon giving to the Charterers written
notice of Builders becoming so entitled, be excused from
giving delivery of the Vessel to the Charterers and upon
receipt of such notice by the Charterers this Charter shall
cease to have effect.
(c)    If for any reason the Owners become entitled under
the Building Contract to reject the Vessel the Owners shall,
before exercising such right of rejection, consult the
Charterers and thereupon
(i) if the Charterers do not wish to take delivery of the Vessel
they shall inform the Owners within seven (7) running days
by notice in writing and upon receipt by the Owners of such
notice this Charter shall cease to have effect; or
(ii) if the Charterers wish to take delivery of the Vessel
they may by notice in writing within seven (7) running days
require the Owners to negotiate with the Builders as to the
terms on which delivery should be taken and/or refrain from
exercising their right to rejection and upon receipt of such
notice the Owners shall commence such negotiations and/
or take delivery of the Vessel from the Builders and deliver
her to the Charterers;
(iii) in no circumstances shall the Charterers be entitled to
reject the Vessel unless the Owners are able to reject the
Vessel from the Builders;
(iv) if this Charter terminates under sub-clause (b) or (c) of
this Clause, the Owners shall thereafter not be liable to the
Charterers for any claim under or arising out of this Charter
or its termination.
(d) Any liquidated damages for delay in delivery under the
Building Contract and any costs incurred in pursuing a claim
therefor shall accrue to the account of the party stated in
Box 41(c) or if not filled in shall be shared equally between
the parties.

**3.    Guarantee Works**
If not otherwise agreed, the Owners authorise the
Charterers to arrange for the guarantee works to be
performed in accordance with the building contract terms,
and hire to continue during the period of guarantee works.
The Charterers have to advise the Owners about the
performance to the extent the Owners may request.

**4.    Name of Vessel**
The name of the Vessel shall be mutually agreed between
the Owners and the Charterers and the Vessel shall be
painted in the colours, display the funnel insignia and fly
the house flag as required by the Charterers.

**5.    Survey on Redelivery**
The Owners and the Charterers shall appoint surveyors
for the purpose of determining and agreeing in writing the
condition of the Vessel at the time of re-delivery.
Without prejudice to Clause 15 (Part II), the Charterers
shall bear all survey expenses and all other costs, if any,
including the cost of docking and undocking, if required,
as well as all repair costs incurred. The Charterers shall
also bear all loss of time spent in connection with any
docking and undocking as well as repairs, which shall be
paid at the rate of hire per day or pro rata.

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification
being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any
loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## PART IV
## HIRE/PURCHASE AGREEMENT
*(Optional, only to apply if expressly agreed and stated in Box 42)*

OPTIONAL
PART

On expiration of this Charter and provided the Charterers have fulfilled their obligations according to Part I and II as well as Part III, if applicable, it is agreed, that on payment of the final payment of hire as per Clause 11 the Charterers have purchased the Vessel with everything belonging to her and the Vessel is fully paid for. — 1, 2, 3, 4, 5, 6, 7

*In the following paragraphs the Owners are referred to as the Sellers and the Charterers as the Buyers.* — 8, 9

The Vessel shall be delivered by the Sellers and taken over by the Buyers on expiration of the Charter. — 10, 11

The Sellers guarantee that the Vessel, at the time of delivery, is free from all encumbrances and maritime liens or any debts whatsoever other than those arising from anything done or not done by the Buyers or any existing mortgage agreed not to be paid off by the time of delivery. Should any claims, which have been incurred prior to the time of delivery be made against the Vessel, the Sellers hereby undertake to indemnify the Buyers against all consequences of such claims to the extent it can be proved that the Sellers are responsible for such claims. Any taxes, notarial, consular and other charges and expenses connected with the purchase and registration under Buyers' flag, shall be for Buyers' account. Any taxes, consular and other charges and expenses connected with closing of the Sellers' register, shall be for Sellers' account. — 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27

In exchange for payment of the last month's hire instalment the Sellers shall furnish the Buyers with a Bill of Sale duly attested and legalized, together with a certificate setting out the registered encumbrances, if any. On delivery of the Vessel the Sellers shall provide for deletion of the Vessel from the Ship's Register and deliver a certificate of deletion to the Buyers. The Sellers shall, at the time of delivery, hand to the Buyers all classification certificates (for hull, engines, anchors, chains, etc.), as well as all plans which may be in Sellers' possession. — 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38

The Wireless Installation and Nautical Instruments, unless on hire, shall be included in the sale without any extra payment. — 39, 40, 41

The Vessel with everything belonging to her shall be at Sellers' risk and expense until she is delivered to the Buyers, subject to the conditions of this Contract and the Vessel with everything belonging to her shall be delivered and taken over as she is at the time of delivery, after which the Sellers shall have no responsibility for possible faults or deficiencies of any description. — 42, 43, 44, 45, 46, 47, 48

The Buyers undertake to pay for the repatriation of the Master, officers and other personnel if appointed by the Sellers to the port where the Vessel entered the Bareboat Charter as per Clause 3 (Part II) or to pay the equivalent cost for their journey to any other place. — 49, 50, 51, 52, 53

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART V**
**PROVISIONS TO APPLY FOR VESSELS REGISTERED IN A BAREBOAT CHARTER REGISTRY**
*(Optional, only to apply if expressly agreed and stated in Box 43)*

**1. Definitions**    1
For the purpose of this PART V, the following terms shall    2
have the meanings hereby assigned to them:    3
"The Bareboat Charter Registry" shall mean the registry    4
of the State whose flag the Vessel will fly and in which    5
the Charterers are registered as the bareboat charterers    6
during the period of the Bareboat Charter.    7
"The Underlying Registry" shall mean the registry of the    8
state in which the Owners of the Vessel are registered    9
as Owners and to which jurisdiction and control of the    10
Vessel will revert upon termination of the Bareboat    11
Charter Registration.    12

**2. Mortgage**    13
The Vessel chartered under this Charter is financed by    14
a mortgage and the provisions of Clause 12(b) (Part II)    15
shall apply.    16

**3. Termination of Charter by Default**    17
If the Vessel chartered under this Charter is registered    18
in a Bareboat Charter Registry as stated in Box 44, and    19
if the Owners shall default in the payment of any amounts    20
due under the mortgage(s) specified in Box 28, the    21
Charterers shall, if so required by the mortgagee, direct    22
the Owners to re-register the Vessel in the Underlying    23
Registry as shown in Box 45.    24
In the event of the Vessel being deleted from the    25
Bareboat Charter Registry as stated in Box 44, due to a    26
default by the Owners in the payment of any amounts    27
due under the mortgage(s), the Charterers shall have    28
the right to terminate this Charter forthwith and without    29
prejudice to any other claim they may have against the    30
Owners under this Charter.    31

This document is a computer generated BARECON 2001 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## ADDITIONAL CLAUSES TO BARECON 2001

### CLAUSE 32 – CHARTER PERIOD

**32.1** For the avoidance of doubt, notwithstanding the fact that the Charter Period shall commence on the Commencement Date, this Charter shall be:

(a) in full force and effect; and

(b) valid, binding and enforceable against the parties hereto,

with effect from the date of this Charter until the end of the Charter Period (subject to the terms of this Charter).

**32.2** The Charter Period shall, subject to the terms of this Charter, continue for a period of one hundred and twenty (120) months from the Commencement Date.

### CLAUSE 33 – CANCELLATION

**33.1** If:

(a) it becomes unlawful for the Owners (as buyers) to perform or comply with any or all of their obligations under the MOA or any of the obligations of the Owners under the MOA is not or ceases to be legal, valid, binding and enforceable; and/or

(b) the MOA expires, is cancelled, terminated, rescinded or suspended or otherwise ceases to remain in full force and effect for any reason,

then this Charter shall immediately terminate and be cancelled (with the exception of Clause 51) upon the Owners serving a Termination Event Notice in accordance with Clause 44.2, provided that the Owners shall be entitled to retain all fees paid by the Charterers pursuant to Clause 41.1 (and without prejudice to Clause 41.1 and Clause 44 and if such fees have not been paid but are due and payable, the Charterers shall forthwith pay such fees to the Owners in accordance with Clause 41.1) and such payment and the payment of the Termination Purchase Price shall not be construed as a penalty but shall represent an agreed estimate of the loss and damage suffered by the Owners in entering into this Charter upon the terms and conditions contained herein and the MOA upon the terms and conditions contained therein, and shall therefore be paid as compensation to the Owners.

### CLAUSE 34 – DELIVERY OF VESSEL

**34.1**

(a) This Charter is part of a transaction involving the sale, purchase and charter of the Vessel and constitutes one of the Pertinent Documents. The Owners are entering into this Charter in consideration of the Charterers as sellers selling the Vessel to the Owners as buyers under the MOA and the Charterers are entering into this Charter in consideration of the Charterers as sellers selling the Vessel to the Owners as buyers under the MOA.

(b) The obligation of the Owners to charter the Vessel to the Charterers hereunder is subject to and conditional upon:

(i) the delivery of the Vessel to the Owners as buyers by the Charterers as sellers pursuant to the MOA and, for the purposes of this Charter, the Vessel shall be deemed delivered to the Charterers simultaneously with delivery of the Vessel to the Owners pursuant to the MOA and at delivery the Charterers shall, subject to Clause 9, keep all bunkers, lubrication oil, unbroached provisions, paints, ropes and other consumable stores in the Vessel which were delivered under the MOA;

(ii) no Potential Termination Event or Termination Event having occurred which is continuing as from the date of this Charter to the last day of the Charter Period;

(iii) the representations and warranties contained in Clause 45 being true and correct on the date of this Charter and each day thereafter until and including the last day of the Charter Period;

(iv) Delivery occurring on or before the Cancelling Date; and

(v) the Owners having received from the Charterers:

   (A) on or prior to the date of this Charter, the documents or evidence set out in Part A of Schedule II in form and substance satisfactory to them; and

   (B) on Delivery, the documents or evidence set out in Part B of Schedule II in form and substance satisfactory to them,

and if any of the documents listed in sub-clauses (A) to (B) above are not in the English language then they shall be accompanied by an English translation.

**34.2** Upon the requirements of Clause 34.1 being fulfilled or waived to the satisfaction of the Owners, the Owners shall give notice thereof in writing to the Charterers.

**34.3** On delivery to and acceptance by (a) the Charterers (as buyers) of the Vessel from the Builder under the Shipbuilding Contract and (b) the Owners (as buyers) of the Vessel from the Charterers (as sellers) under the MOA and subject to the provisions of this Clause, the Vessel shall be deemed to have been delivered to, and accepted without reservation by, the Charterers (as bareboat charterers) under this Charter and the Charterers shall become and be entitled to the possession and use of the Vessel on and subject to the terms and conditions of this Charter.

**34.4** On Delivery, as evidence of the commencement of the Charter Period, the Charterers shall sign and deliver to the Owners, the Acceptance Certificate. Without prejudice to this Clause, the Charterers shall be deemed to have accepted the Vessel under this Charter and the commencement of the Charter Period having started, on Delivery even if, for whatever reason, the Acceptance Certificate is not signed.

**34.5** Without prejudice to and notwithstanding the provisions of this Clause, the Charterers shall not be entitled for any reason whatsoever to refuse to accept delivery of the Vessel under this Charter once the Vessel has been delivered to and accepted by the Owners (as buyers) from the Charterers (as sellers) under the MOA, and the Owners shall not be liable for any losses, costs or expenses whatsoever or howsoever arising including, without limitation, any loss of profit or any loss or otherwise:

(a) resulting directly or indirectly from any defect or alleged defect in the Vessel or any failure of the Vessel; or

(b) arising from any delay in the commencement of the Charter Period or any failure of the Charter Period to commence.

89119645v1
Folegandros - BBC

**34.6**     The Owners will not and shall not be obliged to deliver the Vessel to the Charterers with any bunkers and unused lubricating oils and greases (whether in storage tanks and unopened drums or otherwise).

## CLAUSE 35 – QUIET ENJOYMENT

**35.1**     Provided that the Charterers do not breach any terms of this Charter or any other Pertinent Document, the Owners hereby agree not to disturb or interfere with the Charterers' lawful use, possession and quiet enjoyment of the Vessel during the Charter Period, and, during the Charter Period, the Owners shall remain validly existing under the laws of their jurisdiction of incorporation and comply with applicable laws which, if breached, would disturb or interfere with the Charterers' lawful use, possession and quiet enjoyment of the Vessel during the Charter Period.

**35.2**     Subject to Clause 35.1 above, the Charterers and the Owners hereby agree and acknowledge that:

(a)     the Owners are entitled to enter or have entered into certain funding arrangements with their financier(s), including but not limited to, an affiliate of the Owners or any other banks and financial institutions acceptable in the Owners' sole discretion (each a "**Mortgagee**"), in order to finance part of the Purchase Price, which funding arrangements may be secured, *inter alia*, by the relevant Financial Instruments; and

(b)     the Owners may do any of the following as security for the funding arrangements referred to in paragraph (a) above:

(i)     execute a ship mortgage over the Vessel or any other Financial Instrument in favour of a Mortgagee;

(ii)     assign their rights and interests to, in or in connection with this Charter in favour of a Mortgagee;

(iii)     assign their rights and interests to, in or in connection with the Insurances, the Earnings and the Requisition Compensation of the Vessel in favour of a Mortgagee; and

(iv)     enter into any other document or arrangement which is necessary to give effect to such financing arrangements.

**35.3**     The Charterers hereby agree with the Owners to enter into a Quiet Enjoyment Agreement if required by the Owners' financiers at any time.

**35.4**     The Owners shall use reasonable endeavours to procure their financiers enter into a Quiet Enjoyment Agreement.

**35.5**     The Owners warrant that no other encumbrances or debts will be incurred by the Owners against the Vessel during the Charter Period except those encumbrances or debts created under the Financial Instruments and/or permitted by this Charter (which, for the avoidance of doubt, shall not include those encumbrances and debts incurred by the Charterers or the Approved Manager or any other party to any Transaction Document (other than the Owners) arising out of or in connection with this Charter or the Pertinent Documents or the operation of the Vessel).

## CLAUSE 36 – CHARTERHIRE

**36.1**     In consideration of the Owners agreeing to charter the Vessel to the Charterers under this Charter and buying the Vessel from the Charterers (as sellers) under the MOA at the request

of the Charterers, the Charterers hereby irrevocably and unconditionally agree to pay to the Owners, *inter alia*, the Charterhire in respect of the charter of the Vessel as follows:

(a)     the Advance Charterhire which shall be payable on the Commencement Date and such amount shall be deemed paid by the Charterers to the Owners by setting off against the Purchase Price payable (in an amount equal to the Advance Charterhire) by the Owners to the Charterers as sellers under the MOA on the Commencement Date pursuant to the terms thereof and which, for the avoidance of any doubt, shall be unsecured and non-refundable under all circumstances and no interest shall accrue on the Advance Charterhire;

(b)     during the Pre-delivery Period, an instalment of the Pre-delivery Interest Charterhire payable on each Payment Date falling within such period;

(c)     the Pre-delivery Principal Charterhire which shall be payable on the Commencement Date provided that the Commencement Date falls on a date not later than the date falling one (1) month after the Scheduled Delivery Date and such amount shall be paid by the Charterers to the Owners notionally by reducing the amount of the Purchase Price payable by the Owners to the Charterers as sellers under the MOA on the Commencement Date pursuant to the terms thereof by an amount equal to the Pre-delivery Principal Charterhire and which, for the avoidance of any doubt, shall be unsecured and non-refundable under all circumstances and no interest shall accrue on the Pre-delivery Principal Charterhire and provided further that if the Owners determine in their sole discretion, acting reasonably and in good faith that (i) the Commencement Date will not fall within the period commencing on the Scheduled Delivery Date and ending one (1) month later and  (ii) the Vessel is not or will not be constructed or delivered in accordance with the terms of the Shipbuilding Contract, the Owners shall have the option to, provided that such option shall only be exercisable by the Owners if the non-construction or non-delivery or potential non-construction or potential non-delivery of the Vessel arises out of the termination or cancellation of the Shipbuilding Contract by the Builder solely due to the Charterers' default, to do the following:

(A)     declare that the Pre-delivery Principal Charterhire is due and payable on the date falling one (1) month after the Scheduled Delivery Date; or

(B)     defer the payment of the Pre-delivery Principal Charterhire until the earlier of (i) the Commencement Date and such amount shall be paid by the Charterers to the Owners notionally by reducing the amount of the Purchase Price payable by the Owners to the Charterers as sellers under the MOA on the Commencement Date pursuant to the terms thereof by the amount equal to the Pre-delivery Principal Charterhire or (ii) any other later date to be determined by the Owners in the sole discretion on the basis that the Owners determine that the Vessel is not or will not be constructed or delivered in accordance with the terms of the Shipbuilding Contract

and such option shall be exercised by way of written notice to be served on the Charterers by no later than twenty (20) days after the Scheduled Delivery Date; and

(d)     during the Charter Period, one hundred and twenty (120) monthly instalments of each of the Fixed Charterhire and the Variable Charterhire, each payable on a Payment Date falling within such period with the first instalment of each of the Fixed Charterhire and the Variable Charterhire payable on the Commencement Date and thereafter at monthly intervals on a Payment Date, but provided that (i) the last instalment of each of the Fixed Charterhire and the Variable Charterhire in respect of that Payment Date shall be payable no later than on the last day of the Charter Period and (ii) in the event that the Charter Period is a period of one hundred and twenty (120) months, the Charterers shall also pay the Purchase Obligation Price, in each case, in same day available funds by not later than 4:00pm (Beijing time).

**36.2**    The Vessel shall not at any time be deemed off-hire and the Charterers' obligation to pay all Charterhire and other amounts payable under this Charter in Dollars shall be absolute and

89119645v1
Folegandros - BBC

unconditional under any and all circumstances and shall not be affected by any circumstances of any nature whatsoever including but not limited to:

(a) any set-off (except in the case of the Advance Charterhire or, as the case may be, the Pre-delivery Principal Charterhire, which may be set off in accordance with paragraphs (a) and (c), respectively, of Clause 36.1), counterclaim, recoupment, defence, claim or other right which the Charterers may at any time have against the Owners or any other person for any reason whatsoever including, without limitation, any act, omission or breach on the part of the Owners under this Charter or any other agreement at any time existing between the Owners and the Charterers;

(b) any change, extension, indulgence or other act or omission in respect of any indebtedness or obligation of the Charterers, or any sale, exchange, release or surrender of, or other dealing in, any security for any such indebtedness or obligation;

(c) any title defect or encumbrance or any dispossession of the Vessel by title paramount or otherwise, unless caused by the fault or gross negligence of the Owners;

(d) any defect in the seaworthiness, condition, value, design, merchantability, operation or fitness for use of the Vessel or the ineligibility of the Vessel for any particular trade;

(e) the Total Loss or any damage to or forfeiture or court marshall's or other sale of the Vessel, including, for the avoidance of any doubt, a sale of the Vessel to a third party prior to the occurrence of a Termination Event with the Charterers' consent or, following a Termination Event and the non-payment of the Termination Purchase Price in accordance with the terms of this Charter, a sale of the Vessel to a third party without the Charterers' consent;

(f) any libel, attachment, levy, detention, sequestration or taking into custody of the Vessel or any restriction or prevention of or interference with or interruption or cessation in, the use or possession thereof by the Charterers;

(g) any insolvency, bankruptcy, reorganization, arrangement, readjustment, dissolution, liquidation or similar proceedings by or against the Charterers;

(h) any invalidity, unenforceability, lack of due authorization or other defects, or any failure or delay in performing or complying with any of the terms and provisions of this Charter or any of the Pertinent Documents by any party to this Charter or any other person;

(i) any enforcement or attempted enforcement by the Owners of their rights under this Charter or any of the Pertinent Documents executed or to be executed pursuant to this Charter; or

(j) any loss of use of the Vessel due to deficiency or default or strike of officers or crew, fire, breakdown, damage, accident, defective cargo or any other cause which would or might but for this provision have the effect of terminating or in any way affecting any obligation of the Charterers under this Charter.

**36.3** Time of payment of the Charterhire and other payments by the Charterers shall be of the essence of this Charter and the other Pertinent Documents.

**36.4** All payments of the Charterhire and any other moneys payable hereunder shall be made in Dollars.

**36.5** All Charterhire and any moneys payable hereunder shall be payable by the Charterers to the Owners to such account as the Owners may notify the Charterers in writing from time to time.

**36.6** Payment of the Charterhire shall be at the Charterers' risk until receipt by the Owners.

89119645v1
Folegandros - BBC

**36.7** All stamp duty, value added tax, withholding or other taxes and import and export duties and all other similar types of charges which may be levied or assessed on or in connection with:

(a) the operation of this Charter in respect of the Charterhire and all other payments to be made pursuant to this Charter and the remittance thereof to the Owners; and

(b) the import, export, purchase, delivery and re-delivery of the Vessel,

shall be borne by the Charterers. The Charterers shall pay, if applicable, value added tax and other similar tax levied on any Charterhire and other payments payable under this Charter by addition to, and at the time of payment of, such amounts provided that any income tax which the Owners are liable to pay on, or in respect of, all such amounts shall be for the account of the Owners.

**36.8** Any payment of the Termination Purchase Price shall be made together with any other amount payable under this Charter.

**36.9** If the Charterers fail to make any payment due under this Charter on the due date, they shall pay interest on such late payment at the default rate of 4.6% per annum plus the Interest Rate from the date on which such payment became due until the date of payment thereof.

**36.10** All default interest and any other payments under this Charter which are of an annual or periodic nature shall accrue from day to day and shall be calculated on the basis of the actual number of days elapsed and a 360 day year.

**36.11** Any payment which is due to be made on a day which is not a Business Day, shall be made on the preceding Business Day in the same calendar month.

## CLAUSE 37 – POSSESSION OF VESSEL

**37.1** The Charterers shall not, without the prior written consent of the Owners, assign, mortgage or pledge the Vessel or any interest therein and shall not permit the creation of any Security Interest thereon other than the Permitted Security Interests.

**37.2** The Charterers shall promptly notify any party (as the Owners may request) in writing that the Vessel is the property of the Owners and the Charterers shall provide the Owners with a copy of such written notification and satisfactory evidence that such party has received such written notification.

**37.3** If the Vessel is arrested, seized, impounded, forfeited, detained or taken out of their possession or control (whether or not pursuant to any distress, execution or other legal process), the Charterers shall procure the immediate release of the Vessel (whether by providing bail or procuring the provision of security or otherwise do such lawful things as the circumstances may require) and shall immediately notify the Owners of such event and shall indemnify the Owners against all losses, costs or charges incurred by the Owners by reason thereof in re-taking possession or otherwise in re-acquiring the Vessel. Without prejudice to the generality of the foregoing, the Charterers agree to indemnify the Owners against all consequences or liabilities arising from the master, officers or agents signing bills of lading or other documents.

**37.4** If the Vessel is arrested or otherwise detained by reason of a claim or claims against the Owners, the Owners shall at their own expense take all reasonable steps to secure that within a reasonable time the Vessel is released, including the provision of bail.

**37.5** The Charterers shall pay and discharge or cause any permitted sub-lessee of the Vessel, to pay and discharge all obligations and liabilities whatsoever which have given or may give rise to liens on or claims enforceable against the Vessel and take all steps to prevent an arrest (threatened or otherwise) of the Vessel.

**Clause 38 – INSURANCE**

**38.1** The Charterers shall procure that such insurances are effected in form and substance satisfactory to the Owners and their financiers (if any) and in particular:

(a) in Dollars;

(b) in the case of fire and usual marine risks and war risks, on an agreed value basis in an amount of at least the higher of (i) 110% of the aggregate of the then Outstanding Principal Balance, (ii) 110% of the Book Value and (iii) the Market Value of the Vessel;

(c) in the case of oil pollution liability risks for the Vessel, for an aggregate amount equal to the highest level of cover from time to time available under protection and indemnity club entry and in the international marine insurance market and for an amount of not less than $1,000,000,000;

(d) in relation to protection and indemnity risks in respect of the full tonnage of the Vessel and with an independent and reputable protection and indemnity club rated by Standard & Poor's at no less than A or rated by Moody's at no less than A2 and belonging to the International Group of Protection and Indemnity Clubs and acceptable to the Owners and their financiers (if any);

(e) in relation to any other insurances which may be taken in respect of vessels of similar type as the Vessel in connection with its trading, management, operations and maintenance of safety, on such terms and to such standard as may be required in accordance with international market practice;

(f) on terms acceptable to the Owners and their financiers (if any); and

(g) through approved brokers and with first class international insurers rated by Standard & Poor's at no less than A or rated by Moody's at no less than A2 and/or underwriters acceptable to the Owners or, in the case of war risks and protection and indemnity risks, in a war risks and protection and indemnity risks association rated by Standard & Poor's at no less than A or rated by Moody's at no less than A2 and belonging to the International Group of Protection and Indemnity Clubs and acceptable to the Owners.

**38.2** In addition to the terms set out in Clause 13(a), the Charterers shall procure that the obligatory insurances shall:

(a) subject always to paragraph (ii), name the Owners, the Approved Manager and the Charterers as the only named assureds unless the interest of every other named assured or co-assured is limited:

    (i) in respect of any obligatory insurances for hull and machinery and war risks;

        (A) to any provable out-of-pocket expenses that they have incurred and which form part of any recoverable claim on underwriters; and

        (B) to any third party liability claims where cover for such claims is provided by the policy (and then only in respect of discharge of any claims made against them); and

    (ii) in respect of any obligatory insurances for protection and indemnity risks, to any recoveries they are entitled to make by way of reimbursement following discharge of any third party liability claims made specifically against them,

and every other named assured or co-assured has undertaken in writing to the Owners or their financiers (in such form as they require) that any deductible shall be apportioned between the Charterers and every other named assured or co-assured in proportion to the gross claims made or paid by each of them and that they shall do all things necessary and provide all documents, evidence and information to enable the Owners and their financiers (if any) in accordance with the terms of the loss payable clause, to collect or recover any moneys which at any time become payable in respect of the obligatory insurances;

(b)     whenever a financier of the Owners requires:

(i)      in respect of fire and other usual marine risks and war risks, name (or be amended to name) the same as additional named assured for its rights and interests, warranted no operational interest and with full waiver of rights of subrogation against such financiers, but without such financiers thereby being liable to pay (but having the right to pay) premiums, calls or other assessments in respect of such insurance;

(ii)     in relation to protection and indemnity risks, name (or be amended to name) the same as additional insured or co-assured for its rights and interests to the extent permissible under the relevant protection and indemnity club rules; and

(iii)    name the Owners' financiers (as applicable) and the Owners (as applicable) as the first ranking loss payee and the second ranking loss payee respectively (and in the absence of any financiers, the Owners as first ranking loss payee) in accordance with the terms of the relevant loss payable clauses approved by the Owners' financiers and the Owners with such directions for payment in accordance with the terms of such relevant loss payable clause, as the Owners and their financiers (if any) may specify;

(c)     provide that all payments by or on behalf of the insurers under the obligatory insurances to the Owners and/or their financiers (as applicable) shall be made without set-off, counterclaim or deductions or condition whatsoever;

(d)     provide that such obligatory insurances shall be primary without right of contribution from other insurances which may be carried by the Owners or their financiers (if any);

(e)     provide that the Owners and/or their financiers (if any) may make proof of loss if the Charterers fail to do so; and

(f)     provide that if any obligatory insurance is cancelled, or if any substantial change is made in the coverage which adversely affects the interest of the Owners and/or their financiers (if any), or if any obligatory insurance is allowed to lapse for non-payment of premium, such cancellation, change or lapse shall not be effective with respect to the Owners and/or their financiers (if any) for thirty (30) days (or seven (7) days in the case of war risks) after receipt by the Owners and/or their financiers (if any) of prior written notice from the insurers of such cancellation, change or lapse.

**38.3**  The Charterers shall:

(a)     at least thirty (30) days prior to Delivery (or such lesser period agreed by the parties), notify in writing the Owners (copied to their financiers (if any)) of the terms and conditions of all Insurances;

(b)     at least fourteen (14) days before the expiry of any obligatory insurance notify the Owners (copied to their financiers (if any)) of the brokers (or other insurers) and any protection and indemnity or war risks association through or with whom the Charterers propose to renew that obligatory insurance and of the proposed terms of renewal and obtain the Owners' approval to such matters;

89119645v1
Folegandros - BBC

(c)     at least seven (7) days before the expiry of any obligatory insurance, procure that such obligatory insurance is renewed or to be renewed on its expiry date in accordance with the provisions of this Charter;

(d)     procure that the approved brokers and/or the war risks and protection and indemnity associations with which such a renewal is effected shall promptly after the renewal or the effective date of the new insurance and protection and indemnity cover notify the Owners (copied to their financiers (if any)) in writing of the terms and conditions of the renewal;

(e)     as soon as practicable after the expiry of any obligatory insurance, deliver to the Owners a letter of undertaking as required by this Charter in respect of such Insurances for the Vessel as renewed pursuant to this Clause 38.3 together with copies of the relevant policies or cover notes or entry certificates duly endorsed with the interest of the Owners and/or their financiers (if any);

(f)     in the event of any claim in respect of any of the Insurances (other than in respect of a Total Loss), if the Charterers fail to reach agreement with any of the brokers, insurers, underwriters or protection and indemnity clubs for the immediate repair of the Vessel, or for payment to third parties, within such time as the Owners or their financiers (if any) may stipulate, the Owners or their financiers (if any) shall be entitled to require payment to themselves. In the event of any dispute arising between the Charterers and any broker, insurer, underwriter or protection and indemnity club in regards to any obligation to make any payment to the Charterers or the Owners or their financiers (if any) under or in connection with any of the Insurances, or in regards to the amount of any such payment, the Owners or their financiers (if any) shall be entitled to settle that dispute directly with the broker, insurer or protection and indemnity club. Any such settlement shall be binding on the Charterers.

38.4    The Charterers shall ensure that all insurance companies and/or underwriters, and/or insurance brokers (if any) provide the Owners with copies of the policies, cover notes and certificates of entry relating to the obligatory insurances which they are to effect or renew and a letter or letters of undertaking in a form required by the Owners and/or their financiers (if any) and including undertakings by the insurance companies and/or underwriters that:

(a)     they will have endorsed on each policy, immediately upon issuance, a loss payable clause and a notice of assignment complying with the provisions of this Charter and the Financial Instruments;

(b)     they will hold the benefit of such policies and such insurances, to the order of the Owners and/or their financiers (if any) and/or such other party in accordance with the said loss payable clause;

(c)     they will advise the Owners and their financiers (if any) promptly of any material change to the terms of the obligatory insurances of which they are aware;

(d)     (i) they will indicate in the letters of undertakings that they will immediately notify the Owners and their financiers (if any) when any cancellation, change or lapse of the obligatory insurances occurs and (ii) following a written application from the Owners and/or their financiers (if any) not later than one (1) month before the expiry of the obligatory insurances, they will notify the Owners and their financiers (if any) not less than fourteen (14) days before the expiry of the obligatory insurances, in the event of their not having received notice of renewal instructions from the Charterers and, in the event of their receiving instructions to renew, they will promptly notify the Owners and their financiers (if any) of the terms of the instructions; and

(e)     if any of the obligatory insurances form part of any fleet cover, the Charterers shall procure that the insurance broker(s), or leading insurer, as the case may be, undertakes to the Owners and their financiers (if any) that such insurance broker or insurer will not set off against any

sum recoverable in respect of a claim relating to the Vessel under such obligatory insurances any premiums due in respect of any other vessel under any fleet cover of which the Vessel forms a part or any premium due for other insurances, they waive any lien on the policies, or any sums received under them, which they might have in respect of such premiums, and they will not cancel such obligatory insurances by reason of non-payment of such premiums or other amounts, and will arrange for a separate policy to be issued in respect of the Vessel forthwith upon being so requested by the Owners and/or their financiers (if any) and where practicable.

**38.5** The Charterers shall ensure that any protection and indemnity and/or war risks associations in which the Vessel is entered provides the Owners and their financiers (if any) with:

(a) a copy of the certificate of entry for the Vessel as soon as such certificate of entry is issued;

(b) a letter or letters of undertaking in such form as may be required by the Owners and their financiers (if any) or in such association's standard form; and

(c) a certified copy of each certificate of financial responsibility for pollution by oil or other Environmentally Sensitive Material issued by any relevant certifying authority in relation to the Vessel.

**38.6** The Charterers shall ensure that all policies relating to the obligatory insurances are deposited with the approved brokers through which the insurances are effected or renewed.

**38.7** The Charterers shall procure that all premiums or other sums payable in respect of the obligatory insurances are punctually paid and produce all relevant receipts when so required by the Owners.

**38.8** The Charterers shall ensure that any guarantees required by a protection and indemnity or war risks association are promptly issued and remain in full force and effect.

**38.9** The Charterers shall neither do nor omit to do (nor permit to be done or not to be done) any act or thing which would or might render any obligatory insurance invalid, void, voidable or unenforceable or render any sum payable under an obligatory insurance repayable in whole or in part, and, in particular:

(a) the Charterers shall procure that all necessary action is taken and all requirements are complied with which may from time to time be applicable to the obligatory insurances, and (without limiting the obligations contained in this Clause) ensure that the obligatory insurances are not made subject to any exclusions or qualifications to which the Owners have not given their prior approval (unless such exclusions or qualifications are made in accordance with the rules of a protection and indemnity association which is a member of the International Group of protection and indemnity associations);

(b) the Charterers shall not make or permit any changes relating to the classification or classification society or manager or operator of the Vessel unless such changes have first been approved by the underwriters of the obligatory insurances or the Owners;

(c) the Charterers shall procure that all quarterly or other voyage declarations which may be required by the protection and indemnity risks association in which the Vessel is entered to maintain cover for trading to the United States of America and Exclusive Economic Zone (as defined in the United States Oil Pollution Act 1990 or any other applicable legislation) are made and the Charterers shall promptly provide the Owners with copies of such declarations and a copy of the certificate of financial responsibility; and

(d) the Charterers shall not employ the Vessel, nor allow it to be employed, otherwise than in conformity with the terms and conditions of the obligatory insurances, without first obtaining

89119645v1
Folegandros - BBC

the consent of the insurers and complying with any requirements (as to extra premium or otherwise) which the insurers specify.

38.10 The Charterers shall not make or agree to any alteration to the terms of any obligatory insurance nor waive any right relating to any obligatory insurance without the prior written consent of the Owners and their financiers (if any).

38.11 The Charterers shall not settle, compromise or abandon any claim under any obligatory insurance for a Total Loss or for a Major Casualty, and shall do all things necessary and provide all documents, evidence and information to enable the Owners to collect or recover any moneys which at any time become payable in respect of the obligatory insurances.

38.12 The Charterers shall provide the Owners, upon written request, copies of:

(a) all communications between the Owners or the Charterers and:

   (i) the approved brokers;

   (ii) the approved protection and indemnity and/or war risks associations; and

   (iii) the first class international insurers and/or underwriters, which relate directly or indirectly to:

      (i) the Charterers' obligations relating to the obligatory insurances including, without limitation, all requisite declarations and payments of additional premiums or calls; and

      (ii) any credit arrangements made between the Charterers and any of the persons referred to in paragraphs (i) or (ii) above relating wholly or partly to the effecting or maintenance of the obligatory insurances; and

(b) any communication with all parties involved in case of a claim under any of the Vessel's insurances.

38.13 The Charterers shall promptly provide the Owners (or any persons which they may designate) with any information which the Owners or their financiers (or any such designated person) request for the purpose of:

(a) obtaining or preparing any report from an independent marine insurance broker as to the adequacy of the obligatory insurances effected or proposed to be effected; and/or

(b) effecting, maintaining or renewing any such insurances as are referred to in Clause 13(a) or dealing with or considering any matters relating to any such insurances.

38.14 If one or more of the obligatory insurances are not effected and maintained with first class international insurers or are effected with an insurance or captive subsidiary of the Owners or the Charterers, then the Charterers shall procure, at their own expense, that the relevant insurers maintain in full force and effect facultative reinsurances with reinsurers and through brokers, in each case, of recognised standing and acceptable in all respects to the Owners. Any reinsurance policy shall include, if and when permitted by law, a cut-through clause in a form acceptable to the Owners and/or their financiers (if any). The Charterers shall procure that underwriters of the primary insurances assign each reinsurance to the relevant financiers in full, if required.

38.15 The Charterers shall upon demand fully indemnify the Owners in respect of all premiums and other expenses which are incurred by (i) the Owners in connection with or with a view to effecting, maintaining or renewing a lessor's interest insurance and a lessor's additional perils

11

(pollution) insurance that is taken out in respect of the Vessel and/or (ii) the financier(s) of the Owners (if any) in connection with or with a view to effecting, maintaining or renewing a mortgagee's interest insurance and a mortgagee's additional perils (pollution) insurance that is taken out in respect of the Vessel, in each case, with the insurance brokers appointed by the Owners and/or their financiers (if any) in their sole discretion. In each case, the amount of the insurances referred to in this Clause 38.15 shall be equal to the higher of  (i) 110% of the then current aggregate principal amount outstanding of any loan made available to the Owners under any Financial Instrument, (ii) 110% of the then Outstanding Principal Balance, (iii) 110% of the Book Value and (iii) the Market Value of the Vessel.

38.16  The Charterers shall be solely responsible for and indemnify the Owners in respect of all loss or damage to the Vessel (insofar as the Owners shall not be reimbursed by the proceeds of any insurance in respect thereof) however caused occurring at any time or times before physical possession thereof is retaken by the Owners, with only reasonable wear and tear to the Vessel excepted.

38.17  The Charterers shall:

(a)  reimburse the Owners any expenses incurred by the Owners in obtaining a detailed report signed by an independent firm of marine insurance brokers appointed by the Owners (in their sole discretion) dealing with the Insurances and stating the opinion of such firm as to the adequacy of the Insurances once a year if so requested by the Owners (or, after a Termination Event has occurred, as many times per year as the Owners may determine); and

(b)  procure that there is delivered to the insurance brokers described in Clause 38.17(a) such information in relation to the Insurances as such brokers may require.

38.18  The Charterers shall keep the Vessel insured at their expense against such other risks which the Owners or their financiers (if any) consider reasonable for a prudent shipowner or operator to insure against at the relevant time (as notified by the Owners) and which are, at that time, generally insured against by owners or operators of vessels similar to the Vessel.

## CLAUSE 39   – WARRANTIES RELATING TO VESSEL

39.1  It is expressly agreed and acknowledged that the Owners are not the manufacturer or original supplier of the Vessel which has been purchased by the Owners from the Charterers as sellers pursuant to the MOA for the purpose of the chartering the Vessel to the Charterers hereunder and that no condition, term, warranty or representation of any kind is or has been given to the Charterers by or on behalf of the Owners in respect of the Vessel (or any part thereof).

39.2  All conditions, terms or warranties express or implied by the law relating to the specifications, quality, description, merchantability or fitness for any purpose of the Vessel (or any part thereof) or otherwise are hereby expressly excluded.

39.3  The Charterers agree and acknowledge that the Owners shall not be liable for any claim, loss, damage, expense or other liability of any kind or nature caused directly or indirectly by the Vessel or by any inadequacy thereof or the use or performance thereof or any repairs thereto or servicing thereof and the Charterers shall not by reason thereof be released from any liability to pay any Charterhire or other payment due under this Charter.

## CLAUSE 40   – TERMINATION, REDELIVERY AND TOTAL LOSS

40.1  Upon termination of this Charter pursuant to Clause 44.2, the Charterers shall pay the Owners the Termination Purchase Price (in consideration of (i) prior to Delivery, the payment of the Pre-delivery Instalments under the MOA by the Owners as buyers to the Charterers as sellers upon the terms and conditions of the MOA and (ii) on or after Delivery, the payment of the balance of the Purchase Price by the Owners as buyers to the Charterers as sellers pursuant

to the MOA) and it is hereby agreed by the parties hereto that payment of the Termination Purchase Price shall not be construed as a penalty but shall represent an agreed estimate of the loss and damage suffered by the Owners in buying the Vessel upon the terms and conditions of the MOA and entering into this Charter upon the terms and conditions contained herein, in each case, at the request of the Charterers and shall therefore be paid as compensation to the Owners for the early termination of this Charter and the acquisition of the Vessel by the Charterers.

**40.2** Upon receipt of the Termination Purchase Price by the Owners pursuant to Clause 40.1 in full, this Charter shall terminate.

**40.3** If the Charterers fail to make any payment of the Termination Purchase Price on the due date, Clauses 36.9 and 36.10 shall apply. In addition, the Charterers agree that should the Termination Purchase Price not be paid on the due date for payment under the terms of this Charter, the Charterers' right to possess and operate the Vessel shall immediately cease and the Charterers shall, upon the Owners' request, be obliged to immediately (and at the Charterers' own cost) redeliver the Vessel to the Owners at such ready and nearest safe port as the Owners may require.

**40.4** Concurrently with the irrevocable payment of the Termination Purchase Price in full pursuant to the terms of this Charter, this Charter shall terminate and the Owners shall (save in the event of Total Loss) transfer the legal and beneficial ownership of the Vessel on an "as is where is" basis to the Charterers or their nominees free from any registered mortgages incurred or permitted by the Owners (save for those liens, encumbrances and debts incurred by the Charterers or arising out of or in connection with this Charter) and shall execute a bill of sale and a protocol of delivery and acceptance evidencing the same and any other document strictly necessary to transfer the title of the Vessel to the Charterers.

**40.5** The Charterers hereby undertake to indemnify the Owners against any claims incurred in relation to the Vessel as a result of the Charterers' action or performance prior to such transfer of ownership. Any taxes, notarial, consular and other costs, charges and expenses connected with closing of the Owners' register shall be for the Charterers' account.

**40.6** On natural expiration of this Charter, the Charterers shall redeliver the Vessel to the Owners in accordance with Clause 15 and Clause 40.7 and shall ensure that they have fulfilled their obligations under this Charter and made payment of all Charterhire and all other moneys pursuant to the terms of this Charter. Upon redelivery of the Vessel in accordance with this Clause 40.6 and Clause 40.7 shall apply.

**40.7** Without prejudice to Clause 15, if the Charterers are required to redeliver the Vessel to the Owners pursuant to the terms of this Charter, the Charterers shall ensure that the Vessel shall, at the time of redelivery to the Owners:

(a) be in an equivalent class as she was as at the Commencement Date without any recommendation or condition, and with valid, unextended certificates for not less than six (6) months;

(b) have passed her 5-year and if applicable, 10-year special surveys, and subsequent second intermediate surveys and drydock at the Charterers' time and expense without any condition or outstanding issue and to the satisfaction of the Classification Society;

(c) have her survey cycles up-to-date and trading and class certificates valid for at least the number of months agreed in Box 17;

(d) be redelivered to the Owners together with all spare parts and spare equipment as were on board at the time of Delivery, and any such spare parts and spare equipment on board at the time of re-delivery shall be taken over by the Owners free of charge;

(e)     be free of any cargo and Security Interest (save for the Security Interests granted pursuant to the Financial Instruments); and

(f)     be free of any charter (unless the Owners wish to retain the continuance of any then existing charter).

**40.8**   The Owners shall, at the time of the redelivery of the Vessel, take over all bunkers, lubricating oil, unbroached provisions, paints, ropes and other consumable stores in the Vessel at no cost to the Owners.

**40.9**   If the Vessel, for any reason, becomes a Total Loss after Delivery, in consideration of (i) the Owners agreeing to enter into this Charter at the request of the Charterers and buying the Vessel from the Charterers, and (ii) without prejudice to the rest of this Clause, the Owners agreeing to assign their interest in the Insurances to the Charterers upon receiving full payment of the Termination Purchase Price (in any circumstance where the Owners have not yet received any insurance proceeds of the Vessel at such time or such insurance proceeds is not sufficient to satisfy the full amount of the Termination Purchase Price), the Charterers shall pay the Termination Purchase Price (or, in the case where insurance proceeds have been received by the Owners and applied by the Owners towards paying part of the Termination Purchase Price, the remaining portion of the Termination Purchase Price) to the Owners on the earlier of:

(a)     the date falling ninety (90) days after such Total Loss has occurred; and

(b)     the date of receipt by the Owners and/or their financiers (if any), in accordance with the terms of the relevant loss payable clause, of the proceeds of insurance relating to such Total Loss,

(c)     provided that it is hereby agreed that any insurance proceeds in respect of the Vessel received by the Owners and/or their financiers (if any) shall be applied in or towards discharging the Charterers' obligation to pay the Termination Purchase Price and any interest accrued thereon (and such application shall be deemed satisfaction of the Charterers' obligation to pay the Termination Purchase Price to the extent satisfied) and in the event that the insurance proceeds received from the insurers exceed the Termination Purchase Price due (and any interest accrued thereon), the excess shall be paid to the Charterers by way of rebate of hire.

For the avoidance of doubt, in the event that the Vessel becomes a Total Loss:

(i)     payment of the Charterhire and all other sums payable hereunder during such period shall continue to be made by the Charterers in accordance with the terms of this Charter unless and until the Owners receive the Termination Purchase Price in full;

(ii)    should insurance proceeds be received by the Owners and/or their financiers (if any) from the insurers, the Charterers' obligations to pay the Termination Purchase Price shall be accordingly reduced by such insurance proceeds, but in the event that such insurance proceeds are less than the amount of the Termination Purchase Price together with any interest accrued thereon, the Charterers remain obliged to pay to the Owners the balance so that the full amount of the Termination Purchase Price due together with any interest accrued thereon are received by the Owners;

(iii)   the Vessel continues to be insured in accordance with the terms of this Charter and as may be required by any other agreements relating to the ownership, operation, management, chartering or financing of the Vessel; and

(iv)    the obligation of the Charterers to pay the Termination Purchase Price shall remain unaffected and exist regardless of whether any of the insurers have agreed or refused to meet or has disputed in good faith, the claim for Total Loss.

89119645v1
Folegandros - BBC

**40.10**   The Owners shall have no obligation to supply to the Charterers with a replacement vessel following the occurrence of a Total Loss.

## CLAUSE 41   – FEES AND EXPENSES

**41.1**   In consideration of the Owners entering into this Charter, the Charterers shall pay to the Owners or their nominee:

(a)   a non-refundable arrangement fee of $ 904,706.25 (representing 1.75% of the Contract Price, the "**Handling Fee**") as follows: (a) $452,353.125 (being the first 50% of the Handling Fee) shall be payable on the date of this Charter and (b) $452,353.125 (being the second 50% of the Handling Fee) shall be paid by no later than 15 December 2017; and

(b)   on the Commencement Date, a non-refundable handling fee in an amount equal to the interest accrued on the balance of the Third Instalment (as defined in the MOA) at the rate of 6% per annum during the period commencing on the Remittance Date (as defined in the MOA) and ending on the Commencement Date or, as the case may be, the date on which the balance of the Third Instalment is returned by the Builder's Bank (as defined in the MOA) in accordance with the SWIFT Payment Instructions (as defined in the MOA) in the event that the Vessel is not delivered to the Owners (in their capacities as buyers) in accordance with the MOA on Delivery.

**41.2**   Without prejudice to any other rights of the Owners hereunder, the Charterers shall promptly pay to the Owners on written demand on a full indemnity basis all and documented costs, charges and expenses reasonably incurred by the Owners in collecting any Charterhire or other payments not paid on the due date under this Charter and in remedying any other failure of the Charterers to observe the terms and conditions of this Charter.

**41.3**   All costs and expenses incurred by the Owners in the negotiation and execution of all documentation in relation to this Charter and the other Pertinent Documents and the Financial Instruments including, but not limited to, all costs incurred by the Owners and all legal costs, expenses and other disbursements incurred by the Owners' legal counsels in connection with the same, shall be for the account of the Charterers.

**41.4**   All fees incurred and/or payable by the Owners under the Financial Instruments (or any of them) including, but not limited to, the commitment fee accruing at a rate of 1% on the undrawn amount for the period commencing on the serving of the forty-five (45) days' approximate notice under Clause 5(b) of the MOA and ending on the Cancelling Date, shall be for the account of the Charterers.

**41.5**   All costs and expenses incurred by the Owners in relation to the acquisition and registration of the Vessel by the Owners in the Owners' name in the flag state stated in Box 5 together with any and all fees (including but not limited to any vessel registration and tonnage fees) payable by the Owners to such flag state to maintain and/or renew such registration shall be for the account of the Charterers. Without prejudice to the foregoing, if the flag state stated in Box 5 requires the Owners to establish a physical presence or office in the jurisdiction of such flag state, all fees, costs and expenses payable by the Owners to establish and maintain such physical presence or office shall be for the account of the Charterers.

## CLAUSE 42   - NO WAIVER OF RIGHTS

**42.1**   No neglect, delay or indulgence on the part of either party in enforcing the terms and conditions of this Charter shall prejudice the strict rights of that party or be construed as a waiver thereof nor shall any single or partial exercise of any right of either party preclude any other or further exercise thereof.

89119645v1
Folegandros - BBC

**42.2** No right or remedy conferred upon either party by this Charter shall be exclusive of any other right or remedy provided for herein or by law and all such rights and remedies shall be cumulative.

## CLAUSE 43 - NOTICES

**43.1** Any notice, certificate, demand or other communication to be served, given made or sent under or in relation to this Charter shall be in English and in writing and (without prejudice to any other valid method or giving, making or sending the same) shall be deemed sufficiently given or made or sent if sent by registered post, fax or by email to the following respective address:

   (A)     to the Owners:     **Oriental Fleet International Company Limited**
Attention: Xu Ying/Josh Li Geng
Email: asset@ofi.com.hk/josh.li@ofi.com.hk
Tel: +86 21 6596 6123/+ 852 2902 1349
Fax: +852 2866 7667

   (B)     to the Charterers:     **Kastelorizo Shipping Corporation**
**c/o Eletson Holdings Inc.**
Attention: Peter Kanelos
Email: finance@eletson.com
Tel: +30 210 4598161
Fax: +30 210 4282320

or, if a party hereto changes its address or fax number, to such other address or fax number as that party may notify to the other.

## CLAUSE 44 – TERMINATION EVENTS

**44.1** The Owners and the Charterers hereby agree that any of the following events shall constitute a Termination Event:

(a) the Charterers fail to make any payment on its due date under this Charter or any other Pertinent Document to which they are a party or either Guarantor fails to make any payment on its due date under the Pertinent Documents to which it is a party unless payment is received by the Owners no later than five (5) Business Days of its due date or the date of demand (as the case may be);

(b) the Charterers breach or omit to observe or perform any of their undertakings in Clauses 46.1(i), 46.1(j), 46.1(n), 46.1(o) or 46.1(u) or either Guarantor breaches or omits to observe or perform any of its undertakings contained in the Guarantee to which they are a party (including any breach by Guarantor A of the financial covenants under clause 11.17 of the Guarantee to which it is a party which has not been waived by the Owners or remedied within thirty (30) days after the occurrence of such breach) or any other Relevant Person breaches or omits to observe or perform any of its undertakings contained in any Pertinent Document to which it is a party; or the Charterers fail to obtain and/or maintain the Insurances required under Clause 38 in accordance with the provisions thereof or any insurer in respect of such Insurances cancels the Insurances or disclaims liability with respect thereto;

(c) the Charterers and/or either Guarantor commits any other breach of, or omits to observe or perform, any of their other obligations or undertakings under this Charter or any Pertinent Document (other than a breach referred to in paragraph (a) or (b) above) unless such breach or omission is, in the opinion of the Owners, remediable and the Charterers and/or such Guarantor remedy such breach or omission to the satisfaction of the Owners within fifteen (15) Business Days of notice thereof from the Owners; or

89119645v1
Folegandros - BBC

(d) any breach by either the Charterers or either Guarantor occurs of any provision of this Charter or any other Pertinent Document (other than a breach falling within paragraph (a), (b) or (c)); or

(e) any representation or warranty made by the Charterers, the Guarantors or the Approved Manager in or pursuant to any Pertinent Document to which it is a party or if applicable, in the case of the Charterers only, the Acceptance Certificate, proves to be untrue or misleading; or

(f) any of the following occurs in relation to any Financial Indebtedness of a Relevant Person (other than the Builder and the Refund Guarantor):

(i) any Financial Indebtedness of a Relevant Person is not paid when due or, if so payable, on demand after any applicable grace period has expired, which in the case of Guarantor A is in an amount exceeding $10,000,000 or its equivalent in any other currency or currencies; or

(ii) any Financial Indebtedness of a Relevant Person becomes due and payable, or capable of being declared due and payable, prior to its stated maturity date as a consequence of any event of default and not as a consequence of the exercise of any voluntary right of prepayment, which in the case of Guarantor A is in an amount exceeding $10,000,000 or its equivalent in any other currency or currencies; or

(iii) a lease, hire purchase agreement or charter creating any Financial Indebtedness of a Relevant Person is terminated by the lessor or owner as a consequence of any termination event or event of default (howsoever defined), which in the case of Guarantor A is in an amount exceeding $10,000,000 or its equivalent in any other currency or currencies; or

(iv) any overdraft, loan, note issuance, acceptance credit, letter of credit, guarantee, foreign exchange or other facility, or any swap or other derivative contract or transaction, relating to any Financial Indebtedness of a Relevant Person ceases to be available or becomes capable of being terminated or declared due and payable or cash cover is required or becomes capable of being required, as a result of any termination event or event of default (howsoever defined), which in the case of Guarantor A is in an amount exceeding $10,000,000 or its equivalent in any other currency or currencies; or

(g) any of the following occurs in relation to a Relevant Person (other than the Builder and the Refund Guarantor):

(i) a Relevant Person becomes, in the opinion of the Owners, unable to pay its debts as they fall due unless, in the case of the Guarantor A, its debts are paid within thirty (30) days of the due date; or

(ii) the value of its assets is less than its liabilities (taking into account contingent and prospective liabilities); or

(iii) any assets of the Charterers or any other Relevant Person or the Vessel are subject to any form of execution, attachment, arrest, sequestration or distress which is not discharged within thirty (30) days; or

(iv) any administrative or other receiver is appointed over all or a substantial part of the assets of a Relevant Person unless as part of a solvent reorganisation which has been approved by the Owners; or

89119645v1
Folegandros - BBC

(v)     a Relevant Person makes any formal declaration of bankruptcy or any formal statement to the effect that it is insolvent or likely to become insolvent, or a winding up or administration order is made in relation to a Relevant Person, or the members or directors of a Relevant Person pass a resolution to the effect that they should be wound up, placed in administration or cease to carry on business; or

(vi)    a petition is presented in any Pertinent Jurisdiction for the winding up or administration, or the appointment of a provisional liquidator, of a Relevant Person unless the petition is being contested in good faith and on substantial grounds and is dismissed or withdrawn within twenty-one (21) days of the presentation of the petition; or

(vii)   a Relevant Person petitions a court, or presents any proposal for, any form of judicial or non-judicial suspension or deferral of payments, reorganisation of its debt (or certain of its debt) or arrangement with all or a substantial proportion (by number or value) of their creditors or of any class of them or any such suspension or deferral of payments, reorganisation or arrangement is effected by court order, contract or otherwise; or

(viii)  any meeting of the members or directors of a Relevant Person is summoned for the purpose of considering a resolution or proposal to authorise or take any action of a type described in paragraph (iii), (iv), (v) or (vi); or

(ix)    in a country other than England and Wales, any event occurs or any procedure is commenced which, in the reasonable opinion of the Owners, is similar to any of the foregoing referred to in (ii) to (vii) above inclusive; or

(x)     any expropriation, attachment, sequestration, distress or execution (or any analogous process in any jurisdiction) affects any asset or assets of a Relevant Person, which in the case of Guarantor A, is in an amount exceeding $10,000,000 or its equivalent in any other currency or currencies and is not discharged within thirty (30) days; or

(h)     a Relevant Person or for the period commencing on the date of this Charter and ending on the Commencement Date, the Builder or the Refund Guarantor, suspends or ceases or threatens to suspend or cease carrying on its business; or

(i)     any consent, approval, authorisation, license or permit necessary to enable the Charterers to operate or charter the Vessel or the Builder to sell and construct the Vessel under the Shipbuilding Contract or the Charterers as sellers to sell the Vessel under the MOA or such parties to comply with the provisions of the Shipbuilding Contract or, as the case may be, the MOA or to enable the Charterers to comply with any provision of this Charter or to enable the Charterers as sellers to comply with any provision of the MOA or to ensure that the obligations of the Charterers and the Builder are legal, valid, binding or enforceable is not granted, expires without being renewed, is revoked or becomes liable to revocation or any condition of such a consent, approval, authorisation, license or permit is not fulfilled; or

(j)     any event or circumstance occurs which has or is reasonably likely to have a Material Adverse Effect; or

(k)     the Shipbuilding Contract, the Refund Guarantee or the MOA or this Charter or any other Pertinent Document or any Security Interest created by a Pertinent Document:

(i)     is cancelled, terminated, rescinded or suspended or otherwise ceases to remain in full force and effect for any reason or no longer constitutes valid, binding and enforceable obligations of any party to that document for any reason whatsoever; or

89119645v1
Folegandros - BBC

(ii)     is amended or varied without the prior written consent of the Owners, except for any amendment or variation which is expressly permitted by this Charter or any other relevant Pertinent Document; or

(l)     a Relevant Person rescinds or purports to rescind or repudiates or purports to repudiate a Pertinent Document; or

(m)     it is or has become:

(i)     unlawful or prohibited, whether as a result of the introduction of a new law, an amendment to an existing law or a change in the manner in which an existing law is or will be interpreted or applied; or

(ii)     contrary to, or inconsistent with, any regulation,

for any Relevant Person to maintain or give effect to any of its obligations under this Charter or any other Pertinent Document to which it is a party in the manner it is contemplated under such Pertinent Document or any of the obligations of such Relevant Person under any Pertinent Document to which it is a party are not or cease to be legal, valid, binding and enforceable; or

(n)     the Security Interest constituted by any Pertinent Document is in any way imperilled or in jeopardy; or

(o)     the Vessel is not delivered latest by the Cancelling Date; or

(p)     any Termination Event (as defined in the Other Charter) occurs under the Other Charter; or

(q)     the occurrence of any event described in paragraph 1 of Article XI (*Buyer's Default*) of the Shipbuilding Contract which is not unconditionally waived by the Builder, or any other event entitling the Builder and/or the Charterers to cancel or terminate the Shipbuilding Contract, or any event entitling the Charterers to a refund of any instalment paid under the Shipbuilding Contract, which has not been unconditionally waived by the Charterers or the Builder (as the case may be); or

(r)     there is: (i) a merger, amalgamation, demerger, solvent reorganisation or corporate reconstruction of Guarantor A without the Owners' prior written consent (unless the surviving entity following such merger, amalgamation, demerger, solvent reorganisation or corporate reconstruction is Guarantor A and provided that it does not result in a Material Adverse Effect) or (ii) a merger, amalgamation, demerger, solvent reorganisation or corporate reconstruction of the Charterers without the Owners' prior written consent; or (iii) a change of legal or beneficial ownership or change in control of the Charterers from that set out in Clause 45.1(a) without the Owners' prior written consent; or (iv) a change of legal or beneficial ownership or change in control of Guarantor B from that set out in Clause 45.1(a) without the Owners' prior written consent; or

(s)     if it becomes unlawful in any applicable jurisdiction for the Owners to perform any of their obligations as contemplated by this Charter,  the MOA or any other Pertinent Document.

**44.2**     Subject to Clause 44.4 below, upon the occurrence of a Termination Event (other than  Clause 44.1(s)) which is continuing, the Owners shall notify the Charterers of the occurrence of the same (the "**Termination Event Notice**") whereupon the Charterers may, within ten (10) Business Days of the date of the Termination Event Notice, provide to the Owners a written notice advising the Owners of their intention to terminate this Charter and shall pay the Termination Purchase Price to the Owners in accordance with Clause 40.1.

89119645v1
Folegandros - BBC

44.3 If the Charterers do not notify the Owners of their intention to terminate this Charter pursuant to Clause 44.2 within ten (10) Business Days of the date of the Termination Event Notice then the Owners may be entitled, provided the Termination Event is continuing, by notice to the Charterers to terminate this Charter at any time, and the Charterers shall pay to the Owners the Termination Purchase Price, whereupon the Owners shall sell, transfer and redeliver, at the cost and expense of the Charterers, the Vessel to the Charterers free from any registered mortgages incurred by the Owners.

44.4 Upon the occurrence of the Termination Event set out in Clause 44.1(s), the Owners shall notify the Charterers and the Charterers shall be required to pay to the Owners the Termination Purchase Price on the date on which the next instalment of the Charterhire becomes due following such notice by the Owners or, if earlier, the date specified by the Owners in the notice delivered to the Charterers (being no earlier than the last day of any applicable grace period permitted by law).

44.5 For the avoidance of doubt, notwithstanding any action taken by the Owners following a Termination Event, the Charterers shall remain liable for the outstanding obligations on their part to be performed under this Charter.

44.6 Without limiting the generality of the foregoing or any other rights of the Owners, upon the occurrence of a Termination Event which is continuing, the Owners shall have the sole and exclusive right and power to:

(a) settle, compromise, compound, adjust or defend any action, suit or proceeding relating to or pertaining to the Vessel and this Charter;

(b) make proof of loss, appear in and prosecute any action arising from any policy or policies of insurance maintained pursuant to this Charter, and settle, adjust or compromise any claims for loss, damage or destruction under, or take any other action in respect of, any such policy or policies; and

(c) change or appoint a new manager for the Vessel and the Charterer shall procure that the appointment of the Approved Manager may be terminated immediately without any recourse to the Owners.

## CLAUSE 45 – REPRESENTATIONS AND WARRANTIES

45.1 The Charterers represent and warrant to the Owners as of the date of this Charter, and on each day henceforth until the last day of the Charter Period, as follows:

(a) each of the Charterers and Guarantor B is legally and beneficially owned by Guarantor A;

(b) each Relevant Person is duly incorporated and validly existing under the laws of its jurisdiction of incorporation;

(c) each Relevant Person has the corporate capacity, and has taken all corporate actions and obtained all consents, approvals, authorisations, licenses or permits necessary for it:

(i) to execute each of the Pertinent Documents to which it is a party; and

(ii) to comply with and perform its obligations under each of the Pertinent Documents to which it is a party;

(d) all the consents, approvals, authorisations, licenses or permits referred to in Clause 45.1(c) remain in force and nothing has occurred which makes any of them liable to revocation;

89119645v1
Folegandros - BBC

(e) each of the Pertinent Documents to which a Relevant Person is a party constitutes such Relevant Person's legal, valid and binding obligations enforceable against such party in accordance with its respective terms and any relevant insolvency laws affecting creditors' rights generally;

(f) no third party has any Security Interest, other than the Permitted Security Interests, or any other interest, right or claim over, in or in relation to the Vessel, this Charter or any moneys payable hereunder and/or any of the other Pertinent Documents;

(g) all payments which a Relevant Person is liable to make under any Pertinent Document to which such Relevant Person is a party may be made by such party without deduction or withholding for or on account of any tax payable under the laws of the jurisdiction of incorporation;

(h) no legal or administrative action involving a Relevant Person has been commenced or taken;

(i) each Relevant Person has paid all taxes applicable to, or imposed on or in relation to it, its business or if applicable, the Vessel, except for those being contested in good faith with adequate reserves;

(j) the choice of governing law as stated in each Pertinent Document to which a Relevant Person is party and the agreement by such party to refer disputes to the relevant courts or tribunals as stated in such Pertinent Document are valid and binding against such Relevant Person;

(k) no Relevant Person nor any of its assets are entitled to immunity on the grounds of sovereignty or otherwise from any legal action or proceeding (which shall include, without limitation, suit, attachment prior to judgment, execution or other enforcement);

(l) the obligations of each Relevant Person under each Pertinent Document to which it is a party, are the direct, general and unconditional obligations of such Relevant Person and rank at least *pari passu* with all other present and future unsecured and unsubordinated creditors of such Relevant Person save for any obligation which is mandatorily preferred by law and not by virtue of any contract;

(m) no Relevant Person is a US Tax Obligor and no Relevant Person has established a place of business in the United Kingdom or the United States of America;

(n) no Relevant Person is a Restricted Person;

(o) no Relevant Person is in breach of applicable Sanctions laws, and none of them has been or is currently being investigated on compliance with Sanctions, they have not received notice or are aware of any claim, action, suit, proceeding or investigation against any of them with respect to Sanctions and they have not taken any action to evade the application of Sanctions;

(p) that in relation to the Shipbuilding Documents:

(i) each copy of the Shipbuilding Documents provided to the Owners is a true and complete copy of such document and there have been no amendments, supplements or variations to the same;

(ii) the Pre-delivery Instalments have been fully and irrevocably paid by the Charterers to the Builder under the Shipbuilding Contract on or prior to the date hereof (receipt of which has been duly acknowledged by the Builder) and there are no outstanding amounts as at the date hereof which are due, owing or payable to the Builder by the Charterers thereunder;

89119645v1
Folegandros - BBC

(iii) there are no unresolved disputes and/or pending claims for payment between the Builder and any Relevant Person in respect of the Shipbuilding Contract and/or the Vessel; and

(iv) each of the Builder and the Refund Guarantor is fully aware of the transactions contemplated under the MOA and each has consented to the assignment by the Charterers to the Owners of all their rights, interests and benefits in relation to the Shipbuilding Contract and the Refund Guarantee;

(q) no event described in paragraph 1 of Article XI (*Buyer's Default*) of the Shipbuilding Contract, or any other event entitling the Buyer and/or the Builder to cancel or terminate the Shipbuilding Contract has occurred or any event entitling the Charterers to a refund of any instalment paid under the Shipbuilding Contract;

(r) neither the Charterers nor any of their assets or, to the best knowledge of the Charterers' knowledge, Guarantor A nor any of their assets, in each case, have any right to immunity from set off, legal proceedings, attachment prior to judgment or other attachment or execution of judgement on the grounds of sovereign immunity or otherwise;

(s) none of the Charterers nor either Guarantor is insolvent or in liquidation or administration or subject to any other formal or informal insolvency procedure, and no receiver, administrative receiver, administrator, liquidator, trustee or analogous officer has been appointed in respect of the Charterers or either Guarantor or all or material part of their assets;

(t) no Termination Event or Potential Termination Event is continuing or might reasonably be expected to result from the entry into and performance of this Charter or any other Pertinent Document; and

(u) any factual information provided by the Charterers (or on their behalf) or any other Relevant Person to the Owners was true and accurate in all material respects as at the date it was provided or as the date at which such information was stated.

## CLAUSE 46 – CHARTERERS' UNDERTAKINGS

**46.1** The Charterers undertake that they shall comply or procure compliance with the following undertakings commencing from the date of this Charter and up to the last day of the Charter Period unless otherwise permitted by the Owners in writing:

(a) there shall be sent to the Owners:

(i) a certified true copy of each of the Shipbuilding Documents duly signed by the parties thereto;

(ii) as soon as possible, but in no event later than sixty (60) days after the end of each half of each year of the Charterers, the unaudited semi-annual financial reports of the Charterers;

(iii) as soon as possible, but in no event later than ninety (90) days after the end of each financial year of the Charterer, the unaudited annual financial reports of the Charterer;

(iv) as soon as possible, but in no event later than one hundred and twenty (120) days after the end of each financial year of Guarantor A, the consolidated audited annual financial reports of Guarantor A; and

(v) as soon as possible, but in no event later than sixty (60) days after the end of each quarter of each financial year of Guarantor A, the consolidated unaudited quarterly

89119645v1
Folegandros - BBC

financial statements accounts of Guarantor A certified as to their correctness by the chief financial officer of Guarantor A;

(b)    they will provide to the Owners, promptly at the Owners' request, copies of all notices and minutes relating to any of their extraordinary shareholders' meetings which are despatched to the Charterers' and each Guarantor's respective shareholders or creditors or any class of them;

(c)    they will provide or will procure that each Relevant Person provides the Owners with details of any legal or administrative action involving a Relevant Person or the Vessel as soon as such action is instituted or it becomes apparent to such Relevant Person that it is likely to be instituted and is likely to have a Material Adverse Effect on the ability of a Relevant Person to perform its obligations under each Pertinent Document to which it is a party;

(d)    they will, and will procure that each other Relevant Person will, obtain and promptly renew or procure the obtainment or renewal of and provide copies of, from time to time, any necessary consents, approvals, authorisations, licenses or permits of any regulatory body or authority for the transactions contemplated under each Pertinent Document to which it is a party (including without limitation the sale, chartering and operation of the Vessel);

(e)    they will not, and will procure that each other Relevant Person will not, create, assume or permit to exist any Security Interest of any kind upon any Pertinent Document to which such Relevant Person is a party, and if applicable, the Vessel, in each case other than the Permitted Security Interests;

(f)    they will at their own cost, and will procure that each other Relevant Person will:

(i)    do all that such Relevant Person reasonably can to ensure that any Pertinent Document to which such Relevant Person is a party validly creates the obligations and the Security Interests which such Relevant Person purports to create; and

(ii)    without limiting the generality of paragraph (i), promptly register, file, record or enrol any Pertinent Document to which such Relevant Person is a party with any court or authority in all Relevant Jurisdictions, pay any stamp duty, registration or similar tax in all Relevant Jurisdictions in respect of any Pertinent Document to which such Relevant Person is a party, give any notice or take any other step which, is or has become necessary or desirable for any such Pertinent Document to be valid, enforceable or admissible in evidence or to ensure or protect the priority of any Security Interest which such Relevant Person creates;

(g)    they will, and will procure that each other Relevant Person will, notify the Owners as soon as it becomes aware of the occurrence of:

(i)    any event described in paragraph 1 of Article XI (*Buyer's Default*) of the Shipbuilding Contract, or any other event entitling the Builder and/or the Charterers to cancel or terminate the Shipbuilding Contract or any event entitling the Charterers to a refund of any instalment paid under the Shipbuilding Contract; or

(ii)    any Potential Termination Event or a Termination Event,

and will keep the Owners fully up-to-date with all developments and the Charterers will, if so requested by the Owners, provide any such certificate signed by one of its officers, confirming that there exists no Potential Termination Event or Termination Event;

(h)    they will, and will procure that each other Relevant Person will, as soon as practicable after receiving the request, provide the Owners with any additional financial or other information relating:

    (i)       to themselves and/or the Vessel, including, but not limited to the following:

          (A)      the condition and location of the Vessel;

          (B)      the class records of the Vessel;

          (C)      the employment of the Vessel; or

          (D)      the terms and conditions of any time charter of the Vessel together with any other information relating to such time charter; or

    (ii)      to any other matter relevant to, or to any provision of any Pertinent Document to which it is a party,

which may be requested by the Owners (or their financiers (if any)) at any time;

(i)      without prejudice to Clause 46.1(l), comply, or procure compliance, and will procure that each other Relevant Person will comply or procure compliance, with all laws or regulations relating to the Vessel and its construction, ownership, employment, operation, management and registration, including the ISM Code, the ISPS Code, all Environmental Laws and the laws of the Vessel's registry;

(j)      the Vessel shall be classed with the Classification Society upon Delivery and shall be free of all recommendations and requirements;

(k)     they will ensure that the Market Value of the Vessel shall be tested on a charter-free basis from time to time, with the Initial Market Value to be arranged by the Charterers no later than fifteen (15) days prior to the Commencement Date, at the request of the Owners, but in any event at least once a calendar year in the absence of a Termination Event, and upon the occurrence of a Termination Event which is continuing, at any time at the request of the Owners; and the Charterers shall pay the amount of the fees and expenses of an Approved Valuer and all legal and other expenses incurred by the Owners in connection with any matter arising out of this Clause (k);

(l)      they will notify the Owners immediately of:

    (i)       any Environmental Claim made against the Charterers in connection with the Vessel or any Environmental Incident, arrest or detention of the Vessel, any exercise or purported exercise of any lien on that Vessel or its Earnings or any requisition of the Vessel for hire; and

    (ii)      any casualty or occurrence as a result of which the Vessel has become or is, by the passing of time or otherwise, likely to become, a Major Casualty;

(m)    they shall not permit the sub-chartering of the Vessel on a bareboat charter basis or, without the prior written consent of the Owners, on a time charter basis for any period exceeding twelve (12) months (inclusive of any option to renew) provided that if the Charterers request the Owners' prior written consent to permit the sub-chartering of the Vessel on a time charter basis for a period exceeding three (3) years, the Owners' consent will be conditional upon, without limitation, the Charterers procuring that such sub-charterer enters into a tri-partite agreement between the Owners, the Charterers and such sub-charterer on terms satisfactory to the Owners pursuant to which, inter alia, the Owners will be provided with step-in rights following a default by the Charterers under such time-charter and further providing that the Charterers will, following a default by the Charterers under such time charter, novate their rights and obligations thereunder to the Owners;

(n)    they shall comply, and shall procure that each other Relevant Person complies, with all laws and regulations in respect of Sanctions, and in particular, they shall ensure that the Charterers, shall effect and maintain a sanctions compliance policy to ensure compliance with all such laws and regulations implemented from time to time and they shall notify the Owners in writing of any breach of such laws or regulations by any such party upon becoming aware of the same;

(o)    the Vessel shall not be constructed, employed, operated or managed in any manner which (i) is contrary to any Sanctions and in particular, the Vessel shall not be used by or to benefit any party which is a target of Sanctions or trade to any area or country where trading the Vessel to such area or country would constitute a breach of any Sanctions or published boycotts imposed by any of the United Nations, the European Union, the United States of America, the United Kingdom or the People's Republic of China; or (ii) would trigger the operation of any Sanctions limitation or exclusion clause in any insurance documentation;

(p)    they will, and will procure that each other Relevant Person will promptly notify the Owners and provide all information in relation to its business and operations which may be relevant for the purposes of ascertaining whether they are in compliance with all laws and regulations relating to Sanctions, and in particular, they shall notify the Owners in writing immediately upon being aware that any of its shareholders, directors, officers or employees of a Relevant Person is a Restricted Person or has otherwise become a target of Sanctions;

(q)    they shall not appoint or permit to be appointed any manager of the Vessel save for an Approved Manager appointed on terms acceptable to the Owners and their financiers (if any) and such Approved Manager has (prior to accepting its appointment) entered into a Manager's Undertaking, provided that such new appointment does not or may not (in the Owners' reasonable opinion) result in the occurrence of a Material Adverse Effect;

(r)    they shall supervise or procure the relevant supervision of the construction of the Vessel and shall be responsible for losses directly or indirectly arising out of the defects of the design of the Vessel and/or the Charterers' negligence in the supervision of the construction of the Vessel;

(s)    save with the prior written consent of the Owners, they shall not, and shall procure no Relevant Person shall, agree or enter into any transaction, arrangement, document or do or omit to do anything which will have the effect of varying, amending or supplementing any Shipbuilding Document;

(t)    they shall ensure that:

   (i)    all Earnings and any other amounts received by them in connection with the Vessel are paid into the Earnings Account; and

   (ii)   for each Term, there is maintained in the Earnings Account an amount equal to at least the aggregate of:

      (A)    the amount of the Fixed Charterhire payable for the next Payment Date, provided that the Charterers are entitled to withdraw any surplus in the credit balance of the Earnings Account after all the relevant payments have been made pursuant to this Charter and other Pertinent Documents (including but not limited to the payment of Charterhire payable under this Charter), subject to no Termination Event or Potential Termination Event having occurred and as being continuing at the relevant time; and

      (B)    the amount of the Variable Charterhire calculated at the Interest Rate which is applied on the immediately prior Payment Date and which, once the Interest Rate for the next Term is determined, shall be adjusted accordingly

so as to equal the amount of relevant Variable Charterhire payable on the next Payment Date;

(u)    if the Market Value of the Vessel (i) falls below the amount equal to 105% ("**Percentage A**") of the Outstanding Principal Balance during the period commencing on the Commencement Date and ending on the first anniversary thereof, or (ii) falls below the amount equal to 110% ("**Percentage B**") of the Outstanding Principal Balance during the period commencing on the date following the first anniversary after the Commencement Date and ending on the fifth anniversary after the Commencement Date, or (iii) falls below the amount equal to 120% ("**Percentage C**" and each of Percentage A, Percentage B and Percentage C, a "**Percentage**") of the Outstanding Principal Balance during the period commencing on the date following the fifth anniversary after the Commencement Date and ending on the last day of the Charter Period, the Charterers shall, promptly and in any event not later than the date falling twenty (20) days after the Owners receive the relevant valuation of the Vessel (i) prepay to the Owners such amount so as to eliminate the shortfall which shall be applied first against the Purchase Obligation Price and thereafter the Charterhire Principal Balance in inverse order of maturity or (ii) deposit the amount of the shortfall and maintain the same into the Earnings Account until the Owners determine in their sole discretion that the Market Value of the Vessel is not less than the relevant Percentage of the relevant Outstanding Principal Balance;

(v)    upon request, they will provide or they will procure to be provided to the Owners the report(s) of the survey(s) conducted pursuant to Clause 7 of this Charter in form and substance satisfactory to the Owners;

(w)    they shall notify the Owners as soon as they become aware of any change in the direct or indirect ownership or shareholdings or control of the Charterers and/or either Guarantor from that set out in 45.1(a);

(x)    upon request, they will provide or they will procure to be provided to the Owners the report(s) of the inspection(s) conducted pursuant to Clause 8 of this Charter in form and substance satisfactory to the Owners; and

(y)    they shall credit the deposit of $490,000 (the "**Deposit**") on the Commencement Date with a non-interest bearing account designated and held by the Owners. The Deposit shall be released by the Owners to the Charterers at the earlier of (i) the end of the Charter Period and (ii) an Early Termination Date, provided that the Deposit shall not be returned to the Charterers following the occurrence of a Termination Event and in all cases, any costs, charges and expenses incurred in relation to the holding of the Deposit shall be borne by the Charterers.

## CLAUSE 47    – EARLY TERMINATION OPTION

**47.1**    Subject to Clause 47.2, the Owners hereby grant to the Charterers an early termination option to require the Owners to sell all of the Owners' beneficial and legal right, title and interest in the Vessel and all belonging to her, to the Charterers upon the terms and conditions of this Charter.

**47.2**    Subject to the other terms and conditions of this Charter, the Early Termination Option shall only be exercisable by the Charterers on an Early Termination Date provided that no Termination Event has occurred and is continuing. For the avoidance of doubt, the Early Termination Date shall not fall on a date on or after the last day of the Charter Period.

**47.3**    The Early Termination Option may be exercised by the Charterers by giving the Owners an Early Termination Notice at least three (3) months prior to the relevant intended Early Termination Date of their intention to exercise the Early Termination Option.

89119645v1
Folegandros - BBC

**47.4**   The Early Termination Notice shall be signed by a duly authorised officer or attorney of the Charterers and shall contain the following information:

(a)   the Early Termination Date; and

(b)   the relevant Early Termination Price.

**47.5**   In addition to the Early Termination Price, the Charterers shall pay to the Owners, the relevant Early Termination Fee on the Early Termination Date.

**47.6**   Upon the exercise of the Early Termination Option, the Owners and the Charterers shall thereupon perform their respective obligations referred to in 50.1 and the Early Termination Price (together with the Early Termination Fee (if applicable)) shall be paid by the Charterers on the Early Termination Date.

**CLAUSE 48      – PUT OPTION**

**48.1**

(a)   In the event the Vessel remains unemployed or off-hire for a period of two (2) consecutive months (the "**Put Option Trigger Period**"), the Owners shall be entitled, subject to Clause 48.2, to a put option to require the Charterers to purchase all of the Owners' beneficial and legal right, title and interest in the Vessel and all belonging to her, upon the terms and conditions of this Charter unless:

(i)   the Charterers deposit and maintain the Three Months' Debt Service in the Earnings Account for the period commencing on one (1) day after the Put Option Trigger Date and ending on the date the Vessel is no longer unemployed or off-hire and provided that the Charterers provide the Owners evidence in form and substance satisfactory to the Owners (in their sole discretion) that the Vessel is no longer unemployed or off-hire; or

(ii)   the Charterers immediately notify the Owners of such circumstance (and in any event no later than one (1) day after the Put Option Trigger Date) in writing and provide to the Owners evidence illustrating, *inter alia*, the reasons for the unemployment or off-hire of the Vessel and, provided that such evidence is satisfactory to the Owners (in their sole discretion), the Owners shall notify the Charterers and the Charterers shall deposit and maintain the Three Months' Debt Service in the Earnings Account for the period commencing on the date falling one (1) month after the Put Option Trigger Date and ending on the date the Vessel is no longer unemployed or off-hire and provided that the Charterers provide the Owners evidence in form and substance satisfactory to the Owners (in their sole discretion) that the Vessel is no longer unemployed or off-hire.

(b)   In the event that:

(i)   the evidence provided by the Charterers pursuant to paragraph (a) above is not satisfactory to the Owners (in their sole discretion); or

(ii)   if the Charterers breach any of the provisions of this Clause 48.1,

the Owners shall be entitled, subject to Clause 48.2, to a put option to require the Charterers to purchase all of the Owners' beneficial and legal right, title and interest in the Vessel and all belonging to her, upon the terms and conditions of this Charter.

**48.2** Subject to other terms and conditions of this Charter, the Put Option shall only be exercisable by the Owners on a Put Option Date. For the avoidance of doubt, the Put Option Date shall not fall on a date on or after the last day of the Charter Period.

**48.3** The Put Option may be exercised by the Owners by giving the Charterers a Put Option Notice at least twenty (20) Business Days prior to the relevant intended Put Option Date of their intention to exercise the Put Option.

**48.4** The Put Option Notice shall be signed by a duly authorised officer or attorney of the Owners and shall contain the following information:

(a) the Put Option Date; and

(b) the relevant Put Option Price.

Upon the exercise of the Put Option, the Owners and the Charterers shall thereupon perform their respective obligations referred to in Clause 50 and the Put Option Price shall be paid by the Charterers on the Put Option Date.

## CLAUSE 49 – PURCHASE OBLIGATION

**49.1** Subject to other provisions of this Charter, in consideration of the Owners entering into this Charter, the Charterers shall, on the last day of the Charter Period, be obliged to purchase from the Owners all of the Owners' beneficial and legal right, title and interest in the Vessel and all belonging to her and the Owners and the Charterers shall perform their obligations referred to in Clause 50 and the Charterers shall pay the Purchase Obligation Price on the Purchase Obligation Date unless this Charter is terminated before the natural expiration of this Charter or the Owners and the Charterers agree otherwise or the Vessel has been purchased by the Charterers pursuant to its exercise of the Early Termination Option under Clause 47.

## CLAUSE 50 – SALE OF THE VESSEL BY EARLY TERMINATION OPTION OR PUT OPTION OR PURCHASE OBLIGATION

**50.1** Completion of the exercise of the Early Termination Option or the Put Option or the performance of the Purchase Obligation shall take place on the relevant Early Termination Date or the Put Option Date or the relevant Purchase Obligation Date, respectively, whereupon the Owners will sell to the Charterers (or their nominee), and the Charterers (or their nominee) will purchase from the Owners, all the legal and beneficial interest and title in the Vessel, for the relevant Early Termination Price or the relevant Put Option Price or the Purchase Obligation Price, respectively, on an "as is where is" basis and on the following terms and conditions:

(a) the Charterers expressly agree and acknowledge that no condition, warranty or representation of any kind is or has been given by or on behalf of the Owners in respect of the Vessel or any part thereof, and accordingly the Charterers confirm that they have not, in entering into this Charter, relied on any condition, warranty or representation by the Owners or any person on the Owners' behalf, express or implied, whether arising by law or otherwise in relation to the Vessel or any part thereof, including, without limitation, warranties or representations as to the description, suitability, quality, merchantability, fitness for any purpose, value, state, condition, appearance, safety, durability, design or operation of any kind or nature of the Vessel or any part thereof, and the benefit of any such condition, warranty or representation by the Owners is hereby irrevocably and unconditionally waived by the Charterers to the extent permissible under applicable law, the Charterers hereby also waive any rights which they may have in tort in respect of any of the matters referred to above and irrevocably agree that the Owners shall have no greater liability in tort in respect of any such matter than they would have in contract after taking account of all of the foregoing

89119645v1
Folegandros - BBC

exclusions. No third party making any representation or warranty relating to the Vessel or any part thereof is the agent of the Owners nor has any such third party authority to bind the Owners thereby. Notwithstanding anything contained above, nothing contained herein is intended to obviate, remove or waive any rights or warranties or other claims relating thereto which the Charterers (or their nominee) or the Owners may have against the manufacturer or supplier of the Vessel or any third party;

(b)     the Vessel shall be free from any registered mortgages incurred by the Owners (save for those mortgages, liens, encumbrances and debts arising out of or in connection with this Charter or the Pertinent Documents);

(c)     the relevant Early Termination Price or the relevant Put Option Price or the Purchase Obligation Price, respectively, shall be paid by (or on behalf of) the Charterers to the Owners on the relevant Early Termination Option Date or the relevant Put Option Date or the Purchase Obligation Date, respectively, together with unpaid amounts of the Charterhire and any other moneys owing by or accrued or due from the Charterers under this Charter on or prior to such Early Termination Date or Put Option Date or Purchase Obligation Date, respectively, which remain unpaid at such time; and

(d)     upon the relevant Early Termination Price or the relevant Put Option Price or the Purchase Obligation Price, respectively, and all other moneys payable under this Charter being fully and irrevocably paid to the Owners on, and in accordance with, the terms set forth in this Charter, the Owners agree (at the cost of the Charterers) to enter into (i) a bill of sale and (ii) a protocol of delivery and acceptance, in respect of the Vessel.

## CLAUSE 51     – INDEMNITIES

**51.1**     The Charterers shall pay such amounts to the Owners, on the Owners' demand, in respect of all costs, claims, expenses, liabilities, losses, fees (including, but not limited to any vessel registration and tonnage fees) suffered or incurred by or imposed on the Owners arising from this Charter and any Pertinent Document or in connection with delivery, possession, performance, control, registration, repair, survey, insurance, maintenance, manufacture, purchase, ownership and operation of the Vessel by the Owners and the costs related to the prevention or release of liens or detention of or requisition, use, operation or redelivery, sale or disposal of the Vessel or any part of it and whether prior to, during or after termination of the leasing under this Charter and whether or not the Vessel is in the possession or the control of the Charterers or otherwise. Without prejudice to its generality, this Clause covers any claims, expenses, liabilities and losses which arise, or are asserted, under or in connection with any law relating to safety at sea, the ISM Code, the ISPS Code, the MARPOL Protocol, any Environmental Law or any Sanctions.

**51.2**     In consideration of the Charterers requesting the Owners to charter the Other Vessel to the Other Charterer under the Other Charter, the Charterers hereby irrevocably and unconditionally undertake to pay immediately on demand from the Owners such amounts in respect of all claims, expenses, liabilities, losses, fees of every kind and nature and all other moneys due, owing and/or payable to the Owners by the Other Charterer under or in connection with the Other Charter, and to indemnify and hold the Owners harmless against all such moneys, costs, fees and expenses.

**51.3**     The obligations of the Charterers under Clause 51 and in respect of any Security Interest created pursuant to the Security Documents will not be affected or discharged by an act, omission, matter or thing which would reduce, release or prejudice any of its obligations under Clause 51 or in respect of any Security Interest created pursuant to the Security Documents (without limitation and whether or not known to it or any Relevant Person) including:

89119645v1
Folegandros - BBC

(a)    any time, waiver or consent granted to, or composition with, any Relevant Person or other person;

(b)    the release of any other Relevant Person or any other person under the terms of any composition or arrangement with any creditor of any member of the Eletson Group;

(c)    the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect or delay in perfecting, or refusal or neglect to take up or enforce, or delay in taking or enforcing any rights against, or security over assets of, any Relevant Person or other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

(d)    any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of a Relevant Person or any other person;

(e)    any amendment, novation, supplement, extension, restatement (however fundamental and whether or not more onerous) or replacement of any Pertinent Document or any other document or security;

(f)    any unenforceability, illegality or invalidity of any obligation of any person under any Security Document or any other document or security; or

(g)    any insolvency or similar proceedings.

**51.4**   All rights which the Charterers at any time have (whether in respect of this Charter or any other transaction) against any other Relevant Person or their respective assets shall be fully subordinated to the rights of the Owners under the Leasing Documents and the Other Charter and until the end of the Charter Period and unless the Owners otherwise direct, the Charterers will not exercise any rights which they may have (whether in respect of any Leasing Document to which it is a party or any other transaction) by reason of performance by them of their obligations under the Leasing Documents or by reason of any amount being payable, or liability arising, under this Clause 51:

(a)    to be indemnified by any other Relevant Person;

(b)    to claim any contribution from any third party providing security for, or any other guarantor of, any Relevant Person's obligations under the Leasing Documents or, as the case may be, the Other Charter;

(c)    to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights of the Owners under the Leasing Documents or the Other Charter or of any other guarantee or security taken pursuant to, or in connection with, the Leasing Documents or the Other Charter by the Owners;

(d)    to bring legal or other proceedings for an order requiring any Relevant Person to make any payment, or perform any obligation, in respect of which the Charterers have given a guarantee, undertaking or indemnity under Clause 51;

(e)    to exercise any right of set-off against any Relevant Person; and/or

(f)    to claim or prove as a creditor of any Relevant Person in competition with the Owners.

If the Charterers receive any benefit, payment or distribution in relation to such rights they shall hold that benefit, payment or distribution to the extent necessary to enable all amounts which may be or become payable to the Owner by the Relevant Persons under or in connection with the Leasing Documents or the Other Charter to be repaid in full on trust for

30

the Owners and shall promptly pay or transfer the same to the Owners or as the Owners may direct.

**51.4** Notwithstanding anything to the contrary herein (but subject and without prejudice to Clause 33) and without prejudice to any right to damages or other claim which the Charterers may have at any time against the Owners under this Charter, the indemnities provided by the Charterers in favour of the Owners shall continue in full force and effect notwithstanding any breach of the terms of this Charter or termination of this Charter pursuant to the terms hereof or termination of this Charter by the Owners.

## CLAUSE 52 – NO SET-OFF OR TAX DEDUCTION

**52.1** All Charterhire or payment of the Early Termination Price or the Put Option Price or the Purchase Obligation Price, respectively, and any other payment made from the Charterers to enable the Owners to pay all amounts under a Pertinent Document shall be paid punctually:

(a) without any form of set-off (except in the case of the Advance Charterhire or, case the case may be, the Pre-delivery Principal Charterhire, may be set off in accordance with Clause 36.1(a) or Clause 36.1(c) respectively), cross-claim or condition and in the case of the Charterhire, without previous demand unless otherwise agreed with the Owners; and

(b) free and clear of any tax deduction or withholding unless required by law.

**52.2** Without prejudice to Clause 52.1, if the Owners are required by law to make a tax deduction from any payment:

(a) the Owners shall notify the Charterers as soon as they become aware of the requirement; and

(b) the amount due in respect of the payment shall be increased by the amount necessary to ensure that the Owners receive and retain (free from any liability relating to the tax deduction) a net amount which, after the tax deduction, is equal to the full amount which they would otherwise have received.

**52.3** In this Clause "**tax deduction**" means any deduction or withholding for or on account of any present or future tax, other than a FATCA Deduction.

## CLAUSE 53 – INCREASED COSTS

**53.1** This Clause 53 applies if the Owners notify the Charterers that they consider that as a result of:

(a) the introduction or alteration after the date of this Charter of a law or an alteration after the date of this Charter in the manner in which a law is interpreted or applied (disregarding any effect which relates to the application to payments under this Charter of a tax on the Owners' overall net income); or

(b) complying with any regulation (including any which relates to capital adequacy or liquidity controls or which affects the manner in which the Owners allocates capital resources to their obligations under this Charter) which is introduced, or altered, or the interpretation or application of which is altered, after the date of this Charter; or

(c) the implementation, application of or compliance with Basel III or CRD IV or any law or regulation that implements or applies Basel III or CRD IV.

the Owners (or a parent company of them) has incurred or will incur an "**increased cost**".

**53.2** In this Clause 53:

(a)     "**Increased Cost**" means, in relation to the Owners:

(i)     an additional or increased cost incurred as a result of, or in connection with, the Owners having entered into, or being a party to, this Charter, of funding the acquisition of the Vessel pursuant to the MOA or performing their obligations under this Charter;

(ii)    an additional or increased cost incurred by the financiers of the Owners (if any) as a result of, or in connection with, the financiers of the Owners (if any) having entered into, or being a party to, the financing arrangements with the Owners and the relevant Financial Instruments in each case relating to the funding of the acquisition of the Vessel pursuant to the MOA;

(iii)   a reduction in the amount of any payment to the Owners under this Charter or in the effective return which such a payment represents to the Owners on their capital;

(iv)    a reduction in the amount of any payment to the financiers of the Owners (if any) under their financing arrangements and relevant Financial Instruments or in the effective return which such a payment represents to the financiers of the Owners (if any) or on their capital;

(v)     an additional or increased cost of funding the acquisition of the Vessel pursuant to the MOA; or

(vi)    a liability to make a payment, or a return foregone, which is calculated by reference to any amounts received or receivable by the Owners under this Charter,

and for the purposes of this Clause 53.2 the Owners may in good faith allocate or spread costs and/or losses among their assets and liabilities (or any class of their assets and liabilities) on such basis as they consider appropriate.

(b)     "**Basel III**" means:

(i)     the agreements on capital requirements, a leverage ratio and liquidity standards contained in "Basel III: A global regulatory framework for more resilient banks and banking systems", "Basel III: International framework for liquidity risk measurement, standards and monitoring" and "Guidance for national authorities operating the countercyclical capital buffer" published by the Basel Committee on Banking Supervision in December 2010, each as amended, supplemented or restated; and

(ii)    the rules for global systemically important banks contained in "Global systemically important banks: assessment methodology and the additional loss absorbency requirement – Rules text" published by the Basel Committee on Banking Supervision in November 2011, as amended, supplemented or restated; and

(iii)   any further guidance or standards published by the Basel Committee on Banking Supervision relating to "Basel III".

(c)     "**CRD IV**" means:

(i)     Regulation (EU) No 575/2013 of the European Parliament and of the Council of 26 June 2013 on prudential requirements for credit institutions and investment firms and amending regulation (EU) No. 648/2012;

(ii)    Directive 2013/36/EU of the European Parliament and of the Council of 26 June 2013 on access to the activity of credit institutions and the prudential supervision of credit

89119645v1
Folegandros - BBC

institutions and investment firms, amending Directive 2002/87/EC and repealing Directives 2006/48/EC and 2006/49/EC; and

(iii)     any other law or regulation which implements Basel III.

**53.3**     Subject to the terms of Clause 53.1, the Charterers shall pay to the Owners, on the Owners' demand, the amounts which the Owners from time to time notify the Charterers to be necessary to compensate the Owners for the increased cost.

**CLAUSE 54     – MISCELLANEOUS**

**54.1**     The Charterers waive any rights of sovereign immunity which they or any of their properties may enjoy in any jurisdiction and subjects itself to civil and commercial law with respect to their obligations under this Charter.

**54.2**     No term of this Charter is enforceable under the Contracts (Rights of Third Parties) Act 1999 by a person who is not a party to this Charter.

**54.3**     This Charter and each Pertinent Document may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of this Charter or that Pertinent Document, as the case may be.

**CLAUSE 55     – FATCA**

**55.1**     **Defined terms.** For the purposes of this Clause 55, the following terms shall have the following meanings:

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**FATCA**" means sections 1471 through 1474 of the Code and any Treasury regulations thereunder.

"**FATCA Deduction**" means a deduction or withholding from a payment under this Charter or the Pertinent Documents required by or under FATCA.

"**FATCA Exempt Party**" means a Relevant Party that is entitled under FATCA to receive payments free from any FATCA Deduction.

"**FATCA FFI**" means a foreign financial institution as defined in section 1471(d)(4) of the Code which, if a Relevant Party is not a FATCA Exempt Party, could be required to make a FATCA Deduction.

"**FATCA Non-Exempt Party**" means any Relevant Party who is not a FATCA Exempt Party.

"**IRS**" means the United States Internal Revenue Service or any successor taxing authority or agency of the United States government.

"**Relevant Party**" means any of the parties to this Charter and the Pertinent Documents.

**55.2**     **FATCA Information.**

(a)     Subject to paragraph (c) below, each Relevant Party shall, on the date of this Charter, and thereafter within ten (10) Business Days of a reasonable request by another Relevant Party:

(i)    confirm to that other party whether it is a FATCA Exempt Party or is not a FATCA Exempt Party; and

(ii)   supply to the requesting party (with a copy to all other Relevant Parties) such other form or forms (including IRS Form W-8 or Form W-9 or any successor or substitute form, as applicable) and any other documentation and other information relating to its status under FATCA (including its applicable "pass thru percentage" or other information required under FATCA or other official guidance including intergovernmental agreements) as the requesting party reasonably requests for the purpose of the requesting party's compliance with FATCA .

(b)    If a Relevant Party confirms to any other Relevant Party that it is a FATCA Exempt Party or provides an IRS Form W-8 or W-9 showing that it is a FATCA Exempt Party and it subsequently becomes aware that it is not, or has ceased to be a FATCA Exempt Party, that party shall so notify all other Relevant Parties reasonably promptly.

(c)    Nothing in this clause shall oblige any Relevant Party to do anything which would or, in its reasonable opinion, might constitute a breach of any law or regulation, any policy of that party, any fiduciary duty or any duty of confidentiality, or to disclose any confidential information (including, without limitation, its tax returns and calculations); provided, however, that nothing in this paragraph shall excuse any Relevant Party from providing a true, complete and correct IRS Form W-8 or W-9 (or any successor or substitute form where applicable). Any information provided on such IRS Form W-8 or W-9 (or any successor or substitute forms) shall not be treated as confidential information of such party for purposes of this paragraph.

(d)    If a Relevant Party fails to confirm its status or to supply forms, documentation or other information requested in accordance with the provisions of this Charter or the provided information is insufficient under FATCA, then:

(i)    if that party failed to confirm whether it is (and/or remains) a FATCA Exempt Party then such party shall be treated for the purposes of this Charter and the Pertinent Documents as if it is a FATCA Non-Exempt Party; and

(ii)   if that party failed to confirm its applicable passthru percentage then such party shall be treated for the purposes of this Charter and the Pertinent Documents (and payments made thereunder) as if its applicable passthru percentage is 100%,

until (in each case) such time as the party in question provides sufficient confirmation, forms, documentation or other information to establish the relevant facts.

**55.3    FATCA Deduction and gross-up by Relevant Party.**

(a)    If the representation made by the Charterers under Clause 45.1(m) proves to be untrue or misleading such that the Charterers are required to make a FATCA Deduction, the Charterers shall make the FATCA Deduction and any payment required in connection with that FATCA Deduction within the time allowed and in the minimum amount required by FATCA.

(b)    If the Charterers are required to make a FATCA Deduction then the Charterers shall increase the payment due from them to the Owners to an amount which (after making any FATCA Deduction) leaves an amount equal to the payment which would have been due if no FATCA Deduction had been required.

(c)    The Charterers shall promptly upon becoming aware that they must make a FATCA Deduction (or that there is any change in the rate or basis of a FATCA Deduction) notify the Owners accordingly. Within thirty (30) days of the Charterers making either a FATCA Deduction or any payment required in connection with that FATCA Deduction, the Charterers shall deliver to

89119645v1
Folegandros - BBC

the Owners evidence reasonably satisfactory to the Owners that the FATCA Deduction has been made or (as applicable) any appropriate payment paid to the relevant governmental or taxation authority.

**55.4    FATCA Deduction by Owners.**

The Owners may make any FATCA Deduction they are required by FATCA to make, and any payment required in connection with that FATCA Deduction, and the Owners shall not be required to increase any payment in respect of which they make such a FATCA Deduction or otherwise compensate the recipient for that FATCA Deduction.

**55.5    FATCA Mitigation.**

Notwithstanding any other provision to this Charter, if a FATCA Deduction is or will be required to be made by any party under Clause 55.3 in respect of a payment to the Owners as a result of the Owners not being a FATCA Exempt Party, the Owners shall have the right to transfer their interest in the Vessel (and this Charter) to any person nominated by the Owners and all costs in relation to such transfer shall be for the account of the Charterers.

**CLAUSE 56    – DEFINITIONS**

**56.1**    In this Charter the following terms shall have the meanings ascribed to them below:

"**Acceptance Certificate**" means a certificate substantially in the form set out in Schedule I to be signed by the Charterers at Delivery.

"**Account Security**" means the document creating security over the Earnings Account executed by the Charterers in favour of the Owners, in the agreed form.

"**Advance Charterhire**" means an amount equal to the amount by which the Purchase Price exceeds the lower of (i) an amount equal to 80% of the Contract Price and (ii) an amount equal to 85% of the Initial Market Value.

"**Approved Manager**" means Eletson Corporation as commercial manager and as technical manager or any other international and reputable manager who may, with the prior approval of the Owners be appointed as a manager of the Vessel.

"**Approved Valuer**" means Clarksons, Simpsons, Spencer and Young, Arrow, Howe Robinson, Gibson,  Braemar ACM, Maersk Broker or such other shipbroker which is a member of the Institute of Chartered Shipbrokers nominated by the Charterers and approved by the Owners.

 "**Book Value**" means, at any relevant time, the value of the Vessel determined using a depreciation model acceptable to the Owners over a period of thirty (30) years in accordance with the generally acceptable accounting principles in the US.

"**Breakfunding Costs**" means all breakfunding costs and expenses incurred or payable by the Owners when a repayment or prepayment under the relevant funding arrangement entered into by the Owners for the purpose of financing the Purchase Price do not fall on a Payment Date.

"**Builder**" means Shanghai Waigaoqiao Shipbuilding Co., Ltd., a company incorporated under the laws of the People's Republic of China having its registered office at 3001 Zhouhai Road, Pudong New District, Shanghai, the People's Republic of China 200137.

"**Business Day**" means a day on which banks are open for business in the principal business centres of London, Hong Kong, the People's Republic of China, Greece and, in respect of a day on which a payment is required to be made or other dealing is due to take place under a

89119645v1
Folegandros - BBC

Pertinent Document in Dollars, also a day on which commercial banks are open in New York City.

"**Cancelling Date**" means 31 December 2018 (or such later date as may be agreed by the Charterers and the Owners).

"**Charterhire**" means each of, as the context may require, any of:

(a)     the Advance Charterhire;

(b)     the Pre-delivery Principal Charterhire;

(c)     all of the monthly instalments of the Pre-delivery Interest Charterhire;

(d)     all of the monthly instalments of the Fixed Charterhire; and

(e)     all of the monthly instalments of the Variable Charterhire.

"**Charterhire Principal**" means the Pre-delivery Principal Charterhire or, as from the Commencement Date, the Fixed Charterhire payable under this Charter.

"**Charterhire Principal Balance**" means, at any relevant time, the aggregate Charterhire Principal outstanding under this Charter at such time, as may be reduced by payments or prepayments by the Charterers to the Owners of the Fixed Charterhire instalments or, as the case may be, the Pre-delivery Principal Charterhire paid or repaid as at that time in each case, under this Charter.

"**Charter Period**" means the period commencing on the Commencement Date and described in Clause 32.2 unless it is either terminated earlier in accordance with the provisions of this Charter.

"**CISADA**" means the United States Comprehensive Iran Sanctions, Accountability and Divestment Act of 2010 as it applies to non-US persons.

"**Classification Society**" means Lloyds Register or such other classification society notified by the Charterers to the Owners which is a member of the International Association of Classification Societies ("**IACS**") and approved by the Owners.

"**Commencement Date**" means the date on which Delivery takes place.

"**Contract Price**" means the contract price of the Vessel payable by the Charterers as buyers to the Builder under the Shipbuilding Contract, being $51,697,500.

"**Delivery**" means the delivery of the legal and beneficial interest in the Vessel from the Owners to the Charterers and from the Charterers as sellers to the Owners as buyers under the MOA.

"**Deposit**" shall have the meaning given to it in Clause 46.1(y).

"**Direct Agreement**" means the direct agreement dated on or about the date of this Charter executed between the Owners, the Charterers and the Builder in respect of the Shipbuilding Contract in the agreed form (as set out in the Pre-Delivery Assignment).

"**Dollars**" and "**$**" mean the lawful currency for the time being of the United States of America.

"**Early Termination Option**" means the early termination option granted by the Owners to the Charterers pursuant to Clause 47.

89119645v1
Folegandros - BBC

"**Early Termination Date**" means the date specified in the Early Termination Notice as being the date on which the Owners shall sell and transfer the legal and beneficial interest in the Vessel to the Charterers, and the Charterers shall buy and accept the same, being any of the third anniversary, the fourth anniversary, the fifth anniversary, the sixth anniversary, the seventh anniversary, the eighth anniversary or the ninth anniversary of the Commencement Date.

"**Early Termination Fee**" means, in respect of the Early Termination Date, a fee equal to the amount calculated as per the table below:

| Early Termination Date | Early Termination Fee |
| --- | --- |
| Third anniversary of the Commencement Date | 4% of the Outstanding Principal Balance |
| Fourth anniversary of the Commencement Date | 3% of the Outstanding Principal Balance |
| Fifth anniversary of the Commencement Date | 3% of the Outstanding Principal Balance |
| Sixth anniversary of the Commencement Date | 2% of the Outstanding Principal Balance |
| Seventh anniversary of the Commencement Date | 2% of the Outstanding Principal Balance |
| Eighth anniversary of the Commencement Date | 0 |
| Ninth anniversary of the Commencement Date | 0 |

"**Early Termination Notice**" means a written notice from the Charterers specifying their intention to exercise the Early Termination Option on the Early Termination Date given pursuant to Clause 47.3 and otherwise in accordance with Clause 47.4.

"**Early Termination Price**" means the Outstanding Principal Balance on such Early Termination Date.

"**Earnings**" means all moneys whatsoever which are now, or later become, payable (actually or contingently) and which arise out of the use or operation of the Vessel, including (but not limited to):

(a)     all freight, hire and passage moneys, compensation payable in the event of requisition of the Vessel for hire, remuneration for salvage and towage services, demurrage and detention moneys and damages for breach (or payments for variation or termination) of any charterparty or other contract for the employment of the Vessel; and

(b)     if and whenever the Vessel is employed on terms whereby any moneys falling within paragraph (a) are pooled or shared with any other person, that proportion of the net receipts of the relevant pooling or sharing arrangement which is attributable to the Vessel.

"**Earnings Account**" means, an interest-bearing account in the name of the Charterers with such bank as the Owners and the Charterers may mutually agree.

"**Eletson Group**" means Guarantor A and each of Guarantor A's subsidiaries from time to time.

"**Environmental Claim**" means:

89119645v1
Folegandros - BBC

(a)     any claim by any governmental, judicial or regulatory authority which arises out of an Environmental Incident or which relates to any Environmental Law; or

(b)     any claim by any other person which relates to an Environmental Incident,

and "**claim**" means a claim for damages, compensation, fines, penalties or any other payment; an order or direction to take, or not to take, certain action or to desist from or suspend certain action; and any form of enforcement or regulatory action, including the arrest or attachment of any asset.

"**Environmental Incident**" means:

(a)     any release of Environmentally Sensitive Material from the Vessel; or

(b)     any incident in which Environmentally Sensitive Material is released from a vessel other than the Vessel and which involves a collision between the Vessel and such other vessel or some other incident of navigation or operation, in either case, in connection with which the Vessel is actually liable to be arrested, attached, detained or injuncted and/or the Vessel and/or the Owners and/or the Charterers and/or any other operator or manager of the Vessel is at fault or otherwise liable to any legal or administrative action; or

(c)     any other incident involving the Vessel in which Environmentally Sensitive Material is released otherwise than from the Vessel and in connection with which the Vessel is actually arrested and/or where the Owners and/or the Charterers and/or any other operator or manager of the Vessel is at fault or otherwise liable to any legal or administrative action.

"**Environmental Law**" means any law relating to pollution or protection of the environment, to the carriage or releases of Environmentally Sensitive Material.

"**Environmentally Sensitive Material**" means oil, oil products and any other substances (including any chemical, gas or other hazardous or noxious substance) which are (or are capable of being or becoming) polluting, toxic or hazardous.

"**Financial Indebtedness**" means, in relation to a person (the "**debtor**"), a liability of the debtor:

(a)     for principal, interest or any other sum payable in respect of any moneys borrowed or raised by the debtor;

(b)     under any loan stock, bond, note or other security issued by the debtor;

(c)     under any acceptance credit, guarantee or letter of credit facility made available to the debtor;

(d)     under a lease, a deferred purchase consideration arrangement (other than deferred payments for assets or services obtained on normal commercial terms in the ordinary course of business) or any other agreement having the commercial effect of a borrowing or raising of money by the debtor;

(e)     under any foreign exchange transaction, any interest or currency swap or any other kind of derivative transaction entered into by the debtor or, if the agreement under which any such transaction is entered into requires netting of mutual liabilities, the liability of the debtor for the net amount; or

(f)        under a guarantee, indemnity or similar obligation entered into by the debtor in respect of a liability of another person which would fall within paragraphs (a) to (e) if the references to the debtor referred to the other person.

"**Financial Instruments**" means the mortgage, the deed of covenant, the general assignment or such other financial security instruments granted to the Owners' financiers as security for the obligations of the Owners in relation to the financing of the acquisition of the Vessel.

"**Fixed Charterhire**" means, in relation to a Payment Date, the fixed charterhire for the Term commencing on that Payment Date as set out in the Fixed Charterhire Payment Schedule.

"**Fixed Charterhire Payment Schedule**" means Schedule III to this Agreement indicating details of each payment of the Fixed Charterhire.

"**General Assignment**" means the general assignment executed or to be executed between the Charterers and the Owners in respect of the Vessel, pursuant to which the Charterers shall, *inter alia,* assign their rights under the Insurances, Earnings, Requisition Compensation and sub-charters having a duration of at least twelve (12) months (or which are capable of exceeding twelve (12) months) in respect of the Vessel, in favour of the Owners and in the agreed form.

"**Guarantee**" means a guarantee executed by a Guarantor in favour of the Owners in the agreed form.

"**Guarantor A**" means Eletson Holdings Inc., a corporation incorporated and existing under the laws of Liberia having its registered office at 80 Broad Street, Monrovia, Liberia.

"**Guarantor B**" means Eletson Corporation, a corporation incorporated and existing under the laws of Liberia having its registered office at 80 Broad Street, Monrovia, Liberia.

"**Guarantors**" means Guarantor A and Guarantor B and a "**Guarantor**" means either of them.

"**IAPPC**" means a valid international air pollution prevention certificate for the Vessel issued pursuant to the MARPOL Protocol.

"**Initial Market Value**" means, in relation to the Vessel, at any relevant time, the arithmetic average of two (2) valuations, each prepared:

(a)        on a date no earlier than fifteen (15) days, or such other period as mutually agreed between the Owners and the Charterers, prior to the Commencement Date;

(b)        by an Approved Valuer;

(c)        with or without physical inspection of that Vessel;

(d)        on the basis of a sale for prompt delivery for cash on normal arm's length commercial terms as between a willing seller and a willing buyer, free of any existing charter or other contract of employment; and

(e)        after deducting the estimated amount of the usual and reasonable expenses which would be incurred in connection with the sale,

and such valuations shall be prepared by one (1) Approved Valuer selected and appointed by the Owners and one (1) Approved Valuer selected and appointed by the Charterers  (with the expenses of all such valuations being borne by the Charterers).

"**Insurances**" means:

89119645v1
Folegandros - BBC

(a)     all policies and contracts of insurance, including entries of the Vessel in any protection and indemnity or war risks association, which are effected in respect of the Vessel or otherwise in relation to it whether before, on or after the date of this Charter; and

(b)     all rights and other assets relating to, or derived from, any of the foregoing, including any rights to a return of a premium and any rights in respect of any claim whether or not the relevant policy, contract of insurance or entry has expired on or before the date of this Charter.

"**Interest Rate**" means:

(a)     in relation to the Pre-delivery Interest Charterhire, the rate of 6.00% per annum; or

(b)     in relation to the Variable Charterhire, the rate of interest determined in accordance with Schedule IV plus the Margin.

"**ISM Code**" means the International Safety Management Code (including the guidelines on its implementation), adopted by the International Maritime Organisation Assembly as Resolutions A.741 (18) and A.788 (19), as the same may be amended or supplemented from time to time (and the terms "**safety management system**", "**Safety Management Certificate**" and "**Document of Compliance**" have the same meanings as are given to them in the ISM Code).

"**ISPS Code**" means the International Ship and Port Security Code as adopted by the Conference of Contracting Governments to the Safety of Life at Sea Convention 1974 on 13 December 2002 and incorporated as Chapter XI-2 of the Safety of Life at Sea Convention 1974, as the same may be supplemented or amended from time to time.

"**Leasing Documents**" means this Charter, the MOA and the Security Documents.

"**LIBOR**" means, in relation to a Term, the London interbank offered rate administered by ICE Benchmark Administration Limited (or any other person which takes over the administration of that rate) for Dollars for such Term displayed on page LIBOR01 of the screen of Thomson Reuters or Bloomberg (and such screen to be selected by the Owners in their sole discretion) (or any replacement page which displays each such rate) or on the appropriate page of such other information service which publishes that rate from time to time in place of Thomson Reuters or, as the case may be, Bloomberg, and if such page or service ceases to be available, the Owners may specify another page or service displaying the relevant rate on the day (if such day is not a Business Day, the Business Day immediately preceding such day) falling fifteen (15) Business Days prior to the relevant payment date.

"**Major Casualty**" means any casualty to the Vessel in respect of which the claim or the aggregate of the claims against all insurers, before adjustment for any relevant franchise or deductible, exceeds $1,000,000 or the equivalent in any other currency.

"**Manager's Undertaking**" means the letter of undertaking from the Approved Manager subordinating the rights of such Approved Manager against the Vessel and the Charterers to the rights of the Owners and their financiers (if any) in the agreed form.

"**Margin**" means during the Charter Period, 4.60% per annum.

"**Market Value**" means, in relation to the Vessel, at any relevant date, the market value based on one valuation report prepared at the cost and expense of the Charterers:

(a)     on a date no earlier than fifteen (15) days before the end of the last financial quarter at such relevant time;

(b)     by an Approved Valuer nominated by the Charterers and appointed by the Owners;

(c)     with or without physical inspection of that Vessel;

(d)     on the basis of a sale for prompt delivery for cash on normal arm's length commercial terms as between a willing seller and a willing buyer, free of any existing charter or other contract of employment; and

(e)     after deducting the estimated amount of the usual and reasonable expenses which would be incurred in connection with the sale.

"**MARPOL Protocol**" means Annex VI (Regulations for the Prevention of Air Pollution from Ships) to the International Convention for the Prevention of Pollution from Ships 1973 (as amended in 1978 and 1997).

"**Material Adverse Effect**" means, in the reasonable opinion of the Owners, a material adverse effect on:

(a)     the business, operations, property, condition (financial or otherwise) or prospects of the Charterers or the Guarantors and/or any of its subsidiaries as a whole; or

(b)     the ability of any Relevant Person to perform its obligations under any Pertinent Document to which it is a party; or

(c)     the validity or enforceability of, or the effectiveness or ranking of any Security Interests granted pursuant to any of the Pertinent Documents or the rights or remedies of the Owners under any of the Pertinent Documents.

"**MOA**" means the memorandum of agreement entered into by the Charterers as sellers and the Owners as buyers dated on the date of this Charter in relation to the sale and purchase of the Vessel.

"**Original Financial Statements**" means, with respect to Guarantor A and the Charterers, the audited financial statements of each of Guarantor A and the Charterers for the financial year ended on 31 December 2016.

"**Original Jurisdiction**" means, in relation to each of the Charterers and the Guarantors, the jurisdiction under whose laws they are incorporated as at the date hereof.

"**Other Charter**" means, in relation to the Other Vessel, a bareboat charterparty entered into between the Owner as owners and the Other Charterer as bareboat charterers.

"**Other Charterer**" means Kastelorizo Shipping Corporation, a corporation incorporated and existing under the laws of Liberia, having its registered office at 80 Broad Street, Monrovia, Liberia.

"**Other Vessel**" means, the vessel constructed by the Builder with hull number H1425 which is owned by the Owner.

"**Outstanding Principal Balance**" means:

(a)     during the Pre-delivery Period, the Pre-delivery Principal Charterhire; and

(b)     during the Charter Period, the Post-delivery Outstanding Principal Balance.

"**Payment Date**" means:

(a) during the Pre-delivery Period, each of the monthly dates falling during such period with the first of such dates being the date falling one (1) month after the date of payment of the first Pre-delivery Instalment under the MOA by the Owners to the Charterers and each subsequent date falling at monthly intervals thereafter with the last of such dates falling on the last day of such period; and

(b) during the Charter Period, each of the one hundred and twenty (120) dates upon which the Fixed Charterhire and the Variable Charterhire are to be paid by the Charterers to the Owners pursuant to Clause 36 with the first of such dates falling on the Commencement Date and each subsequent date thereafter falling at monthly intervals thereafter.

"**Permitted Security Interests**" means:

(a) Security Interests created by a Pertinent Document or a Financial Instrument;

(b) liens for unpaid master's and crew's wages in accordance with the ordinary course of operation of the Vessel or in accordance with usual reputable maritime practice;

(c) liens for salvage;

(d) liens for master's disbursements incurred in the ordinary course of trading;

(e) any other liens arising by operation of law or otherwise in the ordinary course of the operation, repair or maintenance of the Vessel provided such liens do not secure amounts more than thirty (30) days overdue;

(f) any Security Interest created in favour of a plaintiff or defendant in any action of the court or tribunal before whom such action is brought as security for costs and expenses where the Owners are prosecuting or defending such action in good faith by appropriate steps; and

(g) Security Interests arising by operation of law in respect of taxes which are not overdue or for payment of taxes which are overdue for payment but which are being contested by the Owners or the Charterers in good faith by appropriate steps and in respect of which adequate reserves have been made.

"**Pertinent Document**" means each of the Shipbuilding Documents and each of the Leasing Documents.

"**Post-Delivery Outstanding Principal Balance**" means the aggregate of:

(a) the Charterhire Principal Balance excluding the Pre-delivery Principal Charterhire; and

(b) the Purchase Obligation Price,

as may be reduced by payments or prepayments by the Charterers to the Owners in accordance with the terms of this Charter.

"**Potential Termination Event**" means, an event or circumstance which, with the giving of any notice, the lapse of time, a determination of the Owners and/or the satisfaction of any other condition, would under the Leasing Documents constitute a Termination Event.

"**Pre-delivery Assignment**" means the assignment agreement dated 1 November 2017 and entered into between, inter alia, the Owners and the Charterers pursuant to which, *inter alia,* the Charterer assigns to the Owners their rights, interests and benefits to the Shipbuilding Contract and the Refund Guarantee in the agreed form.

"**Pre-delivery Instalment**" means each, or as the context may require, any of the two instalments paid by the Owners to the Charterers under the MOA prior to the Delivery.

"**Pre-delivery Instalment Balance**" means any Pre-delivery Instalment paid by the Owners as buyers to the Charterers as sellers under the MOA.

"**Pre-delivery Interest Charterhire**" means, during the Pre-delivery Period, each or, as the context may require, any monthly charterhire comprising of interest accrued on the Pre-delivery Instalment Balance at the applicable Interest Rate payable on the relevant Payment Date in arrears.

"**Pre-delivery Period**" means the period commencing from the date the first Pre-delivery Instalment is paid by the Owners to the Charterers under the MOA up to and including the Commencement Date.

"**Pre-delivery Principal Charterhire**" means the amount of Charterhire payable pursuant to Clause 36.1(c) reflecting the aggregate amount of the Pre-delivery Instalments.

"**Purchase Obligation**" means the purchase obligation referred to in Clause 49.

"**Purchase Obligation Date**" means the date on which the Owners shall transfer the legal and beneficial interest in the Vessel to the Charterers, and the Charterers shall purchase the Vessel, being the date falling on the last day of the Charter Period.

"**Purchase Obligation Price**" means an amount equal to the lower of $13,900,000 and 29% of the Initial Market Value of the Vessel.

"**Purchase Price**" means the purchase price of the Vessel stated in, and payable under the MOA, being an amount equal to the lower of (a) $51,347,500 and (b) the Initial Market Value of the Vessel.

"**Put Option**" means the early termination option which the Owners are entitled to pursuant to Clause 48.

"**Put Option Date**" means the date specified in the Put Option Notice as being the date on which the Owners shall sell and transfer the legal and beneficial interest in the Vessel to the Charterers, and the Charterers shall buy and accept the same.

"**Put Option Notice**" means a written notice from the Owners specifying their intention to exercise the Put Option on the Put Option Date given pursuant to Clause 48.3 and otherwise in accordance with Clause 47.4.

"**Put Option Price**" means the Outstanding Principal Balance, together with any Pre-delivery Interest Charterhire and Variable Charterhire payment on such Put Option Date.

"**Put Option Trigger Date**" means the last day of the Put Option Trigger Period.

"**Put Option Trigger Period**" has the meaning given to that term in Clause 48.1.

"**Quiet Enjoyment Agreement**" means the quiet enjoyment agreement executed or to be executed between amongst others, the Charterers, the Owners and the financiers of the Owners in the agreed form.

"**Refund Guarantee**" means the refund guarantee dated 1 December 2015 with reference no. 5941 issued by the Refund Guarantor in favour of the Charterers (as buyer) in connection with the Shipbuilding Contract.

89119645v1
Folegandros - BBC

"**Refund Guarantor**" means The Export-Import Bank of China, Shanghai Branch.

"**Relevant Person**" means each of the Charterers, the Other Charterers, the Builder, the Refund Guarantor, the Guarantors, the Approved Manager and such other party providing security to the Owners for the Charterers' obligations under this Charter pursuant to a Security Document or otherwise.

"**Relevant Jurisdiction**" means, in relation to each of the Guarantors and the Charterers:

(a)    its Original Jurisdiction;

(b)    any jurisdiction where any property owned by it and charged under a Pertinent Document is situated;

(c)    any jurisdiction where it conducts its business; and

(d)    any jurisdiction whose laws govern the perfection of any of the Pertinent Documents entered into by it creating a Security Interest.

"**Requisition Compensation**" includes all compensation or other moneys payable by reason of any act or event such as is referred to in paragraph (b) of the definition of "**Total Loss**".

"**Restricted Countries**" means those countries subject to country-wide or territory-wide Sanctions and/or trade embargoes, in particular but not limited to pursuant to the U.S.'s Office of Foreign Asset Control of the U.S. Department of Treasury ("**OFAC**") including at the date of this Charter, but without limitation, Iran, Iraq, North Korea, Sudan and Syria and any additional countries based on respective country-wide or territory-wide Sanctions being imposed by OFAC or any of the regulative bodies referred to in the definition of Restricted Persons.

"**Restricted Person**" means a person, entity or any other parties (i) located, domiciled, resident or incorporated in Restricted Countries, and/or (ii) subject to any sanction administrated by the United Nations, the European Union, Switzerland, the United States and the U.S. Department of Treasury's Office of Foreign Assets Control ("**OFAC**"), the United Kingdom, Her Majesty's Treasury ("**HMT**") and the Foreign and Commonwealth Office of the United Kingdom, the People's Republic of China and/or (iii) owned or controlled by or affiliated with persons, entities or any other parties as referred to in (i) and (ii).

"**Sanctions**" means any sanctions, embargoes, freezing provisions, prohibitions or other restrictions relating to trading, doing business, investment, exporting, financing or making assets available (or other activities similar to or connected with any of the foregoing) imposed by law or regulation of United Kingdom, the United States of America (including, without limitation, CISADA and OFAC), the People's Republic of China or the Council of the European Union.

"**Scheduled Delivery Date**" means 30 April 2018.

"**Security Documents**" means the Guarantee, the Account Security, the General Assignment, the Pre-delivery Security Assignment, the Direct Agreement, the Shares Security, the Manager's Undertaking and any other security documents granted as security for the obligations of the Charterers under or in connection with this Charter.

"**Security Interest**" means:

(a)    a mortgage, charge (whether fixed or floating) or pledge, any maritime or other lien or any other security interest of any kind;

(b)    the security rights of a plaintiff under an action *in rem*; or

89119645v1
Folegandros - BBC

(c) any other right which confers on a creditor or potential creditor a right or privilege to receive the amount actually or contingently due to it ahead of the general unsecured creditors of the debtor concerned; however this paragraph (c) does not apply to a right of set off or combination of accounts conferred by the standard terms of business of a bank or financial institution.

"**Shares Security**" means each of the security over the shares of the Charterers executed or to be executed by each of its shareholders in favour of the Owners, in the agreed form.

"**Shipbuilding Contract**" means the shipbuilding contract in respect of the construction and sale of the Vessel dated 5 November 2015 and entered into between the Builder and the Charterers (as supplemented and amended by (i) an addendum no.1 dated 5 November 2015 and entered into between the Charterers and the Builder and (ii) an addendum no.2 dated 18 January 2017 and entered into between the Charterers and the Builder).

"**Shipbuilding Document**" means each of the Shipbuilding Contract and the Refund Guarantee.

"**Term**" means, in relation to the Pre-delivery Interest Charterhire, the Pre-delivery Fixed Charterhire the Fixed Charterhire and the Variable Charterhire, a period of one (1) month's duration provided that:

(a) in relation to the Pre-delivery Principal Charterhire and the Pre-delivery Interest Charterhire, the first Term shall commence on the date on which a Pre-delivery Instalment is paid to the Charterers as sellers under the MOA;

(b)  in relation to the Fixed Charterhire and the Variable Charterhire, the first Term shall commence on the Commencement Date;

(c) each subsequent Term shall commence on the last day of the preceding Term;

(d) any Term which would otherwise end on a non-Business Day shall instead end on the next following Business Day or, if that Business Day is another calendar month, on the immediately preceding Business Day;

(e) if any Term commences on the last Business Day of a calendar month or on a day for which there is no numerically corresponding day in the calendar month one (1) month thereafter, as the case may be, that Term shall, subject to paragraphs (d), (f) and (g), end on the last Business Day of such later calendar month;

(f) any Term which would otherwise overrun a Payment Date shall instead end on that Payment Date; and

(g) any Term which would otherwise extend beyond the Pre-delivery Period or, as the case may be, the Charter Period shall instead end on the last day of the Pre-delivery Period or, as the case may be, the Charter Period.

"**Termination Event**" means any event described in Clause 44.

"**Termination Purchase Price**" means, in respect of any date (for the purposes of this definition only, the "**Relevant Date**"), the aggregate of (i) the Outstanding Principal Balance as at the Relevant Date, plus (ii) any Breakfunding Costs, (iii) any costs incurred and expenses incurred by the Owners (and their financiers (if any)) in locating, repossessing or recovering the Vessel or collecting any payments due under this Charter or in obtaining the due performance of the obligations of the Charterers under this Charter or the other Pertinent Documents and any default interest in relation thereto and (iv) all other amounts payable under this Charter which

89119645v1
Folegandros - BBC

have fallen due on or prior to the relevant date but which remain unpaid together with any default interest thereon.

"**Three Months' Debt Service**" means, in relation to any three (3) month period commencing on the Put Option Trigger Date, the aggregate amount of (i) Fixed Charterhire, (ii) Variable Charterhire and (iii) any amounts payable for that three month period in accordance with this Charter.

"**Total Loss**" means:

(a)     actual, constructive, compromised, agreed or arranged total loss of the Vessel;

(b)     any expropriation, confiscation, requisition or acquisition of the Vessel, whether for full consideration, a consideration less than its proper value, a nominal consideration or without any consideration, which is effected by any government or official authority or by any person or persons claiming to be or to represent a government or official authority (excluding a requisition for hire for a fixed period not exceeding 1 year without any right to an extension) unless it is redelivered within twenty-one (21) days to the full control of the Owners or the Charterers; or

(c)     any arrest, capture, seizure or detention of the Vessel (including any hijacking or theft but excluding any event specified in paragraph (b) of this definition) unless it is redelivered within thirty (30) days to the full control of the Owners or the Charterers.

"**US Tax Obligor**" means (a) a person which is resident for tax purposes in the United States of America or (b) a person some or all of whose payments under the Pertinent Documents are from sources within the United States for United States federal income tax purposes.

"**Variable Charterhire**" means, during the Charter Period, the interest component calculated at the applicable Interest Rate for the Term commencing on that Payment Date on the Post-delivery Outstanding Principal Balance.

"**Vessel**" means the LR2 product tanker vessel with hull number H1426 and which is to be registered under the name of the Owners with the Greek flag upon Delivery.

56.2     In this Charter:

"**agreed form**" means, in relation to a document, such document in a form agreed in writing between the Owners and the Charterers and, if required by the Owners in their sole discretion, the Owners' financiers;

"**asset**" includes every kind of property, asset, interest or right, including any present, future or contingent right to any revenues or other payment;

"**company**" includes any partnership, joint venture and unincorporated association;

"**consent**" includes an authorisation, consent, approval, resolution, licence, exemption, filing, registration, notarisation and legalisation;

"**contingent liability**" means a liability which is not certain to arise and/or the amount of which remains unascertained;

"**continuing**" means, in relation to any Termination Event, a Termination Event which has not been waived by the Owners and in relation to any Potential Termination Event, a Potential Termination Event which has not been waived by the Owners or remedied to the satisfaction of the Owners;

89119645v1
Folegandros - BBC

"**control**" over a particular company means the power (whether by way of ownership of shares, proxy, contract, agency or otherwise) to:

(a)   cast, or control the casting of, more than 51 per cent, of the maximum number of votes that might be cast at a general meeting of such company; or

(b)   appoint or remove all, or the majority, of the directors or other equivalent officers of such company; or

(c)   give directions with respect to the operating and financial policies of such company with which the directors or other equivalent officers of such company are obliged to comply;

"**document**" includes a deed; also a letter, fax or telex;

"**expense**" means any kind of cost, charge or expense (including all legal costs, charges and expenses) and any applicable value added or other tax;

"**gross negligence**" means a form of negligence which is distinct from ordinary negligence, in which the due diligence and care which are generally to be exercised have been disregarded to a particularly high degree, in which the plainest deliberations have not been made and that which should be most obvious to everybody has not been followed;

"**law**" includes any order or decree, any form of delegated legislation, any treaty or international convention and any regulation or resolution of the Council of the European Union, the European Commission, the United Nations or its Security Council;

"**legal or administrative action**" means any legal proceeding or arbitration and any administrative or regulatory action or investigation;

"**liability**" includes every kind of debt or liability (present or future, certain or contingent), whether incurred as principal or surety or otherwise;

"**months**" shall be construed in accordance with Clause 56.3;

"**person**" includes any company; any state, political sub-division of a state and local or municipal authority; and any international organisation;

"**policy**", in relation to any insurance, includes a slip, cover note, certificate of entry or other document evidencing the contract of insurance or its terms;

"**protection and indemnity risks**" means the usual risks covered by a protection and indemnity association which is a member of the International Group of Protection & Indemnity Clubs including pollution risks, extended passenger cover and the proportion (if any) of any sums payable to any other person or persons in case of collision which are not recoverable under the hull and machinery policies by reason of the incorporation in them of clause 6 of the International Hull Clauses (1/11/02 or 1/11/03), clause 8 of the Institute Time Clauses (Hulls) (1/10/83) or clause 8 of the Institute Time Clauses (Hulls) (1/11/1995) or the Institute Amended Running Down Clause (1/10/71) or any equivalent provision;

"**regulation**" includes any regulation, rule, official directive, request or guideline whether or not having the force of law of any governmental, intergovernmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organisation;

"**subsidiary**" has the meaning given in Clause 56.4; and

89119645v1
Folegandros - BBC

"**tax**" includes any present or future tax, duty, impost, levy or charge of any kind which is imposed by any state, any political sub-division of a state or any local or municipal authority (including any such imposed in connection with exchange controls), and any connected penalty, interest or fine.

56.3   **Meaning of "month".**   A period of one or more "months" ends on the day in the relevant calendar month numerically corresponding to the day of the calendar month on which the period started ("**the numerically corresponding day**"), but:

(a)   on the Business Day following the numerically corresponding day if the numerically corresponding day is not a Business Day or, if there is no later Business Day in the same calendar month, on the Business Day preceding the numerically corresponding day; or

(b)   on the last Business Day in the relevant calendar month, if the period started on the last Business Day in a calendar month or if the last calendar month of the period has no numerically corresponding day;

and "**month**" and "**monthly**" shall be construed accordingly.

56.4   Meaning of "**subsidiary**". A company (S) is a subsidiary of another company (P) if:

(a)   a majority of the issued shares in S (or a majority of the issued shares in S which carry unlimited rights to capital and income distributions) are directly owned by P or are indirectly attributable to P; or

(b)   P has direct or indirect control over a majority of the voting rights attaching to the issued shares of S; or

(c)   P has the direct or indirect power to appoint or remove a majority of the directors of S; or

(d)   P otherwise has the direct or indirect power to ensure that the affairs of S are conducted in accordance with the wishes of P,

(e)   and any company of which S is a subsidiary is a parent company of S.

56.5   In this Charter:

(a)   references to a Pertinent Document or any other document being in the form of a particular appendix or to any document referred to in the recitals include references to that form with any modifications to that form which the Owners approve;

(b)   references to, or to a provision of, a Pertinent Document or any other document are references to it as amended or supplemented, whether before the date of this Charter or otherwise;

(c)   references to, or to a provision of, any law include any amendment, extension, re-enactment or replacement, whether made before the date of this Charter or otherwise; and

(d)   words denoting the singular number shall include the plural and vice versa.

56.6   **Headings.**  In interpreting a Pertinent Document or any provision of a Pertinent Document, all clauses, sub-clauses and other headings in that and any other Pertinent Document shall be entirely disregarded.

89119645v1
Folegandros - BBC

**OWNERS**

EXECUTED AND DELIVERED AS A DEED BY )
ORIENTAL FLEET INTERNATIONAL COMPANY LIMITED )
acting by )
expressly authorised in accordance )
with the laws of Hong Kong )
such execution being )
witnessed by )

*Jiang Zhong*      *Li Bing*
*Director*

Name:  Zhu Minjian
Address:  Shanghai

**CHARTERERS**

EXECUTED AND DELIVERED AS A DEED BY )
FOLEGANDROS SHIPPING CORPORATION )
acting by )
expressly authorised in accordance )
with the laws of Liberia )
such execution being )
witnessed by )

Name:
Address:

**EXECUTION PAGE**

**OWNERS**

| | |
|---|---|
| **EXECUTED AND DELIVERED AS A DEED BY** | ) |
| **ORIENTAL FLEET INTERNATIONAL COMPANY LIMITED** | ) |
| acting by | ) |
| expressly authorised in accordance | ) |
| with the laws of Hong Kong | ) |
| such execution being | ) |
| witnessed by | ) |

_____

Name:
Address:

**CHARTERERS**

| | |
|---|---|
| **EXECUTED AND DELIVERED AS A DEED BY** | ) |
| **FOLEGANDROS SHIPPING CORPORATION** | ) |
| acting by | ) |
| expressly authorised in accordance | ) |
| with the laws of Liberia | ) |
| such execution being | ) |
| witnessed by | ) |

L.I. KARASTAMATI

Name:
Address:
ELENA VANDOROU
ATTORNEY - AT - LAW
116, KOLOKOYRONI STR.
PIRAEUS - GREECE
TEL. 30210-4598323, FAX: 30210-4598258

89119645v1
Folegandros - BBC

**SCHEDULE I**

**ACCEPTANCE CERTIFICATE**

**FOLEGANDROS SHIPPING CORPORATION** (the "**Charterers**") hereby acknowledges that at [●] hours on [●], there was delivered to, and accepted by, the Charterers the vessel known as m.v. "[●]" (the "**Vessel**"), registered in the name of [●] (the "**Owners**") under the Greek flag with IMO number [●] under a charter dated [●] (the "**Charter**") and made between the Owners and the Charterers and that Delivery (as defined in the Charter) thereupon took place and that, accordingly, the Vessel is and will be subject to all the terms and conditions contained in the Charter.

The Charterers warrant that the representations and warranties made by them in Clause 45 of the Charter remain correct and that no Termination Event (as defined in the Charter) has occurred and is continuing at the date of this Acceptance Certificate.

_____
Name:
Title:
for and on behalf of
**[●]**
Dated:

89119645v1
Folegandros - BBC

The following are the documents referred to in Clause 34.1(b)(v)(A):

## 1 Relevant Person

1.1 To the extent not already provided under the MOA, a copy of the constitutional documents of each Relevant Person which is a party to a Leasing Document.

1.2 To the extent not already provided under the MOA, a copy of the resolutions of the board of directors (or equivalent) of each Relevant Person which is a party to a Leasing Document:

(a) approving the terms of, and the transactions contemplated by, the Leasing Documents to which it is a party and resolving that it execute the Leasing Documents to which it is a party;

(b) authorizing a specified person or persons to execute the Leasing Documents to which it is a party on its behalf; and

(c) authorizing a specified person or persons, on its behalf, to sign and/or dispatch all documents and notices to be signed and/or dispatched by it under, or in connection with, the Leasing Documents to which it is a party.

1.3 To the extent not already provided under the MOA, an original of the power of attorney of any Relevant Person which is a party to a Leasing Document authorizing a specified person or persons to execute the Leasing Documents to which it is a party.

1.4 A specimen of the signature of each person authorized by the resolution referred to in paragraph 2.1 above.

1.5 If required and to the extent not already provided under the MOA, a copy of the resolutions signed by all the holder[s] of the issued shares of each Relevant Person which is a party to a Leasing Document, approving the terms of, and the transactions contemplated by, the Leasing Documents to which that Relevant Person is a party.

1.6 A certificate of an authorized signatory of each Relevant Person which is a party to a Leasing Document certifying that each copy document relating to it specified in this Schedule is correct, complete and in full force and effect as at a date no earlier than the date of this Charter.

## 2 Vessel and other security

2.1 A duly executed true copy of each Shipbuilding Document as certified true by the Charterers.

2.2 A duly executed original of the Direct Agreement and each other Leasing Document (other than the General Assignment and the Manager's Undertaking).

2.3 A duly executed original of any other document required to be delivered by each Leasing Document (other than the General Assignment and the Manager's Undertaking).

2.4 The Original Financial Statements of the Charterers and Guarantor A.

2.5    Such evidence relating to a Relevant Person as the Owners may require for their (or their financiers) to be able to satisfy each of their "know your customer" or similar identification procedures in relation to the transactions contemplated by the Pertinent Documents.

2.6    If the Owners so require, in relation to any of the documents referred to above, an English translation of that document (with such cost to be borne by the Charterers).

**3    Legal opinions**

3.1    A legal opinion of Watson Farley & Williams, legal advisers to the Owners on such matters on the laws of England in relation to the Leasing Documents in the form and substance acceptable to the Owners.

3.2    Favourable legal opinions by lawyers appointed by the Owners on such matters relating to a Pertinent Document or a Relevant Person (to the extent not already provided in the MOA), concerning the laws of England, Greece, Liberia and such other relevant jurisdictions as the Owners may require, in the form and substance acceptable to the Owners.

**4    Miscellaneous**

4.1    Such other documents as the Owners may reasonably require.

**PART B**

The following are the documents referred to in Clause 34.1(b)(v)(B):

**1      Vessel and other security**

1.1     Documentary evidence that the Earnings Account has been opened.

1.2     Documentary evidence that the Deposit has been remitted into the account designated and held by the Owners.

1.3     Documentary evidence that the fee payable under Clause 41.1 have been or, as the case may be, will be simultaneously with delivery of the Vessel under this Charter, paid.

1.4     Documentary evidence that all the conditions precedent under the MOA have been satisfied and fulfilled.

1.5     A duly executed original of the General Assignment (and of each document to be delivered under it).

1.6     Documentary evidence that the Security Interests intended to be created by each of the Security Documents have been duly perfected under applicable law.

1.7     Documents establishing that the Vessel will, as from the Commencement Date, be managed commercially and managed technically by the Approved Manager on terms acceptable to the Owners, together with:

(a)     a Manager's Undertaking for each Approved Manager (and of each document to be delivered under such Manager's Undertaking); and

(b)     copies of the Document of Compliance of the relevant Approved Manager acting as technical manager of the Vessel.

1.8     Documentary evidence that the Vessel:

(a)     is definitively and permanently registered in the name of the Owners under Greek flag;

(b)     is in the absolute and unencumbered ownership of the Owners; and

(c)     has been unconditionally delivered by the Builder to the Charterers and from the Charterers to the Owners pursuant to the terms of the Shipbuilding Contract and the MOA, respectively, where such documents shall include without limitation:

        (i)     copies of the notarised and legalised copies of the bill of sale and the builder's certificate duly executed by the Builder (and where executed by an attorney of the Builder, together with such original notarised Builder's power of attorney);

        (ii)    the original notarized and legalised copies of the bill of sale duly executed by the Charterers (and where executed by an attorney of the Charterers, together with such original notarized Charterers' power of attorney);

        (iii)   copy of the original protocol of delivery and acceptance duly executed by the Builder and the Charterers under the Shipbuilding Contract; and

89119645v1
Folegandros - BBC

(ii) the original protocol of delivery and acceptance duly executed by the Charterers and the Owners under the MOA.

1.9 An insurance report by an insurance advisor appointed by the Owners (but at the cost of the Charterers) in form and substance acceptable to the Owners.

1.10 A copy of the Vessel's class certificate evidencing that the Vessel maintains its classification of Lloyds Register with the Classification Society free of all recommendations and conditions.

1.11 The Charterers should ensure that, a valuation of the Vessel, addressed to the Owners and dated not earlier than fifteen (15) days before the Commencement Date indicating the Initial Market Value.

1.12 Copies of the Vessel's Safety Management Certificate (together with any other details of the applicable Safety Management System which the Owners require) and of any other documents required under the ISM Code and the ISPS Code (including without limitation an ISSC and IAPPC).

1.13 Such other documents as the Owners may reasonably require.

**SCHEDULE III**

**Fixed Charterhire Payment Schedule**

| Term | Payment Date | Fixed Charterhire | Charterhire Principal Balance |
|------|-------------|-------------------|-------------------------------|
| 1 | Upon Delivery | | |
| 2 | 1 Month from Delivery | | |
| 3 | 2 Months from Delivery | | |
| 4 | 3 Months from Delivery | | |
| 5 | 4 Months from Delivery | | |
| 6 | 5 Months from Delivery | | |
| 7 | 6 Months from Delivery | | |
| 8 | 7 Months from Delivery | | |
| 9 | 8 Months from Delivery | | |
| 10 | 9 Months from Delivery | | |
| 11 | 10 Months from Delivery | | |
| 12 | 11 Months from Delivery | | |
| 13 | 12 Months from Delivery | | |
| 14 | 13 Months from Delivery | | |
| 15 | 14 Months from Delivery | | |
| 16 | 15 Months from Delivery | | |
| 17 | 16 Months from Delivery | | |
| 18 | 17 Months from Delivery | | |
| 19 | 18 Months from Delivery | | |
| 20 | 19 Months from Delivery | | |
| 21 | 20 Months from Delivery | | |
| 22 | 21 Months from Delivery | | |
| 23 | 22 Months from Delivery | | |
| 24 | 23 Months from Delivery | | |

89119645v1
Folegandros - BBC

| 25 | 24 Months from Delivery | | |
|----|--------------------------|---|---|
| 26 | 25 Months from Delivery | | |
| 27 | 26 Months from Delivery | | |
| 28 | 27 Months from Delivery | | |
| 29 | 28 Months from Delivery | | |
| 30 | 29 Months from Delivery | | |
| 31 | 30 Months from Delivery | | |
| 32 | 31 Months from Delivery | | |
| 33 | 32 Months from Delivery | | |
| 34 | 33 Months from Delivery | | |
| 35 | 34 Months from Delivery | | |
| 36 | 35 Months from Delivery | | |
| 37 | 36 Months from Delivery | | |
| 38 | 37 Months from Delivery | | |
| 39 | 38 Months from Delivery | | |
| 40 | 39 Months from Delivery | | |
| 41 | 40 Months from Delivery | | |
| 42 | 41 Months from Delivery | | |
| 43 | 42 Months from Delivery | | |
| 44 | 43 Months from Delivery | | |
| 45 | 44 Months from Delivery | | |
| 46 | 45 Months from Delivery | | |
| 47 | 46 Months from Delivery | | |
| 48 | 47 Months from Delivery | | |
| 49 | 48 Months from Delivery | | |
| 50 | 49 Months from Delivery | | |
| 51 | 50 Months from Delivery | | |
| 52 | 51 Months from Delivery | | |

| 53 | 52 Months from Delivery | | |
|----|-------------------------|---|---|
| 54 | 53 Months from Delivery | | |
| 55 | 54 Months from Delivery | | |
| 56 | 55 Months from Delivery | | |
| 57 | 56 Months from Delivery | | |
| 58 | 57 Months from Delivery | | |
| 59 | 58 Months from Delivery | | |
| 60 | 59 Months from Delivery | | |
| 61 | 60 Months from Delivery | | |
| 62 | 61 Months from Delivery | | |
| 63 | 62 Months from Delivery | | |
| 64 | 63 Months from Delivery | | |
| 65 | 64 Months from Delivery | | |
| 66 | 65 Months from Delivery | | |
| 67 | 66 Months from Delivery | | |
| 68 | 67 Months from Delivery | | |
| 69 | 68 Months from Delivery | | |
| 70 | 69 Months from Delivery | | |
| 71 | 70 Months from Delivery | | |
| 72 | 71 Months from Delivery | | |
| 73 | 72 Months from Delivery | | |
| 74 | 73 Months from Delivery | | |
| 75 | 74 Months from Delivery | | |
| 76 | 75 Months from Delivery | | |
| 77 | 76 Months from Delivery | | |
| 78 | 77 Months from Delivery | | |
| 79 | 78 Months from Delivery | | |
| 80 | 79 Months from Delivery | | |

89119645v1
Folegandros - BBC

| | | | |
|---|---|---|---|
| 81 | 80 Months from Delivery | | |
| 82 | 81 Months from Delivery | | |
| 83 | 82 Months from Delivery | | |
| 84 | 83 Months from Delivery | | |
| 85 | 84 Months from Delivery | | |
| 86 | 85 Months from Delivery | | |
| 87 | 86 Months from Delivery | | |
| 88 | 87 Months from Delivery | | |
| 89 | 88 Months from Delivery | | |
| 90 | 89 Months from Delivery | | |
| 91 | 90 Months from Delivery | | |
| 92 | 91 Months from Delivery | | |
| 93 | 92 Months from Delivery | | |
| 94 | 93 Months from Delivery | | |
| 95 | 94 Months from Delivery | | |
| 96 | 95 Months from Delivery | | |
| 97 | 96 Months from Delivery | | |
| 98 | 97 Months from Delivery | | |
| 99 | 98 Months from Delivery | | |
| 100 | 99 Months from Delivery | | |
| 101 | 100 Months from Delivery | | |
| 102 | 101 Months from Delivery | | |
| 103 | 102 Months from Delivery | | |
| 104 | 103 Months from Delivery | | |
| 105 | 104 Months from Delivery | | |
| 106 | 105 Months from Delivery | | |
| 107 | 106 Months from Delivery | | |
| 108 | 107 Months from Delivery | | |

| | | | |
|---|---|---|---|
| 109 | 108 Months from Delivery | | |
| 110 | 109 Months from Delivery | | |
| 111 | 110 Months from Delivery | | |
| 112 | 111 Months from Delivery | | |
| 113 | 112 Months from Delivery | | |
| 114 | 113 Months from Delivery | | |
| 115 | 114 Months from Delivery | | |
| 116 | 115 Months from Delivery | | |
| 117 | 116 Months from Delivery | | |
| 118 | 117 Months from Delivery | | |
| 119 | 118 Months from Delivery | | |
| 120 | 119 Months from Delivery | | |

(Owners and Charterers hereby agree that the Fixed Charterhire Payment Schedule is subject to change near the time of Delivery.)

89119645v1
Folegandros - BBC

**SCHEDULE IV**

**INTEREST RATE**

1.  Subject to the provisions of this Schedule IV, the rate of interest during the Charter Period, on the Post-delivery Outstanding Principal Balance in respect of each Term relating thereto, shall be the aggregate of the Margin and LIBOR for a three (3) month period beginning on the first day of that Term.

2.  The Owners shall notify the Charterers of the rate of interest in respect of a Term as soon as reasonably practicable after such rate of interest is determined by the Owners on the date falling fifteen (15) days prior to the relevant Payment Date.

3.  If, in relation to any Term:

(a)  the Owners determine (which determination shall be conclusive and binding) that by reason of circumstances affecting the London interbank market generally, adequate and fair means do not or will not exist for ascertaining LIBOR at the beginning of that Term or the same does not reflect the cost of funding of the Owners; or

(b)  the Owners determine (which determination shall be conclusive and binding) that by reason of circumstances affecting the London interbank market generally, deposits in Dollars in the required amount for the three-month period commencing on the first day of that Term are not available to it in the London interbank market or from whatever sources it may select to obtain funds for that Term,

the Owners shall promptly notify the Charterers accordingly.

4.  Immediately following the notification referred to in paragraph 3 above, the Owners and the Charterers, shall negotiate in good faith with a view to agreeing upon a substitute basis for funding the Post-delivery Outstanding Principal Balance and determining the applicable interest rate for that Term.

5.  If a substitute basis is not so agreed pursuant to paragraph 4 above, the Charterers shall pay the Owners an amount equal to the interest on the Post-delivery Outstanding Principal Balance for the relevant Term at the rate per annum equal to the cost certified to the Owners (expressed as an annual rate of interest) of funding an amount equal the Post-delivery Outstanding Principal Balance during the relevant Term (as conclusively determined by the Owners and which shall be binding on the Charterers).

6.  If a substitute basis is not so agreed pursuant to paragraph 4 above the Charterers may prepay in full the Post-delivery Outstanding Principal Balance, by giving written notice to the Owners specifying a prepayment date which is not less than ten (10) days after such notice is given. On the date specified in the notice the Charterers shall prepay the Post-delivery Outstanding Principal Balance in full together with interest thereon to the date of prepayment and all other sums payable under this Charter. For this purpose, the interest rate from time to time applicable to the Post-delivery Outstanding Principal Balance shall be the rate as ascertained in accordance with paragraph 5 above in relation to the relevant period.

89119645v1
Folegandros - BBC

7.  Interest shall accrue from day to day, shall be calculated on the basis of the actual number of days elapsed and a 360 day year, including the first day of the period during which it accrues but excluding the last day.

89119645v1
Folegandros - BBC