# EXHIBIT E

**EXECUTION VERSION**

Date _____12 March_____ 2019

**ELETSON HOLDINGS INC.**
as Guarantor

– and –

**ORIENTAL FLEET TANKER 02 LIMITED**
**东方富利 TANKER02 有限公司**
as Owner

**GUARANTEE**

relating to a Bareboat Charter of m.v. "FOLEGANDROS"

WATSON FARLEY & WILLIAMS

**INDEX**

| Clause | | Page |
|---|---|---|
| 1 | INTERPRETATION | 1 |
| 2 | GUARANTEE | 2 |
| 3 | LIABILITY AS PRINCIPAL AND INDEPENDENT DEBTOR | 3 |
| 4 | EXPENSES | 4 |
| 5 | ADJUSTMENT OF TRANSACTIONS | 4 |
| 6 | PAYMENTS | 4 |
| 7 | INTEREST | 4 |
| 8 | SUBORDINATION | 4 |
| 9 | ENFORCEMENT | 5 |
| 10 | REPRESENTATIONS AND WARRANTIES | 5 |
| 11 | UNDERTAKINGS | 7 |
| 12 | JUDGMENTS AND CURRENCY INDEMNITY | 10 |
| 13 | SET-OFF | 11 |
| 14 | SUPPLEMENTAL | 11 |
| 15 | ASSIGNMENT | 13 |
| 16 | NOTICES | 13 |
| 17 | INVALIDITY OF BAREBOAT CHARTER | 13 |
| 18 | GOVERNING LAW AND JURISDICTION | 14 |
| SCHEDULE 1 | | 15 |
| FORM OF COMPLIANCE CERTIFICATE | | 15 |
| EXECUTION PAGE | | 16 |

**THIS GUARANTEE** is made on _____12 March_____ 2019

**BETWEEN**

(1)     **ELETSON HOLDINGS INC.**, a corporation incorporated under the laws of the Republic of Liberia with registration number C-40191 and whose registered office is at 80 Broad Street, Monrovia, Liberia (the "**Guarantor**"); and

(2)     **ORIENTAL FLEET TANKER 02 LIMITED** 东方富利 TANKER02 有限公司, a company incorporated under the laws of the British Virgin Islands whose registered office is at Ritter House, Wickhams Cay II, Road Town, Tortola VG 1110, British Virgin Islands (the "**Owner**", which expression includes its successors and assigns).

**BACKGROUND**

(A)     Pursuant to a memorandum of agreement dated 1 November 2017 (the "**Original MOA**") and made between Folegandros Shipping Corporation as sellers (the "**Bareboat Charterer**") and Oriental Fleet International Company Limited as buyers (the "**Original Owner**"), the Bareboat Charterer agreed to sell and deliver and the Original Owner agreed to purchase and accept the legal and beneficial title to one (1) 109,900 DWT crude oil tanker m.v. "FOLEGANDROS" (the "**Vessel**").

(B)     Pursuant to a memorandum of agreement dated _____12 March_____ 2019 (the "**New MOA**") and made between the Original Owner as sellers and the Owner as buyers, the Original Owner agreed to sell and deliver and the Owner agreed to purchase and accept the legal and beneficial title to the Vessel.

(C)     Simultaneously with the entry into the Original MOA, the Original Owner as owners and the Bareboat Charterer as charterers entered into a bareboat charter dated 1 November 2017 (the "**Original Bareboat Charter**"), pursuant to which the Original Owner agreed to bareboat charter the Vessel to the Bareboat Charterer according to the terms and conditions contained therein.

(D)     Simultaneously with the entry into the New MOA, the Original Owner as original owner, the Owner as replacement owner and the Bareboat Charterer as bareboat charterer entered into a novation agreement dated _____12 March_____ 2019 (the "**Novation Agreement**"), pursuant to which the rights and obligations of the Original Owner under the Original Bareboat Charter were novated in favour of the Owner according to the terms and conditions contained therein. The Original Bareboat Charter, as novated, amended and/or supplemented by the Novation Agreement, is referred to as the "**Bareboat Charter**".

(E)     The execution and delivery to the Owner of this Guarantee is one of the conditions to the purchase of the Vessel by the Owner in accordance with the New MOA and the chartering of the Vessel by the Owner to the Bareboat Charterer under the Bareboat Charter.

**IT IS AGREED** as follows:

**1       INTERPRETATION**

**1.1    Defined expressions.**     Words and expressions defined in the Bareboat Charter shall have the same meanings when used in this Guarantee unless the context otherwise requires.

**1.2    Construction of certain terms.**     In this Guarantee:

"**bankruptcy**" includes a liquidation, receivership or administration and any form of suspension of payments, arrangement with creditors or reorganisation under any corporate or insolvency law of any country.

"**Code**" means the US Internal Revenue Code of 1986, as amended.

"**Compliance Certificate**" means a certificate in the form set out in Schedule 1 (*Form of Compliance Certificate*) or in any other form agreed between the Guarantor and the Owner.

"**Eletson Group**" means the Guarantor and each of the Guarantor's subsidiaries form time to time.

"**FATCA**" means:

(a)     sections 1471 to 1474 of the Code or any associated regulations or other official guidance;

(b)     any treaty, law, regulation or other official guidance enacted in any other jurisdiction, or relating to an intergovernmental agreement between the US and any other jurisdiction, which (in either case) facilitates the implementation of paragraph (a) above; or

(c)     any agreement pursuant to the implementation of paragraphs (a) or (b) above with the US Internal Revenue Service, the US government or any governmental or taxation authority in any other jurisdiction.

"**FATCA Deduction**" means a deduction or withholding from a payment under the Bareboat Charter required by FATCA.

"**FATCA Exempt Party**" means a Party that is entitled to receive payments free from any FATCA Deduction.

"**FATCA FFI**" means a foreign financial institution as defined in section 1471(d)(4) of the Code which, if the Owner is not a FATCA Exempt Party, could be required to make a FATCA Deduction.

"**Party**" means a party to this Guarantee.

"**Secured Liabilities**" means all liabilities which the Bareboat Charterer has, at the date of this Guarantee or at any later time or times, to the Owner under or in connection with the Bareboat Charter or any other Leasing Document or any judgment relating to the Bareboat Charter or the Leasing Documents, and for this purpose, there shall be disregarded any total or partial discharge of these liabilities, or variation of their terms, which is effected by, or in connection with, any bankruptcy, liquidation, arrangement or other procedure under the insolvency laws of any country.

"**US Tax Obligor**" means:

(a)     a Party which is resident for tax purposes in the United States of America; or

(b)     a Party some or all of whose payments under this Guarantee, the Bareboat Charter are from sources within the United States for US federal income tax purposes.

**2      GUARANTEE**

**2.1    Guarantee and indemnity.** The Guarantor unconditionally and irrevocably:

(a) guarantees the due payment of all amounts payable by the Bareboat Charterer under or in connection with the Bareboat Charter and the Leasing Documents to which it is a party;

(b) guarantees the punctual performance by the Bareboat Charterer of all the Bareboat Charterer's obligations under or in connection with the Bareboat Charter and/or the other Leasing Documents;

(c) undertakes to pay to the Owner, immediately on the Owner's demand as if it was the principal obligor, any such amount which is not paid by the Bareboat Charterer when due and payable under or in connection with the Bareboat Charter and/or the other Leasing Documents to which it is a party; and

(d) undertakes to fully indemnify, as an independent and primary obligation, the Owner immediately on its demand in respect of all claims, expenses, liabilities, costs and losses which are made or brought against or incurred by the Owner as a result of or in connection with any obligation or liability of the Bareboat Charterer under the Bareboat Charter or any other Leasing Documents to which the Bareboat Charterer is a party and/or any obligation or liability guaranteed by the Guarantor being or becoming unenforceable, invalid, void or illegal; and the amount recoverable under this indemnity shall be equal to the amount which the Owner would otherwise have been entitled to recover under the Bareboat Charter or any other Leasing Documents to which the Bareboat Charterer is a party.

**2.2** **No limit on number of demands.** The Owner may serve more than one demand under Clause 2.1.

**2.3** **Guarantee of whole amount.**

This Guarantee shall be construed and take effect as a guarantee of all amounts due to the Owner under the Bareboat Charter and any of the other Leasing Documents to which the Bareboat Charterer is a party.

**3** **LIABILITY AS PRINCIPAL AND INDEPENDENT DEBTOR**

**3.1** **Principal and independent debtor.** The Guarantor shall be liable under this Guarantee as a principal and independent debtor and accordingly it shall not have, as regards this Guarantee, any of the rights or defences of a surety.

**3.2** **Waiver of rights and defences.** Without limiting the generality of Clause 3.1, the Guarantor shall neither be discharged by, nor have any claim against the Owner in respect of:

(a) any amendment or supplement being made to the Bareboat Charter or any other Leasing Document;

(b) any arrangement or concession (including a rescheduling or acceptance of partial payments) relating to, or affecting, the Bareboat Charter or any other Leasing Document;

(c) any release or loss (even though negligent) of any right or Security Interest created by the Bareboat Charter or any other Leasing Document;

(d) any failure (even though negligent) promptly or properly to exercise or enforce any such right or Security Interest, including a failure to realise for its full market value an asset covered by such a Security Interest; or

(e) the Bareboat Charter or any other Leasing Document being or later becoming void, unenforceable, illegal or invalid or otherwise defective for any reason, including a neglect to register it.

**4 EXPENSES**

**4.1 Costs of preservation of rights, enforcement etc.** The Guarantor shall pay to the Owner on its demand the amount of all expenses (including, without limitation, out of pocket expenses and legal fees) incurred by the Owner in connection with the enforcement of, or the preservation of any rights under this Guarantee or any other Leasing Document, including any advice, claim or proceedings relating to this Guarantee or any Leasing Document.

**4.2 Fees and expenses payable under Bareboat Charter.** Clause 4.1 is without prejudice to the Guarantor's liabilities in respect of the Bareboat Charterer's obligations under clause 41 of the Bareboat Charter.

**5 ADJUSTMENT OF TRANSACTIONS**

**5.1 Reinstatement of obligation to pay.** The Guarantor shall pay to the Owner on its demand any amount which the Owner is required, or agrees, to pay pursuant to any claim by, or settlement with, a trustee in bankruptcy of the Bareboat Charterer on the ground that the Bareboat Charter (as the case may be), or a payment by the Bareboat Charterer or a Relevant Person, was invalid or on any similar ground.

**6 PAYMENTS**

**6.1 Method of payments.** Any amount due under this Guarantee shall be paid:

(a) in immediately available funds;

(b) to such account as the Owner may from time to time notify to the Guarantor;

(c) without any form of set-off, cross-claim or condition; and

(d) free and clear of any tax deduction or withholding for or on account of any tax payable except a tax deduction or withholding which the Guarantor is required by law to make.

**6.2 Grossing-up for taxes.** If the Guarantor is required by law to make a tax deduction, the amount due to the Owner shall be increased by the amount necessary to ensure that the Owner receives and retains a net amount which, after the tax deduction, is equal to the full amount that it would otherwise have received.

**7 INTEREST**

**7.1 Accrual of interest.** Any amount due under this Guarantee shall carry interest after the second Business Day following the date on which the Owner demands payment of it until it is actually paid, unless interest on that same amount also accrues under the Bareboat Charter.

**7.2 Calculation of interest.** Interest under this Guarantee shall be calculated and accrue in the same way as interest under clause 36.9 of the Bareboat Charter, as applicable.

**7.3 Guarantee extends to interest payable under Bareboat Charter**. For the avoidance of doubt, it is confirmed that this Guarantee covers all interest payable under the Bareboat Charter.

**8 SUBORDINATION**

**8.1 Subordination of rights of Guarantor.** All rights which the Guarantor at any time has (whether in respect of this Guarantee or any other transaction) against the Bareboat Charterer or any other Relevant Person or its assets shall be fully subordinated to the rights of the Owner under the Bareboat Charter and any other Leasing Document and, in particular, the Guarantor shall not:

(a) claim, or in a bankruptcy of the Bareboat Charterer or any Relevant Person prove for, any amount payable to the Guarantor by the Bareboat Charterer or any Relevant Person, whether in respect of this Guarantee or any other transaction;

(b) take or enforce any Security Interest for any such amount;

(c) claim to set-off any such amount against any amount payable by the Guarantor to the Bareboat Charterer or any Relevant Person; or

(d) claim any subrogation or other right in respect of the Bareboat Charter or any sum received or recovered by the Owner under the Bareboat Charter or any other Leasing Document.

## 9 ENFORCEMENT

**9.1 No requirement to commence proceedings against Bareboat Charterer.** The Owner will not need to commence any proceedings under, or enforce any Security Interest created by the Bareboat Charter or any other Leasing Document before claiming or commencing proceedings under this Guarantee.

**9.2 Conclusive evidence of certain matters.** However, as against the Guarantor:

(a) any judgment or order of a court in any Relevant Jurisdiction in connection with the Bareboat Charter or any other Pertinent Document; and

(b) any statement or admission of the Bareboat Charterer in connection with the Bareboat Charter or any other Pertinent Document,

shall be binding and conclusive as to all matters of fact and law to which it relates.

## 10 REPRESENTATIONS AND WARRANTIES

**10.1 General.** The Guarantor represents and warrants to the Owner, as at the date of this Guarantee and throughout the Charter Period, as follows.

**10.2 Status.**

(a) The Guarantor is duly incorporated and validly existing and in good standing under the laws of the Republic of Liberia.

(b) The Guarantor is not a FATCA FFI or a US Tax Obligor.

**10.3 Corporate power.** The Guarantor has the corporate capacity, and has taken all corporate action and obtained all consents necessary for it:

(a) to execute this Guarantee or any other Leasing Document to which it is a party; and

(b) to make all the payments contemplated by, and to comply with, this Guarantee or any other Leasing Document to which it is a party.

**10.4 Consents in force.** All the consents referred to in Clause 10.3 remain in force and nothing has occurred which makes any of them liable to revocation.

**10.5 Legal validity.** This Guarantee and any of the other Leasing Documents to which it is a party constitute the Guarantor's legal, valid and binding obligations enforceable against the Guarantor in accordance with their terms subject to any relevant insolvency laws affecting creditors' rights generally.

**10.6** **No third party Security Interests.** Without limiting the generality of Clause 10.5, at the time of the execution and delivery of this Guarantee and any other Leasing Document to which the Guarantor is a party:

(a) the Guarantor will have the right to create all the Security Interests which that Leasing Document purports to create; and

(b) no third party will have any Security Interest (except for Permitted Security Interests) or any other interest, right or claim over, in or in relation to any asset to which any such Security Interest, by its terms, relates.

**10.7** **No conflicts.** The execution by the Guarantor of this Guarantee and any other Leasing Document to which it is a party and its compliance with this Guarantee and such Leasing Documents will not involve or lead to a contravention of:

(a) any law or regulation; or

(b) the constitutional documents of the Guarantor; or

(c) any contractual or other obligation or restriction which is binding on the Guarantor or any of its assets.

**10.8** **No withholding taxes.** All payments which the Guarantor is liable to make under this Guarantee and the other Leasing Documents to which it is a party may be made without deduction or withholding for or on account of any tax payable under any law of any Relevant Jurisdiction.

**10.9** **No default.** No Termination Event or Potential Termination Event has occurred.

**10.10** **Information.** All information which has been provided in writing by or on behalf of the Guarantor to the Owner in connection with any other Leasing Document satisfied the requirements of Clause 11.2; all audited and unaudited accounts which have been so provided satisfied the requirements of Clause 11.4; and there has been no Material Adverse Effect in the financial position or state of affairs of the Guarantor from that disclosed in the latest of those accounts.

**10.11** **No litigation.** No legal or administrative action involving the Guarantor has been commenced or taken which, in either case, would be likely to have a material adverse effect on the Guarantor's financial position or profitability.

**10.12** **Sanctions.** Neither the Guarantor, nor any of its directors, officers or employees or any person acting on its behalf:

(a) is a Restricted Person; or

(b) has received notice of or is aware of any claim, action, suit, proceeding or investigation against it with respect of Sanctions and it has not taken any action to evade the application of Sanctions.

**10.13** **Taxes paid.** The Guarantor has paid all taxes applicable to, or imposed on or in relation to the Guarantor or its business.

**10.14** **Provisions of Bareboat Charter.** The Guarantor is fully familiar with and agrees with all provisions of the Bareboat Charter and the other Leasing Documents to which the Bareboat Charterer is a party.

**10.15** **No waiver.** No oral or written statement has been made to the Guarantor by or on behalf of the Owner or any other person which could be construed as a waiver of any provisions of this

Guarantee or a statement of intention not to enforce this Guarantee in accordance with its terms.

**11  UNDERTAKINGS**

**11.1  General.**   The Guarantor undertakes with the Owner to comply with the following provisions of this Clause 11 at all times during the Charter Period, except as the Owner may otherwise permit.

**11.2  Information provided to be accurate.**   All financial and other information which is provided in writing by or on behalf of the Guarantor under or in connection with this Guarantee will be true and not misleading and will not omit any material fact or consideration.

**11.3  Provision of financial statements.**   The Guarantor will send to the Owner:

(a)  as soon as possible, but in no event later than 120 days after the end of each financial year of the Guarantor, the audited consolidated annual financial reports of the Guarantor;

(b)  as soon as possible, but in no event later than 60 days after the end of each financial quarter of the Guarantor, the unaudited consolidated quarterly statements of the Guarantor certified as to their correctness by the chief financial officer of the Guarantor.

**11.4  Form of financial statements.**   All accounts (audited and unaudited) delivered under Clause 11.3 will:

(a)  be prepared in accordance with all applicable laws and generally accepted accounting principles consistently applied;

(b)  give a true and fair view of the state of affairs of the Guarantor and the Eletson Group at the date of those accounts and of their profit for the period to which those accounts relate; and

(c)  fully disclose or provide for all significant liabilities of the Guarantor and the Eletson Group.

**11.5  Shareholder and creditor notices.**   The Guarantor will send the Owner, at the same time as they are despatched, copies of all material communications which are material in relation to the Bareboat Charter and the Pertinent Documents.

**11.6  Consents.**   The Guarantor will maintain in force and promptly obtain or renew, and will, upon the request of the Owner, promptly send certified copies to the Owner of, all consents required:

(a)  for the Guarantor to perform its obligations under this Guarantee and any other Leasing Document to which it is a party; and

(b)  for the validity or enforceability of this Guarantee and any other Leasing Document to which it is a party,

and the Guarantor will comply with the terms of all such consents.

**11.7  Maintenance of Security Interests.**   The Guarantor will:

(a)  at its own cost, do all that it reasonably can to ensure that any Leasing Document to which it is a party validly creates the obligations and the Security Interests which it purports to create; and

(b)  without limiting the generality of paragraph (a) above, at its own cost, promptly register, file, record or enrol any Leasing Document to which it is a party with any court or authority in all Relevant Jurisdictions, pay any stamp, registration or similar tax in all Relevant    Jurisdictions

in respect of any Leasing Document to which it is a party, give any notice or take any other step which may be or become necessary or desirable for any Leasing Document to which it is a party to be valid, enforceable or admissible in evidence or to ensure or protect the priority of any Security Interest which it creates.

**11.8** **Notification of litigation.** The Guarantor will provide the Owner with details of any legal, arbitral or administrative action involving the Guarantor as soon as such action is instituted. For the purposes of this Clause 11.8, any such legal, arbitral or administrative action involving the Guarantor and whose subject matter is less than $1,500,000 (or its equivalent in any other currency) shall not be considered to be material in the context of this Guarantee and, for the avoidance of any doubt, the Owner shall, at its sole discretion (acting reasonably) in all other circumstances, consider whether any legal, arbitral or administrative action involving the Guarantor is material in the context of this Guarantee.

**11.9** **Notification of default.** The Guarantor will notify the Owner as soon as the Guarantor becomes aware of:

(a) the occurrence of a Termination Event or a Potential Termination Event; or

(b) any matter which indicates that a Termination Event or a Potential Termination Event may have occurred,

and will thereafter keep the Owner fully up-to-date with all developments.

**11.10** **Maintenance of status.** The Guarantor will maintain its separate corporate existence as a corporation and remain in good standing under the laws of the Republic of Liberia.

**11.11** **Negative Pledge.** The Guarantor shall procure that the Bareboat Charterer will not create or permit to arise any Security Interest over any asset present or future except for the Permitted Security Interests.

**11.12** **No disposal of assets, change of business.** The Guarantor will not, and shall procure that the Bareboat Charterer will not:

(a) transfer, lease or otherwise dispose of all or a substantial part of its assets, whether by one transaction or a number of transactions, whether related or not except in the usual course of its trading operations; or

(b) make any substantial change to the nature of its business or its corporate structure from that existing at the date of this Guarantee.

**11.13** **No merger etc.** The Guarantor shall not, and shall procure that the Bareboat Charterer will not, enter into any form of merger, sub-division, amalgamation, demerger, solvent reorganisation, corporate reconstruction or other reorganisation, except with the prior written consent of the Owner unless, in the case of the Guarantor only, the surviving entity following such merger, sub-division, amalgamation, demerger, solvent reorganisation, corporate reconstruction or other reorganisation is the Guarantor and such merger, sub-division, amalgamation, demerger, solvent reorganisation, corporate reconstruction or other reorganisation does not result in a Material Adverse Effect.

**11.14** **Maintenance of ownership of Bareboat Charterer.** The Guarantor shall remain the ultimate beneficial owner of all the issued and allotted share capital of the Bareboat Charterer.

**11.15** **Sanctions.** The Guarantor shall procure that the Bareboat Charterer will not, and will not permit or authorise any other person to, directly or indirectly, utilise the Vessel or to use, lend, make payments of, contribute or otherwise make available, all or any part of the proceeds of any transaction(s) contemplated by the transaction to fund any trade, business or other activities:

(i) involving or for the benefit of any Restricted Party, or

(ii) any other manner that would reasonably be expected to result in the Bareboat Charterer, the Approved Manager, any sub-lessee or the Owner or any of the Owner's financiers being in breach of any Sanctions or becoming a Restricted Party.

**11.16 FATCA.** The Guarantor shall not, and shall procure that the Bareboat Charterer will not become a FATCA FFI or US Tax Obligor.

**11.17 Financial covenants**. The Guarantor shall ensure that:

(a) at all times, the EBITDA and Working Capital of the Eletson Group will be positive on a consolidated basis; and

(b) the Minimum Interest Coverage Ratio shall be:

(i) for the period commencing on 1 January 2018 and ending on the Commencement Date, no less than 1.5:1; and

(ii) at all times thereafter during the Charter Period, no less than 2.0:1.

For the purposes of this Clause 11.17:

"**Accounting Information**" means the annual audited consolidated financial reports or, as the case may be, the quarterly unaudited consolidated accounts, each in respect of the Guarantor, to be provided by the Guarantor;

"**Current Assets**" means, as at the date of calculation or, as the case may be, for any Relevant Period, all of the short-term assets of the Eletson Group determined in accordance with GAAP on a consolidated basis as shown in the most recent Accounting Information and calculated on the same basis as was applied in the Original Financial Statements but using the information current as at the relevant date of calculation or, as the case may be, that Relevant Period.

"**Current Liabilities**" means, as at the date of calculation or, as the case may be, for any Relevant Period, all of the short-term liabilities of the Eletson Group (less the current portion of long-term debt, the current portion of long-term capital lease obligations and mark to market swap valuations and excluding in all respect liabilities under the Bareboat Charter and the Other Charter) determined in accordance with GAAP on a consolidated basis as shown in the most recent Accounting Information and calculated on the same basis as was applied in the Original Financial Statements but using the information current as at the relevant date of calculation or, as the case may be, that Relevant Period and, for the avoidance of doubt, the current portion of long-term lease obligations in relation to the Bareboat Charter and the Other Charter will be included for the purposes of this definition.

"**EBITDA**" means, as at the date of calculation or, as the case may be, for any Relevant Period, the consolidated net income of the Eletson Group for that Relevant Period:

(a) plus, to the extent deducted in computing consolidated net income of the Eletson Group for that Relevant Period, the sum, without duplication, of:

(i) all federal, state, local and foreign taxes and tax distributions;

(ii) the Net Interest Expenses; and

(iii) depreciation, depletion, amortisation of intangibles and other non-cash charges or non-cash losses (including non-cash transaction expenses, the amortisation of debt discounts and non-cash loss on sale or cancellation of

(b) minus, to the extent added in computing consolidated net income of the Eletson Group for that Relevant Period, any non-cash income or non-cash gains (including any non-cash gain on sale or cancellation of vessels) and any extraordinary gains not incurred in the ordinary course of business,

all determined on a consolidated basis on a trailing 12-month basis in accordance with GAAP and as shown in the consolidated statements of income for the Guarantor and its subsidiaries in the applicable Accounting Information;

"**Fleet Vessel**" means any ship (including, but not limited to, the Vessel) from time to time wholly owned, leased under a capital lease or controlled by the Guarantor (directly or indirectly) excluding, for the avoidance of doubt, any newbuilding vessels not delivered to the Guarantor at the relevant time;

"**Minimum Interest Coverage Ratio**" means, as at the date of calculation or any Relevant Period, the ratio of (a) EBITDA for the most recent financial period of the Group ending on that date of calculation to (b) the Net Interest Expenses for that financial period (calculated on a trailing 12-months basis);

"**Net Interest Expenses**" means, as at the date of calculation or, as the case may be, for any Relevant Period, the aggregate of all consolidated interest, commitment and other fees, commissions, discounts and other costs, charges or expenses accruing due from a guarantee by the Guarantor during that Relevant Period less interest income received, determined on a trailing 12-month basis on a consolidated basis in accordance with GAAP and as shown in the consolidated statements of income of the Guarantor in the most recent Accounting Information;

"**Relevant Period**" means each period of twelve months ending on or about the last day of each calendar year and each period of three, six or nine (as the case may be) months ending on or about the last day of each financial quarter of the Guarantor (except the last financial quarter); and

"**Working Capital**" means, as at the date of calculation or, as the case may be, for any Relevant Period the Current Assets less Current Liabilities except any current liability related to balloon financial debt payment.

**11.18 Compliance Certificate.**

(a) The Guarantor shall supply to the Owner, a Compliance Certificate setting out (in reasonable detail) computations as to compliance with Clause 11.17 (*financial covenants*) together with:

(i) the annual consolidated financial reports of the Guarantor to be provided to the Owner in accordance with Clause 11.3(a); and

(ii) quarterly consolidated accounts of the Guarantor to be provided to the Owner in accordance with Clause 11.3(b); and

(b) Each Compliance Certificate shall be signed by the chief financial officer of the Guarantor as appropriate.

**12 JUDGMENTS AND CURRENCY INDEMNITY**

**12.1 Judgments relating to Bareboat Charter.** This Guarantee shall cover any amount payable by the Bareboat Charterer under or in connection with any judgment relating to the Bareboat Charter or any of the other Leasing Documents.

**12.2** **Currency indemnity.** If any sum due from the Guarantor to the Owner under this Guarantee or under any order or judgment relating to this Guarantee has to be converted from the currency in which this Guarantee provided for the sum to be paid (the "**Contractual Currency**") into another currency (the "**Payment Currency**") for the purpose of:

(a) making or lodging any claim or proof against the Guarantor, whether in its liquidation, any arrangement involving it or otherwise; or

(b) obtaining an order or judgment from any court or other tribunal; or

(c) enforcing any such order or judgment;

the Guarantor shall indemnify the Owner against the loss arising when the amount of the payment actually received by the Owner is converted at the available rate of exchange into the Contractual Currency.

In this Clause 12.2, the "**available rate of exchange**" means the rate at which the Owner is able, at the opening of business (Beijing time) on the Business Day after it receives the sum concerned, to purchase the Contractual Currency with the Payment Currency.

**13** **SET-OFF**

**13.1** **Application of credit balances.** The Owner may without prior notice:

(a) apply any balance (whether or not then due) which at any time stands to the credit of any account in the name of the Guarantor at any office in any country of the Owner in or towards satisfaction of any sum then due from the Guarantor to the Owner under this Guarantee and any other Leasing Document; and

(b) for that purpose:

   (i) break, or alter the maturity of, all or any part of a deposit of the Guarantor;

   (ii) convert or translate all or any part of a deposit or other credit balance into Dollars; and

   (iii) enter into any other transaction or make any entry with regard to the credit balance which the Owner considers appropriate.

**13.2** **Existing rights unaffected.** The Owner shall not be obliged to exercise any of its rights under Clause 13.1; and those rights shall be without prejudice and in addition to any right of set-off, combination of accounts, charge, lien or other right or remedy to which the Owner is entitled (whether under the general law or any document).

**14** **SUPPLEMENTAL**

**14.1** **Continuing guarantee.** This Guarantee shall remain in force as a continuing security at all times from the date of this Guarantee up to the last day of the Charter Period.

**14.2** **Rights cumulative, non-exclusive.** The Owner's rights under and in connection with this Guarantee are cumulative, may be exercised as often as appears expedient and shall not be taken to exclude or limit any right or remedy conferred by law.

**14.3** **No impairment of rights under Guarantee.** If the Owner omits to exercise, delays in exercising or invalidly exercises any of its rights under this Guarantee, that shall not impair that or any other right of the Owner under this Guarantee.

**14.4** **Severability of provisions.** If any provision of this Guarantee is or subsequently becomes void, illegal, unenforceable or otherwise invalid, that shall not affect the validity, legality or enforceability of its other provisions.

**14.5** **Guarantee not affected by other security.** This Guarantee shall not impair, nor be impaired by, any other guarantee, any Security Interest or any right of set-off or netting or to combine accounts which the Owner may now or later hold in connection with the Bareboat Charter or any other Pertinent Document.

**14.6** **Guarantor bound by Bareboat Charter.** The Guarantor agrees with the Owner to be bound by all provisions of the Bareboat Charter in the same way as if those provisions had been set out (with any necessary modifications) in this Guarantee.

**14.7** **Applicability of provisions of Guarantee to other Security Interests.** Any Security Interest which the Guarantor creates (whether at the time at which it signs this Guarantee or at any later time) to secure any liability under this Guarantee shall be a principal and independent security, and Clauses 3 and 17 shall, with any necessary modifications, apply to it, notwithstanding that the document creating the Security Interest neither describes it as a principal or independent security nor includes provisions similar to Clauses 3 and 17.

**14.8** **Applicability of provisions of Guarantee to other rights.** Clauses 3 and 17 shall also apply to any right of set-off or netting or to combine accounts which the Guarantor creates by an agreement entered into at the time of this Guarantee or at any later time (notwithstanding that the agreement does not include provisions similar to Clauses 3 and 17), being an agreement referring to this Guarantee.

**14.9** **Third party rights.** A person who is not a party to this Guarantee has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce or to enjoy the benefit of any term of this Guarantee.

**14.10** **Counterparts.** This Guarantee may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of this Guarantee.

**14.11** **FATCA Information.**

(a) Subject to paragraph (c) below, each Party shall, within ten Business Days of a reasonable request by the other Party:

   (i) confirm to the other Party whether it is:

      (A) a FATCA Exempt Party; or

      (B) not a FATCA Exempt Party; and

   (ii) supply to the other Party such forms, documentation and other information relating to its status under FATCA (including its applicable "passthru payment percentage" or other information required under the US Treasury Regulations or other official guidance including intergovernmental agreements) as the other Party reasonably requests for the purposes of the other Party's compliance with FATCA.

(b) If a Party confirms to the other Party pursuant to paragraph (a)(i) above that it is a FATCA Exempt Party and it subsequently becomes aware that it is not, or has ceased to be a FATCA Exempt Party, that Party shall notify the other Party reasonably promptly.

(c) Paragraph (a) above shall not oblige the Owner to do anything which would or might in its reasonable opinion constitute a breach of:

(i) any law or regulation;

(ii) any fiduciary duty; or

(iii) any duty of confidentiality.

(d) If a Party fails to confirm its status or to supply forms, documentation or other information requested in accordance with paragraph (a) above (including, for the avoidance of doubt, where paragraph (c) above applies), then:

(i) if that Party failed to confirm whether it is (and/or remains) a FATCA Exempt Party then such Party shall be treated for the purposes of this Guarantee and the Leasing Documents as if it is not a FATCA Exempt Party; and

(ii) if that Party failed to confirm its applicable "passthru payment percentage" then such Party shall be treated for the purposes of the Finance Documents (and payments made thereunder) as if its applicable "passthru payment percentage" is 100%,

until (in each case) such time as the Party in question provides the requested confirmation, forms, documentation or other information.

## 15 ASSIGNMENT

**15.1 Assignment by Owner.** The Owner may assign its rights under and in connection with this Guarantee to the same extent as it may assign its rights under the Bareboat Charter.

## 16 NOTICES

**16.1 Notices to Guarantor.** Any notice or demand to the Guarantor under or in connection with this Guarantee shall be given by letter or fax at:

**Eletson Holdings Inc.**
Attention: Mr. Vasilis Hadjieleftheriadis
Email: vasilis.hadjieleftheriadis@eletson.com
Tel: +30 210 4598237
Fax: +30 210 4282319
or to such other address which the Guarantor may notify to the Owner.

**16.2 Validity of demands.** A demand under this Guarantee shall be valid notwithstanding that it is served:

(a) on the date on which the amount to which it relates is payable by the Bareboat Charterer under the Bareboat Charter (as the case may be); and

(b) at the same time as the service of a notice under clause 44.2 of the Bareboat Charter;

and a demand under this Guarantee may refer to all amounts payable under or in connection with the Bareboat Charter without specifying a particular sum or aggregate sum.

**16.3 Notices to Owner.** Any notice to the Owner under or in connection with this Guarantee shall be sent to the same address and in the same manner as notices to the Owner under the Bareboat Charter.

## 17 INVALIDITY OF BAREBOAT CHARTER

**17.1 Invalidity of Bareboat Charter.** In the event of:

13

(a) the Bareboat Charter now being or later becoming, with immediate or retrospective effect, void, illegal, unenforceable or otherwise invalid for any other reason whatsoever, whether of a similar kind or not; or

(b) without limiting the scope of paragraph (a), a bankruptcy of the Bareboat Charterer, the introduction of any law or any other matter resulting in the Bareboat Charterer being discharged from liability under the Bareboat Charter, or the Bareboat Charter ceasing to operate (for example, by interest ceasing to accrue),

this Guarantee shall cover any amount which would have been or become payable under or in connection with the Bareboat Charter if the Bareboat Charter had been and remained entirely valid, legal and enforceable, or the Bareboat Charterer had not suffered bankruptcy, or any combination of such events or circumstances, as the case may be, and the Bareboat Charterer had remained fully liable under it for liabilities whether invalidly incurred or validly incurred but subsequently retrospectively invalidated; and references in this Guarantee to amounts payable by the Bareboat Charterer under or in connection with the Bareboat Charter shall include references to any amount which would have so been or become payable as aforesaid.

## 18 GOVERNING LAW AND JURISDICTION

**18.1** This Guarantee and any non-contractual obligations arising under or in connection with it shall be governed by and construed in accordance with English law.

**18.2** Any dispute, controversy, difference or claim arising out of or relating to this Guarantee, including the existence, validity, interpretation, performance, breach or termination thereof or any dispute regarding non-contractual obligations arising out of or relating to it shall be referred to and finally resolved by arbitration administered by the Hong Kong International Arbitration Centre ("**HKIAC**") under the HKIAC Administered Arbitration Rules in force when the Notice of Arbitration is submitted.

**18.3** The seat of arbitration shall be Hong Kong.

**18.4** The number of arbitrators shall be three. The arbitration proceedings shall be conducted in English.

**THIS GUARANTEE** has been executed and delivered as a deed on the date stated at the beginning of this Guarantee.

## SCHEDULE 1

## FORM OF COMPLIANCE CERTIFICATE

To:
**ORIENTAL FLEET TANKER 02 LIMITED 东方富利 TANKER02 有限公司**

From:
**Eletson Holdings Inc.**

Date: [●]

Dear Sirs

1. We refer to the Guarantee. This is a Compliance Certificate. Terms defined in the Guarantee have the same meaning when used in this Compliance Certificate unless given a difference meaning in this Compliance Certificate.

2. We confirm that in respect of the period ended on [31 March][30 June][30 September][31 December] 20[●]:

(a) the EBITDA of the Eletson Group is [●];

(b) the Working Capital of the Eletson Group is [●]; and

(c) the Minimum Interest Coverage Ratio is [●].

Signed: _____

Chief Financial Officer
of
**Eletson Holdings Inc.**

# EXECUTION PAGE

**GUARANTOR**

**EXECUTED AS A DEED**
by
for and on behalf of
**ELETSON HOLDINGS INC.**
as duly authorised signatory
in the presence of:

)
)
) Vasileios Chatzielefteriadis
)
)

_____
Witness' Name:

VALENTINI TOPOUZELI
ATTORNEY - AT - LAW
118, KOLOKOTRONI STREET
PIRAEUS - GREECE
TEL. 30210 4598321 - FAX: 30210 4590250


**OWNER**

**EXECUTED AS A DEED**
by **ORIENTAL FLEET TANKER 02 LIMITED**
东方富利 TANKER02 有限公司

acting by
in the presence of:

Witness' signature:
Witness' name:
Witness' address:

)
)
)
)
)
)
)
)
)

**GUARANTOR**

EXECUTED AS A DEED )
by )
for and on behalf of )
**ELETSON HOLDINGS INC.** )
as duly authorised signatory )
in the presence of: )

_____

Witness' Name:




**OWNER**

EXECUTED AS A DEED )
by **ORIENTAL FLEET TANKER 02 LIMITED** )
东方富利 TANKER02 有限公司 )
 )
acting by    **LI BING** )
in the presence of: )
 )
Witness' signature: )
Witness' name:  **CHEN YANGYANG** )
Witness' address: )
    50/F, COSCO Tower,
    183 Queen's Road Central,
    Hong Kong